WILLIAM W. OXLEY, SBN 136793
ZOE M. STEINBERG, SBN 324324
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:  310.820.8800
Facsimile:   310.820.8859
Emails:     *woxley@bakerlaw.com*
            *zsteinberg@bakerlaw.com*

SASHE D. DIMITROFF, TX BN 00783970
*Admitted Pro Hac Vice*
ALEXANDRA TRUJILLO, TX BN 24110452
*Admitted Pro Hac Vice*
**BAKER & HOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Telephone:  713.751.1600
Facsimile:   713.751.1717
Emails:     *sdimitroff@bakerlaw.com*
            *atrujillo@bakerlaw.com*

*Attorneys for Defendant*
PACIFIC COAST ENERGY COMPANY LP

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVERGREEN CAPITAL MANAGEMENT LLC, Individually and on Behalf of All Others Similarly Situated, | Case No.:  2:20-CV-07561-MWF-AGR |
| | [Hon. Michael W. Fitzgerald, Crtm. 5A] |
| Plaintiff, | **DECLARATION OF SASHE D. DIMITROFF IN SUPPORT OF DEFENDANT PACIFIC COAST ENERGY COMPANY LP'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT, OR ALTERNATIVELY, COMPEL ARBITRATION** |
| vs. | |
| THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. AS TRUSTEE FOR PACIFIC COAST OIL TRUST and PACIFIC COAST ENERGY COMPANY LP, | |
| Defendants. | [*Filed concurrently with Notice of Motion; Memorandum of Points & Authorities; [Proposed] Order; and Request for Judicial Notice*] |
| | Date:     September 28, 2020 |
| | Time:     10:00 a.m. |
| | Dept:     5A |
| | Action Filed:  July 8, 2020 |
| | Action Removed: August 20, 2020 |

1

## <u>DECLARATION OF SASHE D. DIMITROFF</u>

I, Sashe D. Dimitroff, declare as follows:

1.       I am a member of the State Bar of Texas, a Partner with the law firm of Baker & Hostetler LLP, and admitted *pro hac vice* to appear as lead counsel for Defendant Pacific Coast Energy Company, LP ("Defendant") in this case. I have personal knowledge of the facts stated herein and if called as a witness I could and would competently testify thereto.

2.       Pursuant to Local Rule 7-3, on August 20, 2020, I called both Mr. Laughlin and Mr. Jasnoch, counsel for Plaintiff Evergreen Capital Management LLC ("Plaintiff"), in an effort to meet and confer regarding Defendant's intent to move to dismiss, or in the alternative, compel arbitration of Plaintiff's claim. I did not reach either Mr. Laughlin or Mr. Jasnoch, but left a voicemail message for Mr. Jasnoch. I directed associate Zoe M. Steinberg, also counsel for Defendant, to follow up with a meet and confer email to Plaintiff's counsel, to which Plaintiff's counsel responded. After meeting and conferring, Plaintiff's counsel did not address any of Defendant's concerns, necessitating the filing of this Motion.

3.       Attached hereto as **<u>Exhibit 1</u>** is a true and correct copy of the Amended and Restated Trust Agreement of Pacific Coast Oil Trust Among Pacific Coast Energy Company, LP, and Wilmington Trust, National Association, and The Bank of New York Mellon Trust Company, N.A. (the "Trust Agreement").

4.       Attached hereto as **<u>Exhibit 2</u>** is a true and correct copy of the Conveyance of Net Profits Interests and Overriding Royalty Interests Agreement (the "Conveyance Agreement").

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Executed on August 27, 2020, in Houston, Texas.

SASHE D. DIMITROFF

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

3

# EXHIBIT 1

EX-3.1 3 d349196dex31.htm AMENDED AND RESTATED TRUST AGREEMENT OF PACIFIC COAST OIL TRUST

**Exhibit 3.1**

**AMENDED AND RESTATED**

**TRUST AGREEMENT**

**OF**

**PACIFIC COAST OIL TRUST**

**AMONG**

**PACIFIC COAST ENERGY COMPANY LP**

**and**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

**and**

**THE BANK OF NEW YORK
MELLON TRUST COMPANY, N.A.**

**Dated: As of May 8, 2012**

**TABLE OF CONTENTS**

Article I
Definitions

Article II
Name and Purpose of the Trust; Declaration of Trust

| | | |
|---|---|---|
| Section 2.01 | Name; Certificate of Trust | 6 |
| Section 2.02 | Purpose | 6 |
| Section 2.03 | Transfer of Trust Property to the Trust | 7 |
| Section 2.04 | Creation of the Trust | 8 |
| Section 2.05 | Principal Offices | 8 |

Article III
Administration of the Trust and Powers of the Trustee
and the Delaware Trustee

| | | |
|---|---|---|
| Section 3.01 | General Authority | 8 |
| Section 3.02 | Limited Power of Disposition | 9 |
| Section 3.03 | No Power to Engage in Business or Make Investments or Issue Additional Securities | 11 |
| Section 3.04 | Interest on Cash Reserves | 11 |
| Section 3.05 | Power to Settle Claims | 12 |
| Section 3.06 | Power to Contract for Services | 13 |
| Section 3.07 | Payment of Liabilities of Trust | 13 |
| Section 3.08 | Income and Principal | 14 |
| Section 3.09 | Term of Contracts | 14 |
| Section 3.10 | Transactions with Entity Serving as the Trustee or the Delaware Trustee | 15 |
| Section 3.11 | No Security Required | 15 |
| Section 3.12 | Filing of Securities Act Registration Statement, Exchange Act Registration Statement and Other Reports, Listing of Trust Units, etc.; Certain Fees and Expenses | 15 |
| Section 3.13 | Reserve Report | 16 |
| Section 3.14 | No Liability for Recordation | 16 |
| Section 3.15 | California Backup Withholding Waiver | 16 |

Article IV
Trust Units and Uncertificated Beneficial Interest

Section 4.01   Creation and Distribution                                                                              17
Section 4.02   Rights of Trust Unitholders; Limitation on Personal Liability of Trust Unitholders                    17
Section 4.03   Effect of Transfer                                                                                    18
Section 4.04   Determination of Ownership                                                                            18
Section 4.05   Transfer Agent                                                                                        18

i

Article V
Accounting and Distributions; Reports

Section 5.01   Fiscal Year and Accounting Method                                                                     19
Section 5.02   Monthly Cash Distributions                                                                            19
Section 5.03   Reports to Trust Unitholders and Others                                                               19
Section 5.04   Federal Income Tax Provisions                                                                         20

Article VI
Liability of Delaware Trustee and Trustee and
Method of Succession

Section 6.01   Liability of Delaware Trustee, Trustee and Agents                                                     20
Section 6.02   Indemnification of Trustee or Delaware Trustee                                                         21
Section 6.03   Resignation of Delaware Trustee and Trustee                                                           23
Section 6.04   Removal of Delaware Trustee and Trustee                                                               23
Section 6.05   Appointment of Successor Delaware Trustee or Trustee                                                  24
Section 6.06   Laws of Other Jurisdictions                                                                           24
Section 6.07   Reliance on Experts                                                                                   25
Section 6.08   Force Majeure                                                                                         26
Section 6.09   Failure of Action by PCEC                                                                             26
Section 6.10   Action Upon Instructions                                                                             26
Section 6.11   Management of Trust Estate                                                                            26
Section 6.12   Validity                                                                                              27
Section 6.13   Rights and Powers; Litigation                                                                         27
Section 6.14   No Duty to Act Under Certain Circumstances                                                            27
Section 6.15   Indemnification of Trust                                                                              27

Article VII
Compensation of the Trustee and the Delaware Trustee

Section 7.01   Compensation of Trustee and Delaware Trustee                                                          28
Section 7.02   Reimbursement of PCEC                                                                                 28
Section 7.03   Source of Funds                                                                                       28
Section 7.04   Ownership of Units by PCEC, the Delaware Trustee and the Trustee                                      28

Article VIII
Meetings of Trust Unitholders

Section 8.01   Purpose of Meetings                                                                                   29
Section 8.02   Call and Notice of Meetings                                                                           29
Section 8.03   Method of Voting and Vote Required                                                                    29
Section 8.04   Conduct of Meetings                                                                                   30

Article IX
Duration, Revocation and Termination of Trust

Section 9.01   Revocation                                                                                            30

ii

Section 9.02   Termination                                                                                           30
Section 9.03   Disposition and Distribution of Assets and Properties                                                 30
Section 9.04   Reorganization or Business Combination                                                                31

Article X
Amendments

| | | |
|---|---|---|
| Section 10.01 | Prohibited Amendments | 32 |
| Section 10.02 | Permitted Amendments | 32 |

Article XI
Arbitration

Article XII
Miscellaneous

| | | |
|---|---|---|
| Section 12.01 | Inspection of Books | 36 |
| Section 12.02 | Disability of a Trust Unitholder | 36 |
| Section 12.03 | Interpretation | 36 |
| Section 12.04 | Merger or Consolidation of Delaware Trustee or Trustee | 36 |
| Section 12.05 | Change in Trust Name | 37 |
| Section 12.06 | Filing of this Agreement | 37 |
| Section 12.07 | Choice of Law | 37 |
| Section 12.08 | Separability | 38 |
| Section 12.09 | Notices | 38 |
| Section 12.10 | Counterparts | 39 |
| Section 12.11 | No Fiduciary Duty of PCEC or its Affiliates | 40 |

iii

---

**AMENDED AND RESTATED**
**TRUST AGREEMENT**
**OF**
**PACIFIC COAST OIL TRUST**

This Amended and Restated Trust Agreement of Pacific Coast Oil Trust, a Delaware statutory trust (the "*Trust*"), is entered into effective as of the 8th day of May, 2012, by and among PACIFIC COAST ENERGY COMPANY LP, a Delaware limited partnership with its principal office in Los Angeles, California ("*PCEC*"), as trustor, WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association organized under the laws of the United States with its principal office in Wilmington, Delaware ("*Wilmington Trust*"), as Delaware Trustee (as hereinafter defined), and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., a national association organized under the laws of the United States (the "*Bank*"), as Trustee (as hereinafter defined).

**WITNESSETH:**

WHEREAS, PCEC is engaged in the exploration for, and the development and production of, oil and natural gas, the development, ownership and operation of oil and natural gas infrastructure and the acquisition of leases and other real property in connection therewith, and owns oil and natural gas properties and related assets in California; and

WHEREAS, PCEC has determined to convey to the Trust the Conveyed Interests (hereinafter defined) in exchange for 38,583,158 Trust Units (hereinafter defined); and

WHEREAS, PCEC, Wilmington Trust and the Bank have previously formed the Trust pursuant to the Organizational Trust Agreement (hereinafter defined) in accordance with the provisions of the Trust Act (hereinafter defined) and, in connection therewith, PCEC has previously delivered to the Bank, on behalf of the Trust, good and valuable consideration, which consideration the Bank has accepted, to have and to hold, in trust, such consideration, for the purposes and subject to the terms and conditions hereinafter provided; and

NOW, THEREFORE, PCEC, Wilmington Trust and the Bank hereby amend and restate the Organizational Trust Agreement in its entirety.

**ARTICLE I**
**DEFINITIONS**

As used herein, the following terms have the meanings indicated:

"*AAA*" has the meaning assigned to that term in Article XI.

"*Affiliate*" means, for any specified Person, another Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the specified Person. "*Control*," in the preceding sentence, refers to the possession, directly or indirectly, of the right or power to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"*Agent*" means, with respect to a Person, an agent, employee, officer, director, custodian, nominee or attorney of such Person.

"*Agreement*" means this Amended and Restated Trust Agreement of Pacific Coast Oil Trust, as it may be further amended, supplemented or restated from time to time.

"*Bank*" means The Bank of New York Mellon Trust Company, N.A., a national banking association, and its successors and assigns.

"*Beneficial Interest*" means the aggregate beneficial ownership interest of all Trust Unitholders in the Trust Estate, including without limitation the proceeds from the conversion of the Conveyed Interests to cash, and in the right to cash resulting from such conversion of the Conveyed Interests, which beneficial interest is expressed in Trust Units, but such beneficial interest does not include any direct ownership interest, legal or equitable, in or to the Conveyed Interests, or any part thereof, or in or to any asset of the Trust Estate.

"*Business Day*" means any day that is not a Saturday, Sunday, a holiday determined by the NYSE Regulation, Inc. as affecting "'ex' dates" or any other day on which national banking institutions in New York, New York or Wilmington, Delaware are closed as authorized or required by law.

"*Claimant*" has the meaning assigned to that term in <u>Article XI</u>.

"*Closing*" means the first closing of the initial public offering of Trust Units contemplated by the Securities Act Registration Statement.

"*Closing Date*" means the date of Closing.

"*Commission*" means the Securities and Exchange Commission.

"*Conveyance*" means the Conveyance of Net Profits Interests and Overriding Royalty Interest to be entered into on May 8, 2012, from PCEC, as grantor, to the Trust, as grantee.

"*Conveyed Interests*" means the Net Profits Interests and Royalty Interest.

"*Delaware Trustee*" means the Entity serving as a trustee (other than as the Trustee) hereunder having its principal place of business in Delaware, not in its individual capacity but solely in its capacity as trustee hereunder, and having the rights and obligations specified with respect to the Delaware Trustee in this Agreement. Furthermore, any benefit, indemnity, release or protection granted to the Delaware Trustee herein shall extend to and shall be fully applicable and effective with regard to any Entity serving as the Delaware Trustee, including, without limitation, Wilmington Trust.

"*Developed Properties*" means the Subject Interests described in the Conveyance as the "Developed Properties Subject Interests."

"*Entity*" means a corporation, partnership, limited liability company, trust, estate or other entity, organization or association.

2

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exchange Act Registration Statement*" means the registration statement on Form 8-A pursuant to which the Trust Units may be registered under Section 12 of the Exchange Act.

"*Expenses*" has the meaning assigned to that term in <u>Section 6.02(a)</u>.

"*Fair Value*" means, with respect to any portion of the Conveyed Interests to be released or sold pursuant to <u>Section 3.02(c)</u> in connection with a sale of Underlying Properties, an amount equal to the excess, if any, of (a) the proceeds which could reasonably be expected to be obtained from the sale of such portion of the Conveyed Interests to a party which is not an Affiliate of PCEC or the Trust on an arms-length negotiated basis, taking into account relevant market conditions and factors existing at the time of any such proposed sale or release, over (b) the Trust's proportionate share of any sales costs, commissions and brokerage fees related to such sales.

"*Gross Deductions*" has the meaning assigned to that term in the Conveyance.

"*Gross Fair Value*" means, as applicable, an amount equal to the sum of (i) the Fair Value for the Developed Properties divided by 0.80 plus (ii) the Fair Value for the Remaining Properties divided by 0.25.

"*Indemnified Party*" or "*Indemnified Parties*" has the meaning assigned to that term in <u>Section 6.02(c)</u>.

"*Indemnifying Party*" has the meaning assigned to that term in <u>Section 6.02(c)</u>.

"*Independent Reserve Engineers*" means Netherland, Sewell & Associates, Inc., independent petroleum engineers, or any successor petroleum engineering consultants employed by the Trust to provide information and reports with respect to the Conveyed Interests.

"**Monthly Cash Distribution**" means, for each Monthly Period, an amount determined by the Trustee pursuant to Section 5.02 hereof to be equal to the excess, if any, of (a) the sum of (i) the cash received by the Trust attributable to the Conveyed Interests with respect to the Monthly Period, plus (ii) any decrease with respect to the Monthly Period in any cash reserve theretofore established by the Trustee for the payment of liabilities of the Trust, plus (iii) any other cash receipts of the Trust with respect to the Monthly Period (including any cash received from interest earned pursuant to Section 3.04), over (b) the sum of (i) the liabilities of the Trust paid with respect to the Monthly Period, plus (ii) the amount of any cash used with respect to the Monthly Period by the Trustee to establish or increase a cash reserve established for the payment of any liabilities, including contingent liabilities, of the Trust.

"**Monthly Payment Date**" means the 10th Business Day after the Monthly Record Date.

"**Monthly Period**" means, for the initial period, the period that commences on April 1, 2012 and continues through and includes April 30, 2012, and for succeeding periods each calendar month of each year.

3

"**Monthly Record Date**" means, for each Monthly Period, the last Business Day of the next succeeding month or such other date established by the Trustee in order to comply with applicable law or the rules of any securities exchange or quotation system on which the Trust Units may be listed or admitted to trading, in which event "Monthly Record Date" means such other date; *provided, however*, that the initial Monthly Record Date may occur prior to May 30, 2012.

"**Net Profits Interest**" means each of (i) the net profits interest in the Developed Properties to be conveyed by PCEC to the Trust in the Conveyance and (ii) the net profits interest in the Remaining Properties to be conveyed by PCEC to the Trust in the Conveyance.

"**Operating and Services Agreement**" means the Operating and Services Agreement to be entered into on May 8, 2012, by and between PCEC and the Trust.

"**Organizational Trust Agreement**" means the Trust Agreement of Pacific Coast Oil Trust, entered into and effective as of January 3, 2012, by and among PCEC, Wilmington Trust and the Bank.

"**PCEC**" means Pacific Coast Energy Company LP, a Delaware limited partnership, and its successors and permitted assigns.

"**Person**" means a natural person or an Entity.

"**Prospectus**" means the final prospectus constituting a part of the Securities Act Registration Statement, as filed pursuant to Rule 424(b) under the Securities Act.

"**Record Date Trust Unitholders**" has the meaning assigned to that term in Section 8.02.

"**Registration Rights Agreement**" means the Registration Rights Agreement, to be entered into on May 8, 2012, entered into between PCEC and the Trust.

"**Remaining Properties**" means the Subject Interests described in the Conveyance as the "Remaining Properties Subject Interests."

"**Responsible Officer**" means (a) with respect to the Delaware Trustee, any officer in the Corporate Trust Administration office of the Delaware Trustee having direct responsibility for the administration of this Agreement, and with respect to a particular corporate trust matter, any officer of the Delaware Trustee to whom such matter is referred because of his or her knowledge of and familiarity with the particular subject, and (b) with respect to the Trustee, any officer in the Corporate Trust Administration office of the Trustee having direct responsibility for the administration of this Agreement, and with respect to a particular corporate trust matter, any officer of the Trustee to whom such a matter is referred because of his or her knowledge of and familiarity with the subject.

"**Respondent**" has the meaning assigned to that term in Article XI.

"**Royalty Interest**" means the overriding royalty interest described in the Conveyance as the "Overriding Royalty Interest."

4

"**Rules**" has the meaning assigned to that term in Article XI.

"**Sarbanes-Oxley Act**" means the Sarbanes-Oxley Act of 2002, as amended.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securities Act Registration Statement**" means the Registration Statement on Form S-1 (Registration No. 333-178928) as it has been or as it may be amended or supplemented from time to time, filed by PCEC and the Trust with the Commission under the Securities Act to register the

offering and sale of Trust Units.

"*Special Provisions*" has the meaning assigned to that term in Article XI.

"*Transaction Documents*" means this Agreement, the Underwriting Agreement, the Conveyance, the Operating and Services Agreement and the Registration Rights Agreement.

"*Transferee*" means, as to any Trust Unitholder or former Trust Unitholder, any Person succeeding to the interest of such Trust Unitholder or former Trust Unitholder in one or more Trust Units, whether as purchaser, donee, legatee or otherwise.

"*Trust*" means Pacific Coast Oil Trust, the Delaware statutory trust created pursuant to the Organizational Trust Agreement and continued by and administered under the terms of this Agreement.

"*Trust Act*" means the Delaware Statutory Trust Act, Title 12, Chapter 38 of the Delaware Code, Sections 3801 et seq., as amended from time to time during the term of this Agreement.

"*Trust Estate*" means the assets held by the Trust under this Agreement, including both income and principal.

"*Trust Units*" means uncertificated, undivided pro rata fractional interests in the Beneficial Interest, determined as hereinafter provided.

"*Trust Unitholder*" means the owner of one or more Trust Units as reflected on the books of the Trustee pursuant to Section 4.01 or in the records of The Depository Trust Company.

"*Trustee*" means the Entity serving as a trustee (other than the Delaware Trustee) under this Agreement, not in its individual capacity but solely in its fiduciary capacity. Furthermore, any benefit, indemnity, release or protection granted to the Trustee herein shall extend to and shall be fully applicable and effective with regard to any Entity serving as Trustee, including, without limitation, the Bank. The term "principal office" of the Trustee shall mean the principal office of the Trustee in Austin, Texas, or the principal office at which at any particular time its institutional or corporate trust business may be administered.

5

"*Trustee Release*" means a recordable instrument (in a form reasonably acceptable to PCEC or its Affiliates, as applicable) that evidences or effects the termination and release of a Conveyed Interest with respect to the Underlying Properties being conveyed.

"*Underlying Properties*" means the Subject Interests subject to the Conveyed Interests, as "Subject Interests" is defined in the Conveyance.

"*Underwriters*" means each Person named as an underwriter in Schedule 1 to the Underwriting Agreement.

"*Underwriting Agreement*" means the Underwriting Agreement dated as of May 2, 2012 among the Underwriters, the Trust and PCEC, providing for the purchase of 18,500,000 Trust Units and any additional Trust Units to be sold pursuant to the Underwriters' overallotment option.

"*Wilmington Trust*" means Wilmington Trust, National Association, a national banking association organized under the laws of the United States, and its successors and assigns.

## ARTICLE II
## NAME AND PURPOSE OF THE TRUST; DECLARATION OF TRUST

Section 2.01 *Name; Certificate of Trust*. The Trust continued by this Agreement shall remain a Delaware statutory trust under the Trust Act. The Trust shall continue to be known as "Pacific Coast Oil Trust", and the Trustee may transact the Trust's affairs in that name (or, if required by applicable law, in the Trustee's name in its capacity as the trustee on behalf of the Trust). The continuation and operation of the Trust shall be in accordance with this Agreement, which shall constitute the "governing instrument" of the Trust within the meaning of Section 3801(f) of the Trust Act. In the event that a Responsible Officer of either the Delaware Trustee or the Trustee becomes aware that any statement contained or matter described in the Trust's Certificate of Trust has changed, making it false in any material respect, it will notify the other trustee and the Delaware Trustee shall promptly file or cause to be filed in the office of the Secretary of State of Delaware an amendment of same at the written direction of the Trustee, duly executed in accordance with Section 3811 of the Trust Act, in order to effect such change thereto, such filing to be in accordance with Section 3810(b) of the Trust Act.

Section 2.02 *Purpose*. The purposes of the Trust are, and the Trust (and the Trustee on behalf of the Trust) shall have the power and authority and is hereby authorized:

(a) to acquire, hold, protect and conserve the Trust Estate for the benefit of the Trust Unitholders;

(b) to receive and hold the Conveyed Interests and the other assets of the Trust Estate;

6

(c) to issue 38,583,158 Trust Units on the Closing Date and to perform its obligations with respect thereto;

(d) to invest cash reserves as provided in <u>Section 3.04</u>;

(e) to convert the Conveyed Interests into cash either by (1) retaining the Conveyed Interests and collecting the proceeds of production payable with respect to the Conveyed Interests until production has ceased or the Conveyed Interests have been sold or transferred or the Conveyed Interests have otherwise terminated or (2) selling or otherwise disposing of all or any portion of the Conveyed Interests in accordance with the terms of this Agreement;

(f) to pay, or provide for the payment of, any liabilities incurred in carrying out the purposes of the Trust, and thereafter to distribute the remaining amounts of cash received by the Trust to the Trust Unitholders on a pro rata basis determined by the number of Trust Units held by each Trust Unitholder in accordance with <u>Section 5.02</u>;

(g) to distribute the Monthly Cash Distribution;

(h) to incur indebtedness and grant security interests in or otherwise encumber the Trust Estate in order to pay the liabilities of the Trust as they become due, if necessary;

(i) to enter into, execute, deliver and perform its obligations and enforce its rights under the Transaction Documents to which it is a party;

(j) to cause to be prepared and file (i) reports required to be filed under the Exchange Act, (ii) any reports required by the rules of any securities exchange or quotation system on which the Trust Units are listed or admitted to trading, and (iii) any reports, forms or returns required to be filed pursuant to tax laws and other applicable laws and regulations, and to establish, evaluate and maintain a system of internal control over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act;

(k) to conduct or wind up its business as described in the Securities Act Registration Statement; and

(l) to engage in such other activities as are necessary or convenient for the attainment of any of the foregoing or are incident thereto, including activities required or permitted by the terms of the Conveyance, and which may be engaged in or carried on by a statutory trust under the Trust Act.

The Trust hereby authorizes the Transaction Documents and the activities contemplated therein.

Section 2.03 *Transfer of Trust Property to the Trust*. Upon the formation of the Trust, PCEC paid good and valuable consideration to the Trust, in trust, for the uses and purposes provided in the Organizational Trust Agreement and in this Agreement. At (and subject to the occurrence of) the Closing the following transactions will occur:

7

(a) PCEC shall, or shall cause its Affiliates to, grant, bargain, sell, convey and assign to the Trust, for the uses and purposes provided herein, the Conveyed Interests in consideration for 38,583,158 Trust Units to be issued by the Trust to PCEC, which Trust Units shall collectively represent the entire Beneficial Interest in accordance with <u>Section 4.01</u>. The issuance of 38,583,158 Trust Units is hereby duly authorized and, upon issuance at the Closing, such Trust Units shall be duly and validly issued and outstanding and, upon receipt by the Trust at the Closing of the consideration described above, the Trust Units will be fully paid and nonassessable without the requirement of any further consideration.

(b) PCEC and the Trustee, on behalf of the Trust, shall enter into the Registration Rights Agreement.

Section 2.04 *Creation of the Tru*st. The Trustee declares that it shall hold the Trust Estate in trust for the benefit of the Trust Unitholders, upon the terms and conditions set forth in this Agreement. As set forth above and amplified herein, the Trust is intended to be a passive entity limited to the receipt of revenues attributable to the Conveyed Interests and the distribution of such revenues, after payment of or provision for Trust expenses and liabilities, to the Trust Unitholders. It is not the intention of the parties hereto to create, and nothing in this Agreement shall be construed as creating, for any purpose, a partnership, joint venture, joint stock company or similar business association, between or among Trust Unitholders, present or future, or between or among Trust Unitholders, or any of them, the Delaware Trustee, the Trustee and/or PCEC. Neither the Trustee nor the Delaware Trustee, in its individual capacity, or otherwise, makes any representation as to the validity or sufficiency of this Trust Agreement.

Section 2.05 *Principal Offices*. Unless and until changed by the Trustee, the address of the principal office of the Trustee is 919 Congress Avenue, Suite 500, Austin, Texas 78701, Attention: Institutional Trust Services. Unless and until changed by the Delaware Trustee, the principal place of business of the Delaware Trustee is 1100 North Market Street, Wilmington, Delaware 19890-1615, Attention: Corporate Trust Administration. The Trust may maintain offices at such other place or places within or without the State of Delaware as the Trustee deems advisable.

## ARTICLE III
## ADMINISTRATION OF THE TRUST AND POWERS OF THE TRUSTEE
## AND THE DELAWARE TRUSTEE

Section 3.01 *General Authority*.

(a) The Trustee accepts the trust hereby continued and agrees to perform its duties hereunder with respect to the same, but only upon the express terms of this Agreement. Subject to the limitations set forth in this Agreement, the Trustee, acting alone, without the approval or consent of, or notice to, the Delaware Trustee or any Trust Unitholder, is authorized to take such action as in its judgment is necessary, desirable or advisable to best achieve the purposes and

8

powers of the Trust set forth in Section 2.02 hereof, including the execution and delivery of the Transaction Documents. The Trustee shall not (i) dispose of any part of the Trust Estate except as expressly provided herein or (ii) except as permitted by Section 10.02, agree to amend or waive any provision of, give any consent or release with respect to, or terminate this Agreement or the Conveyance without the express approval of Trust Unitholders of record holding at least 75% of the then outstanding Trust Units at a meeting held in accordance with the requirements of Article VIII.

(b) The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirements of Section 3807(a) of the Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware, or if a natural person, who is a resident of the State of Delaware. It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties, obligations or liabilities of any other Person, including, without limitation, the Trustee. The Delaware Trustee shall satisfy the requirements of Section 3807(a) of the Trust Act. The Delaware Trustee accepts the Trust hereby continued and agrees to perform its duties hereunder with respect to the same, but only upon the express terms of this Agreement. The Delaware Trustee is authorized to take only such actions, and shall be required to perform only such duties and obligations, with respect to the Trust as are specifically set forth in this Agreement, and no implied duties, obligations or powers shall be read into this Agreement in respect to the Delaware Trustee. The Delaware Trustee shall not otherwise manage or take part in the business or affairs of the Trust in any manner.

(c) The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware, (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Trust Act, (iii) the filing of any such certificates with the Delaware Secretary of State upon the written request of the Trustee and (iv) the acts of the Delaware Trustee provided in Section 7.01. Except for the purpose of the foregoing sentence, the Delaware Trustee shall not be deemed a trustee, and shall have no management responsibilities or owe any fiduciary duties to the Trust or the Trust Unitholders. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unitholders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement. Notwithstanding any other provision of this Agreement, the Delaware Trustee shall not participate in any decisions or possess any authority with respect to the administration of the Trust, the investment of the Trust's property or the payment of dividends or other distributions of income or principal to the Trust Unitholders.

Section 3.02 *Limited Power of Disposition*.

(a) The Trustee shall not release, sell or otherwise dispose of all or any part of the Trust Estate, including, without limitation, all or any portion of a Conveyed Interest, or any interest therein, except that the Trustee is directed to release, sell and convey all or any portion of a Conveyed Interest as provided in Section 3.02(b), Section 3.02(c), Section 3.07 or Section 9.03, as applicable. No Trust Unitholder approval shall be required for any release, sale or conveyance of a Conveyed Interest under Section 3.02(c), Section 3.07 or Section 9.03, as applicable.

9

(b) In the event that PCEC notifies the Trustee that PCEC desires the Trustee to sell or dispose of (except for releases, which are addressed under Section 3.02(c)) all or any part of the Trust Estate, including, without limitation, all or any portion of the Conveyed Interests, or any interest therein, the Trustee shall sell the applicable portion of the Trust Estate for cash if approved by the Trust Unitholders of record holding at least 75% of the then outstanding Trust Units at a meeting held in accordance with the requirements of Article VIII. This Section 3.02(b) shall not be construed to require approval of the Trust Unitholders for any sale or other disposition of all or any part of the Trust Estate pursuant to Section 3.02(c), Section 3.07 or Section 9.03.

(c) PCEC and its Affiliates may at any time and from time to time sell a divided or undivided portion of their interests in the Underlying Properties, free from and unburdened by the Conveyed Interests (without the consent of the Trustee), subject to the following terms and conditions:

(i) no sale of a portion of PCEC's or its Affiliates' interests in the Underlying Properties shall be permitted under this paragraph (c) if (A) the sale is to a Person who is an Affiliate of PCEC, (B) the sale relates to an interest in the Underlying Properties that accounted for in excess of 0.25% of the total production from the Underlying Properties during the most recently completed 12 calendar months or (C) the aggregate Fair Value of all portions of the Conveyed Interests released by the Trustee pursuant to this paragraph (c) would exceed $500,000 during any consecutive 12-month period;

(ii) in connection with any sale pursuant to this paragraph (c), the Gross Fair Value of the portion of a Conveyed Interest released by the Trustee shall be an "Offset Amount" (as defined in the Conveyance) against the Gross Deductions when determining the amount of cash attributable to such Conveyed Interest; and

(iii) the Trustee shall have received a certificate from PCEC certifying to the Trustee and the Trust that the amount to be offset pursuant

to clause (ii) above represents the Gross Fair Value of the portion of the Conveyed Interests to be released by the Trustee.

Upon receipt of (a) written notice of such a sale given by PCEC or its Affiliates, (b) an accurate description of the Conveyed Interest to be conveyed, and (c) a certification of PCEC or other sufficient information to evidence conclusively that the conditions to transfer described in the Conveyance and in this paragraph (c) have been satisfied, the Trustee shall (subject to clauses (i) through (iii) above) terminate and release the Conveyed Interest with respect to the applicable Underlying Properties through execution and delivery of a Trustee Release at the closing of such sale, and such other instruments, agreements and documents as PCEC or its Affiliates may reasonably request, to evidence or effect the transfer of such portion of PCEC's or its Affiliates' interests in the Underlying Properties, free from and unburdened by the applicable Conveyed Interest.

10

(d) Following the sale of all or any portion of the Underlying Properties, PCEC will be relieved of its obligations with respect to the Conveyed Interest that burdens such portion of the Underlying Properties. Promptly after completion of any such sale, PCEC shall so notify the Trustee in writing. Any purchaser of such Underlying Properties shall be the assignee of PCEC to the extent of the interest sold and shall be bound by the obligations of PCEC under this Agreement and the Conveyance to such extent.

(e) Anything herein to the contrary notwithstanding, the Trustee shall not agree to any distribution of a Conveyed Interest or any other asset of the Trust that would cause the interest of a Trust Unitholder to be treated (except for tax purposes) as an interest other than an intangible personal property interest. Unless required to sell pursuant to this Section 3.02, or pursuant to Section 3.07 or Section 9.03, or to distribute the Monthly Cash Distribution pursuant to Section 5.02, the Trustee is authorized to retain any part of the Trust Estate in the form in which such property was transferred to the Trustee, without regard to any requirement to diversify investments or other requirements.

(f) Any conveyance, transfer or other disposition not expressly addressed in this Agreement shall be governed by the provisions of the Conveyance. In the event that there is a conflict between the provisions of the Conveyance and this Agreement, the provisions of the Conveyance shall control to the extent of such conflict.

Section 3.03 *No Power to Engage in Business or Make Investments or Issue Additional Securities.* Neither the Trustee nor the Delaware Trustee shall cause or permit the Trust to (a) acquire any asset other than the Conveyed Interests and profits therefrom, other than in connection with the rights of the Trust to enforce the terms and provisions of the Transaction Documents to which it or the Trustee as trustee of the Trust is a party, and to collect other amounts paid to the Trust or the Trustee as trustee of the Trust as set forth herein, (b) engage in any business or investment activity of any kind whatsoever, except for the activities permitted herein, or (c) issue Trust Units or other securities after the Closing Date. Neither the Trustee nor the Delaware Trustee shall have any responsibility or authority relating to the development or operations of the Underlying Properties or the marketing of any production therefrom or any other business decision affecting the assets of the Trust.

Section 3.04 *Interest on Cash Reserves.* Cash being held by the Trustee as a reserve for, or in anticipation of, the payment of a Monthly Cash Distribution or for the payment of any liabilities, other than current routine administrative costs, shall be placed by the Trustee with one or more banks or financial institutions (which, to the extent to which authorized pursuant to the Trust Act and other applicable laws, may be, or may include, any bank serving as the Trustee or the Delaware Trustee) and be invested in (a) accounts payable on demand without penalty (which may be non-interest bearing), (b) interest bearing obligations issued by (or unconditionally guaranteed by) the United States of America or any agency or instrumentality thereof (provided such agency or instrumentality obligations are guaranteed by the full faith and credit of the United States of America), (c) money market funds that invest only in United States government securities;

11

(d) repurchase agreements secured by obligations qualifying under (b) above or (e) certificates of deposit of any bank or banks having combined capital, surplus and undivided profits in excess of $100,000,000 which, in the case of (b), (d) and (e) above, mature prior to the date on which such Monthly Cash Distribution is to be distributed or any such liability is to be paid. Any government obligation, repurchase agreement or certificate of deposit held by the Trustee shall be held until maturity. The interest rate on reserves placed with any bank or financial institution serving as the Trustee or the Delaware Trustee shall be the interest rate that such bank pays in the normal course of business on amounts placed with it, taking into account the amount involved, the period held and other relevant factors. Subject to Section 6.01, the Trustee shall not be liable for its selection of permitted investments or for any investment losses resulting from such investments. Notwithstanding anything herein to the contrary, the Delaware Trustee shall not be obligated to accept any such cash or other assets for investment or otherwise. To the extent that the Delaware Trustee decides in its sole and absolute discretion to accept cash for investment pursuant to this Section 3.04, the Delaware Trustee shall invest such cash pursuant to the written instructions of the Trustee, and the Delaware Trustee shall not be liable to the Trust or any other Person for any losses resulting from such investments absent its own fraud, gross negligence or willful misconduct.

Section 3.05 *Power to Settle Claims*

(a) The Trustee is authorized to prosecute or defend, and to settle by arbitration or otherwise, any claim of or against the Trustee, the Trust or the Trust Estate, to waive or release rights of any kind, to settle any dispute with PCEC or any other Person, and to pay or satisfy any debt, tax or claim upon any evidence by it deemed sufficient, without the joinder or consent of any Trust Unitholder, including enforcing the rights of the Trust under the Transaction Documents to which the Trust (or the Trustee as trustee of the Trust) is a party; *provided, however*, that the Trustee shall not settle any dispute involving the Conveyed Interest part of a Conveyance if such actions would change the character of the Conveyed Interest in such

a way that the Conveyed Interest becomes a working interest or that the Trust would fail to continue to qualify as a grantor trust for U.S. federal income tax purposes. To the fullest extent permitted by law, the Trust Unitholders shall have no power to prosecute any claim of the Trust or the Trust Estate against any Person other than to prosecute a claim to compel performance by the Trustee on behalf of the Trust or the Trust Estate.

(b) The Trustee is authorized and empowered to require any Trust Unitholder to dispose of his Trust Units if an administrative or judicial proceeding seeks to cancel or forfeit any of the property in which the Trust holds an interest because of the nationality or any other status of such Trust Unitholder. If a Trust Unitholder fails to dispose of his Trust Units as required by the Trustee pursuant to this Section 3.05(b), the Trustee is authorized to purchase such Trust Units on behalf of the Trust and to borrow funds to make that purchase.

12

Section 3.06 *Power to Contract for Services*. In the administration of the Trust, the Trustee is empowered to employ oil and natural gas consultants (which may include the Independent Reserve Engineers), accountants (with the consent of PCEC, which consent shall not be unreasonably withheld or delayed), attorneys (who may, but need not be, counsel to PCEC or any of its Affiliates) and other professional and expert Persons, to employ or contract for clerical and other administrative assistance (including assistance from PCEC or any of its Affiliates), to delegate to Agents any matter, whether ministerial or discretionary, and to act through such Agents and to make payments of all fees for services or expenses in any manner thus incurred out of the Trust Estate.

Section 3.07 *Payment of Liabilities of Trust*.

(a) Except as otherwise provided herein, the Trustee may and shall use any money received by it for the payment or reimbursement of all liabilities of the Trust, including, but not limiting the generality of the foregoing, all expenses, taxes, liabilities incurred of all kinds, compensation to it for its services hereunder, as provided for in Article VII, and compensation to such parties as may be employed as provided for in Section 3.06. With respect to any liability that is contingent or uncertain in amount or any anticipated liability that is not currently due and payable, the Trustee may, but is not obligated to, establish a cash reserve for the payment of such liability. Except to the extent permitted under applicable law, the Trustee shall not pay any liability of the Trust with funds set aside pursuant to Section 5.02 for the payment of a Monthly Cash Distribution.

(b) If at any time the cash on hand and to be received by the Trustee and available to pay liabilities of the Trust is not, or will not be, in the judgment of the Trustee, sufficient to pay liabilities of the Trust as they become due, the Trustee is authorized to cause the Trust to borrow the funds required to pay such liabilities. In such event, no further distributions will be made to Trust Unitholders (except in respect of any previously determined Monthly Cash Distribution) until the indebtedness created by such borrowings, including interest thereon, has been paid in full. Such funds may be borrowed from any Person, including, without limitation, the Bank (to the extent permitted by law), including its Affiliates, while serving as Trustee or any other Entity serving as a fiduciary hereunder; *provided*, *however*, that neither the Bank nor any other Entity shall be required to make any such loan. Under no circumstances shall the Trustee or the Delaware Trustee be personally liable for any indebtedness or other liability of the Trust. To secure payment of such indebtedness (including any indebtedness to the Bank or any other Entity serving as a fiduciary hereunder), the Trustee is authorized to (i) mortgage, pledge, grant security interests in or otherwise encumber the Trust Estate, or any portion thereof, including the Conveyed Interests, (ii) include any and all terms, powers, remedies, covenants and provisions deemed necessary or advisable in the Trustee's discretion, including, without limitation, confession of judgment, waiver of appraisal and the power of sale with or without judicial proceedings and (iii) provide for the exercise of those and other remedies available to a secured lender in the event of a default on such loan. If such funds are loaned to the Trust by the Trustee or any other such Entity while the Trustee or such other Entity is serving as a fiduciary hereunder, the terms of such indebtedness and security interest shall be similar to the terms which the Trustee or such other Entity would grant to a similarly situated commercial customer with whom it did not have, directly or indirectly, a fiduciary relationship, and the Trustee or such other Entity shall be entitled to enforce its rights with respect to any such indebtedness and security interest as if it were not, directly or indirectly, and had never been, directly or indirectly, the Trustee or a fiduciary hereunder.

13

(c) PCEC will, upon written request of the Trustee, provide the Trust with a $1 million letter of credit. If the Trust requires more than the $1 million under the letter of credit to pay administrative expenses, PCEC will, upon written request of the Trustee, loan funds to the Trust in such amount as is necessary to pay such Trust expenses. Any funds drawn under the letter of credit or loaned by PCEC pursuant to this Section 3.07(c) shall be limited to the payment of current accounts or other obligations to trade creditors in connection with obtaining goods or services or for the payment of other accrued current liabilities arising in the ordinary course of the Trust's business, and shall not be used to satisfy any indebtedness of the Trust. Any loan made by PCEC to the Trust pursuant to this Section 3.07(c) shall: (i) be evidenced by a written promissory note executed by the Trustee on behalf of the Trust, (ii) be on an unsecured basis, (iii) have terms (including interest rate) that are no less favorable to PCEC as those that would be obtained in an arm's-length transaction between PCEC and an unaffiliated third party and (iv) be without recourse to the Trustee and the Bank, it being agreed that any such note shall be payable solely out of the assets of the Trust.

(d) In the event that the Trust (or the Trustee on behalf of the Trust) draws on the letter of credit or PCEC loans funds to the Trust (or the Trustee on behalf of the Trust) pursuant to Section 3.07(c), no further distributions will be made to Trust Unitholders (except in respect of any previously determined Monthly Cash Distribution) until the indebtedness created by such amounts drawn or borrowed, including interest thereon, has been paid in full.

(e) No provision of this Trust Agreement shall require either the Delaware Trustee, the Trustee or any other Entity serving as a fiduciary hereunder to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers. In no event shall the Trustee be responsible for the payment of any Monthly Cash Distribution or other amount except to the extent that it has sufficient cash on hand on behalf of the Trust to make such payment.

Section 3.08 *Income and Principal.* The Trustee shall not be required to keep separate accounts or records for income and principal. However, if the Trustee does keep such separate accounts or records, then the Trustee is authorized to treat all or any part of the receipts from the Conveyed Interests as income or principal, without having to maintain any reserve therefor, and in general to determine all questions as between income and principal and to credit or charge to income or principal or to apportion between them any receipt or gain and any charge, disbursement or loss as is deemed advisable under the circumstances of each case.

Section 3.09 *Term of Contracts*. To the fullest extent permitted by law, in exercising the rights and powers granted hereunder, the Trustee is authorized to make the term of any transaction or contract or other instrument extend beyond the term of the Trust.

14

Section 3.10 *Transactions with Entity Serving as the Trustee or the Delaware Trustee*. To the extent such conduct is not prohibited by applicable law and except as otherwise provided herein, each of the Trustee and the Delaware Trustee is authorized in exercising its powers under this Agreement to make contracts and have dealings with itself or its Affiliates, directly and indirectly, in any other fiduciary or individual capacity.

Section 3.11 *No Security Required*. No Entity serving as a trustee hereunder shall be required to furnish any bond or security of any kind.

Section 3.12 *Filing of Securities Act Registration Statement, Exchange Act Registration Statement and Other Reports, Listing of Trust Units, etc.; Certain Fees and Expenses*.

(a) After the registration of the Trust Units pursuant to the Exchange Act and/or the listing of the Trust Units for trading on the New York Stock Exchange, LLC or another national securities exchange, the Trustee, on behalf of the Trust and acting upon the advice of counsel, shall cause the Trust to comply with all applicable rules, orders and regulations of the Commission and the national securities exchange on which the Trust Units are listed or admitted for quotation and to take all such other reasonable actions necessary for the Trust Units to remain registered under the Exchange Act and listed or quoted on such national securities exchange or quotation system, respectively, until the Trust is terminated. In addition, the Trustee is authorized to make, and the Trustee shall take, all reasonable actions to prepare and, to the extent required by this Agreement or by law, mail to Trust Unitholders any reports, press releases or statements, financial or otherwise, that the Trustee determines are required to be provided to Trust Unitholders by applicable law or governmental regulation or the requirements of any securities exchange or quotation system on which the Trust Units are listed or admitted to trading. In addition, the Trustee, on behalf of the Trust and acting upon the advice of counsel, shall cause the Trust to comply with all of the provisions of the Sarbanes-Oxley Act and the rules and regulations of the Commission related thereto, including but not limited to, establishing, evaluating and maintaining a system of internal control over financial reporting in compliance with the requirements of Section 404 thereof and making all required certifications pursuant to the Sarbanes-Oxley Act and the rules and regulations adopted by the Commission related thereto.

(b) The Trustee shall execute, on behalf of the Trust or in the name of the Trustee in its capacity as trustee of the Trust, any documents incidental or related to the initial public offering of the Trust Units and the listing of the Trust Units on the New York Stock Exchange, LLC.

(c) The Trust is hereby authorized and empowered to take all steps, make all filings and applications and pay all fees necessary, customary or appropriate to the accomplishment of the objectives set forth in paragraph (a) or (b) of this <u>Section 3.12</u>.

15

(d) Except as otherwise provided in <u>Article VI</u>, the fees, charges, expenses, disbursements and other costs incurred by the Trustee or the Delaware Trustee in connection with the discharge of its duties pursuant to this Agreement, including, without limitation, trustee fees, engineering, audit, accounting and legal fees, printing and mailing costs, amounts reimbursed or paid to PCEC pursuant to <u>Section 3.07</u> or <u>Section 7.02</u> hereof, and the fees and expenses of legal counsel for the Trustee, the Delaware Trustee, and the Trust (including legal fees and expenses incurred by the Trustee or the Delaware Trustee in connection with the formation of the Trust and issuance of Trust Units), shall be paid out of the Trust Estate as an administrative expense of the Trust; *provided, however,* that the Trustee's and the Delaware Trustee's acceptance fees paid by PCEC upon execution hereof shall be reimbursed to PCEC by the Trust. All other organizational expenses of the Trust will be paid by PCEC, and PCEC shall not be entitled to reimbursement thereof.

(e) The Trustee is hereby authorized and empowered to take all steps, make all filings and applications and pay all fees necessary, customary or appropriate in order to perform the obligations of the Trust under the Registration Rights Agreement.

Section 3.13 *Reserve Report.* The Trustee shall cause a reserve report to be prepared by or for the Trust by the Independent Reserve Engineers as of December 31 of each year in accordance with criteria established by the Commission showing estimated proved oil, natural gas and natural gas liquids reserves attributable to the Conveyed Interests as of December 31 of such year and other reserve information required to comply with <u>Section 5.03</u>. PCEC, to the extent it is the operator of the Underlying Properties, shall, and to the extent any of its Affiliates is the operator of

the Underlying Properties, shall cause such Affiliate or Affiliates to, use commercially reasonable efforts to cooperate with the Trust and the Independent Reserve Engineers in connection with the preparation of any such reserve report, and to the extent it is not the operator of the Underlying Properties and has not sold its interest in the same pursuant to Section 3.02(b), shall use commercially reasonable efforts to obtain and provide to the Trustee and the Independent Reserve Engineers such information as may be reasonably necessary in connection with the preparation of the reserve reports. The Trustee shall cause each reserve report prepared pursuant to this Section 3.13 to be completed and delivered to it within 75 days of the last day of the prior calendar year or such shorter period as may be required to enable the Trustee to comply with the provisions of Section 5.03.

Section 3.14 *No Liability for Recordation*. PCEC shall be solely responsible, and the Trustee and the Delaware Trustee shall have no responsibility, for the filing of the Conveyance in the real property records of any jurisdiction in which the Underlying Properties are located. Neither the Trustee, the Delaware Trustee, the Bank nor any of their respective Agents shall be liable to the Trust Estate or any Trust Unitholder for any loss, claim or damage resulting from, or arising out of, the failure to file, or failure to properly file, the Conveyance in any real property records of any jurisdiction.

Section 3.15 *California Backup Withholding Waiver*. PCEC shall use commercially reasonable efforts to maintain the waiver from the State of California of the amounts paid to the trust that are attributable to the Conveyed Interests held by unitholders not qualifying for an exemption for withholding, including by seeking a renewal

16

of such waiver prior to its expiration under California law. Notwithstanding the foregoing sentence, PCEC shall not be liable for any loss, claim or damage resulting from, or arising out of, the State of California's failure to renew such waiver, unless it shall be determined that PCEC failed to use commercially reasonable efforts to maintain such waiver from the State of California.

## ARTICLE IV
## TRUST UNITS AND UNCERTIFICATED BENEFICIAL INTEREST

Section 4.01 *Creation and Distribution*. Ownership of the entire Beneficial Interest shall be divided into 38,583,158 Trust Units. The Trust Units shall be uncertificated and ownership thereof shall be evidenced by entry of a notation in an ownership ledger maintained for such purpose by the Trustee or a transfer agent designated by the Trustee. The Trust Unitholders from time to time shall be the sole beneficial owners of the Trust Estate.

Section 4.02 *Rights of Trust Unitholders; Limitation on Personal Liability of Trust Unitholders*. Each Trust Unit shall represent pro rata undivided ownership of the Beneficial Interest and shall entitle its holder to participate pro rata in the rights and benefits of Trust Unitholders under this Agreement. A Trust Unitholder (whether by assignment or otherwise) shall take and hold each Trust Unit subject to all the terms and provisions of this Agreement and the Conveyance which shall be binding upon and inure to the benefit of the successors, assigns, legatees, heirs and personal representatives of such Trust Unitholder. By an assignment or a transfer of one or more Trust Units, the assignor thereby shall, with respect to such assigned or transferred Trust Unit or Trust Units, except as required by federal or state tax laws and as provided in Section 4.03 hereof in the case of a transfer after a Monthly Record Date and prior to the corresponding Monthly Payment Date, part with (a) all of its Beneficial Interest attributable to such Trust Unit or Trust Units and (b) all interests, rights and benefits of a Trust Unitholder under the Trust and this Agreement that are attributable to such Trust Unit or Trust Units as against all other Trust Unitholders, the Trust and the Trustee. The Trust Units and the rights, benefits and interests evidenced thereby (including, without limiting the foregoing, the entire Beneficial Interest) are and, for all purposes, shall be construed (except for tax purposes), to be in all respects intangible personal property, and the Trust Units shall be bequeathed, assigned, disposed of and distributed as intangible personal property. No Trust Unitholder as such shall have any title, legal or equitable, in or to any real property interest or tangible personal property interest that may be considered a such part of the Trust Estate, including, without limiting the foregoing, the Conveyed Interests or any part thereof, or in or to any asset of the Trust Estate to the extent that an interest in such asset would cause the interest of a Trust Unitholder to be treated as other than an intangible personal property interest, but the sole interest of each Trust Unitholder shall be his ownership in the Beneficial Interest. No Trust Unitholder shall have the right to call for or demand or secure any partition or distribution of the Conveyed Interests or any other asset of the Trust Estate or any accounting during the continuance of the Trust or during the period of liquidation and winding up under Section 9.03. Pursuant to Section 3803(a) of the Trust Act, the Trust Unitholders shall be entitled, to the fullest extent permitted by law, to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the General Corporation Law of the State of Delaware.

17

Section 4.03 *Effect of Transfer.* As to matters affecting the title, ownership, warranty or transfer of Trust Units, Article 8 of the Uniform Commercial Code and the Uniform Act for Simplification of Fiduciary Security Transfers, each as adopted and then in force in the State of Delaware, and other statutes and rules pertaining to the transfer of securities, each as is adopted and then in force in the State of Delaware, shall govern and apply. Neither the death nor divorce of any Trust Unitholder or any other event shall entitle the Transferee of any Trust Unitholder to an accounting or valuation for any purpose.

Section 4.04 *Determination of Ownership*. In the event of any disagreement between Persons claiming to be Transferees of any Trust Unit, or in the event of any question on the part of the Trustee when presented with a request for transfer of a Trust Unit, which the Trustee believes is not fully resolved by opinions of counsel or other documents obtained in connection therewith, then, in addition to other rights which it may have under applicable law, the Trustee shall be entitled at its option to refuse to recognize any such claim so long as such disagreement or question shall continue. In so refusing, the Trustee, and any Entity serving in such capacity, may elect to refrain or refuse to act with respect to the interest represented by the Trust Unit involved, or any part thereof, or of any sum or sums of money accrued or accruing thereunder, and, in so doing, the Trustee shall not be or become liable to any Person for the failure or refusal of the Trustee to comply with such conflicting claims or requests for transfer, and shall be entitled to continue so to refrain and refuse so to act, until:

(a) the rights of the adverse claimants or the questions of the Trustee have been adjudicated by a final nonappealable judgment of a court assuming and having jurisdiction of the parties and the interest and money involved; or

(b) all differences have been adjusted by valid agreement between said parties and the Trustee shall have been notified thereof in writing signed by all of the interested parties.

Section 4.05 *Transfer Agent*. The Trustee may serve as transfer agent or may designate a transfer agent at any time. The initial transfer agent shall be American Stock Transfer & Trust Company, LLC. The Trustee may dismiss the transfer agent and designate a successor transfer agent at any time with or without reason. Any entity serving as transfer agent shall be entitled to payment of its fees in accordance with the terms of its engagement.

18

## ARTICLE V
## ACCOUNTING AND DISTRIBUTIONS; REPORTS

Section 5.01 *Fiscal Year and Accounting Method*. The Trust shall adopt the calendar year as its fiscal year and shall maintain its books on an appropriate basis to comply with Sections 5.03 and 5.04, except to the extent such books must be maintained on any other basis pursuant to applicable law.

Section 5.02 *Monthly Cash Distributions*. On (or, to the extent reasonably practicable, prior to) the Monthly Record Date, the Trustee shall, in the manner required by the rules of any securities exchange or quotation system on which the Trust Units are listed or admitted to trading, communicate to the Trust Unitholders the amount of the Monthly Cash Distribution for the relevant Monthly Period. On each Monthly Payment Date, the Trustee shall distribute pro rata to Trust Unitholders of record on the Monthly Record Date the Monthly Cash Distribution for the immediately preceding Monthly Period.

Section 5.03 *Reports to Trust Unitholders and Others*.

(a) Within 75 days following the end of each calendar quarter, or such shorter period of time as may be required by the rules and regulations of the Commission adopted with respect to the Exchange Act or by the rules of any securities exchange or quotation system on which the Trust Units are listed or admitted to trading, the Trustee shall mail to each Person who was a Trust Unitholder of record on a Monthly Record Date during such quarter a report, which may be a copy of the Trust's Quarterly Report on Form 10-Q under the Exchange Act, which shall show in reasonable detail the assets and liabilities and receipts and disbursements of the Trust for such quarter; *provided, however,* the obligation to mail a report to each Trust Unitholder of record shall be deemed to be satisfied if the Trustee files a copy of the Trust's quarterly report on Form 10-Q on the Electronic Data Gathering, Analysis, and Retrieval system (EDGAR) maintained by the Commission or any successor system or otherwise makes such report publicly available on an Internet website that is generally accessible to the public.

(b) Within 120 days following the end of each fiscal year or such shorter period of time as may be required by the rules and regulations of the Commission adopted with respect to the Exchange Act or by the rules of any securities exchange or quotation system on which the Trust Units are listed or admitted to trading, the Trustee shall mail to each Person who was a Trust Unitholder of record on a date to be selected by the Trustee an annual report, containing financial statements audited by an independent registered public accounting firm selected by the Trustee, plus such annual reserve information regarding the Conveyed Interests as may be required under Section 3.13 by any regulatory authority having jurisdiction.

(c) Notwithstanding any time limit imposed by Section 5.03(a) or (b), if, due to a delay in receipt by the Trustee of information necessary for preparation of a report or reports required by such paragraphs, the Trustee shall be unable to prepare and mail such report or reports within such time limit, the Trustee shall prepare and mail such report or reports as soon thereafter as reasonably practicable.

19

Section 5.04 *Federal Income Tax Provisions*. For federal or state income tax purposes, the Trustee shall file for the Trust such returns and statements as in its judgment are required to comply with applicable provisions of the Internal Revenue Code of 1986, as amended, and the regulations thereunder and any applicable state laws and regulations, in either case to permit each Trust Unitholder to report such Trust Unitholder's share of the income and deductions of the Trust. The Trustee will treat all income and deductions of the Trust for each month as having been realized on the Monthly Record Date for such month unless otherwise advised by its counsel. The Trustee will treat the Trust and

report with respect to the Trust as a grantor trust until and unless it receives an opinion of tax counsel that such reporting is no longer proper. Within 75 days following the end of each fiscal year, the Trustee shall mail to each Person who was a Trust Unitholder of record on a Monthly Record Date during such fiscal year, a report which shall show in reasonable detail such information as is necessary to permit such Trust Unitholder to make calculations necessary for tax purposes.

## ARTICLE VI
## LIABILITY OF DELAWARE TRUSTEE AND TRUSTEE AND
## METHOD OF SUCCESSION

Section 6.01 *Liability of Delaware Trustee, Trustee and Agents*.

(a) Notwithstanding any other provision of this Agreement, each of the Delaware Trustee and the Trustee, in carrying out its powers and performing its duties, may act directly or in its discretion, at the expense of the Trust, through Agents (including attorneys) pursuant to agreements entered into with any of them, and each Entity serving as Delaware Trustee or Trustee shall be personally or individually liable only for (i) its own fraud, gross negligence or willful misconduct and (ii) taxes, fees or other charges on, based on or measured by any fees, commissions or compensation received by it in connection with any of the transactions contemplated by this Agreement, and shall not otherwise be individually or personally liable under any circumstances whatsoever, including but not limited to any act or omission of any Agent unless such Entity has acted with fraud, gross negligence or willful misconduct in the selection, retention or supervision of such Agent. Notwithstanding any other provision of this Agreement, each Agent of the Delaware Trustee and the Trustee (including PCEC and any of the Affiliates when acting as Agents), in carrying out its powers and performing its duties, may act directly or in its discretion, at the expense of the Trust, through agents or attorneys engaged by such Agent, and shall not otherwise be individually or personally liable for any act or omission unless such Agent has acted with fraud, gross negligence or willful misconduct. Neither the Trustee nor the Delaware Trustee shall have any liability to any Persons other than the Trust Unitholders in accordance with Section 3803 of the Trust Act and, for the avoidance of any doubt, shall have no liability hereunder to the Trust Unitholders absent its own fraud or gross negligence or willful misconduct. No Entity serving as Trustee or Delaware Trustee shall be individually liable by reason of any act or omission of any other Entity serving as Trustee or Delaware Trustee.

20

(b) Each of the Delaware Trustee and the Trustee, and each Entity serving in any such fiduciary capacity or as an Agent of the Delaware Trustee or the Trustee (including PCEC and any of its Affiliates when acting as Agents), shall be protected in relying or reasonably acting upon any notice, certificate, opinion or advice of counsel or tax advisors, report of certified accountant, petroleum engineer, geologist, auditor or other expert, or other parties the Trustee believes to be an expert on matters for which advice is sought, or any other document or instrument. Each of the Delaware Trustee and the Trustee, and each Entity serving in any such fiduciary capacity or as an Agent of the Delaware Trustee or the Trustee (including PCEC and any of its Affiliates when acting as Agents), is specifically authorized to rely upon the application of Article 8 of the Uniform Commercial Code, the application of the Uniform Act for Simplification of Fiduciary Security Transfers and the application of other statutes and rules with respect to the transfer of securities, each as adopted and then in force in the State of Delaware, as to all matters affecting title, ownership, warranty or transfer of the Trust Units, without any personal liability for such reliance, and the indemnity granted under Section 6.02 shall specifically extend to any matters arising as a result thereof. Further, and without limiting the foregoing, each of the Delaware Trustee, the Trustee and each Entity serving in either such capacity is specifically authorized and directed to rely upon the validity of the Conveyance and the title held by the Trust in the Conveyed Interests pursuant thereto, and is further specifically authorized and directed to rely upon opinions of counsel in the State of California where the Underlying Properties are located, and on any notice, certificate or other statement of PCEC or information furnished by PCEC without any liability in any capacity for such reliance.

Section 6.02 *Indemnification of Trustee or Delaware Trustee*.

(a) Each Entity serving as the Trustee or the Delaware Trustee, individually and as Trustee, as well as each of their respective Agents (including PCEC and any of its Affiliates when acting as Agents) and equityholders, shall be indemnified and held harmless by, and receive reimbursement from, the Trust Estate against and from any and all liabilities, obligations, actions, suits, costs, expenses, claims, damages, losses, penalties, taxes, fees and other charges (collectively, "*Expenses*," excluding, however, any taxes and fees payable by the Trustee and the Delaware Trustee on, based on or measured by any fees, commissions or compensation received by the Trustee and the Delaware Trustee for their services hereunder) incurred by it individually in the administration of the Trust and the Trust Estate or any part or parts thereof, or in the doing of any act done or performed or omission occurring on account of its being Trustee or Delaware Trustee, as applicable, except such Expenses as to which it is liable under Section 6.01 (it being understood that each Entity serving as the Trustee or the Delaware Trustee (and their respective Agents (including PCEC and any of its Affiliates when acting as Agents) and equityholders) shall be indemnified by, and receive reimbursement from, the Trust Estate against such Entity's own negligence which does not constitute gross negligence). Each Entity serving as the Trustee or the Delaware Trustee shall have a lien upon the Trust Estate for payment of such indemnification and reimbursement (including, without limitation, repayment of any funds borrowed from any Entity serving as a fiduciary hereunder), as well as for compensation to be paid to such Entity, in each case entitling such Entity to priority as to payment thereof over payment to any other Person under this Agreement. Neither the Trustee, the Delaware Trustee nor any Entity serving in either of such capacities, nor any Agent thereof shall be entitled to any reimbursement or indemnification from any Trust Unitholder for any Expense incurred by the Delaware Trustee or the Trustee or any such Entity or Agent thereof, their right of

21

reimbursement and indemnification, if any, except as provided in Section 6.02(b), being limited solely to the Trust Estate, whether or not the Trust Estate is exhausted without full reimbursement or indemnification of the Trustee, the Delaware Trustee or any such Entity or Agent thereof. All legal or other expenses reasonably incurred by the Trustee or the Delaware Trustee in connection with the investigation or defense of any Expenses as to which such Entity is entitled to indemnity under this Section 6.02(a) shall be paid out of the Trust Estate.

(b) If the Trust Estate is exhausted without the Trustee, the Delaware Trustee or any Agent or equityholder thereof being fully reimbursed as provided in Section 6.02(a) above, PCEC shall fulfill the remaining indemnity obligation to the Trustee and the Delaware Trustee.

(c) If any action or proceeding shall be brought or asserted against the Trustee or the Delaware Trustee or any Agent or equityholder thereof (each referred to as an "**_Indemnified Party_**" and, collectively, the "**_Indemnified Parties_**") in respect of which indemnity may be sought from PCEC (the "**_Indemnifying Party_**") pursuant to Section 6.02(b) hereof, of which the Indemnified Party shall have received notice, the Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party unless (i) the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnifying Party shall have failed to assume the defense of such action or proceeding and employ counsel reasonably satisfactory (including the qualifications of such counsel) to the Indemnified Party in respect of any such action or proceeding or (iii) the named parties to any such action or proceeding include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to such Indemnified Party that are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of the Indemnified Party and the Indemnified Party may employ such counsel for the defense of such action or proceeding as is reasonably satisfactory to the Indemnifying Party; it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys for the Indemnified Parties at any time). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed), but, if settled with such written consent, or if there be a final judgment for the plaintiff in any such action or proceeding, the Indemnifying Party agrees (to the extent stated above) to indemnify and hold harmless the Indemnified Party from and against any loss or liability by reason of such settlement or judgment.

(d) Any claim for indemnification pursuant to this Section 6.02 shall survive the termination of this Agreement and the resignation or removal of any Indemnified Party.

22

(e) Except as expressly set forth in this Agreement, none of the Trustee, the Delaware Trustee or any other Indemnified Party shall have any duties or liabilities, including fiduciary duties, to the Trust or any Trust Unitholder, and the provisions of this Agreement, to the extent they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the Trustee, the Delaware Trustee or any other Indemnified Party otherwise existing at law or in equity, are agreed by the Trust Unitholders to replace such other duties and liabilities of the Trustee, the Delaware Trustee or any other Indemnified Party. To the extent that, at law or in equity, any of the Trustee, the Delaware Trustee or any other Indemnified Party has duties, including fiduciary duties, and liabilities relating thereto to the Trust or any Trust Unitholder, such Trustee, Delaware Trustee or other Indemnified Party shall not be liable to the Trust or to any Trust Unitholder for its good faith reliance on the provisions of this Agreement. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Trustee and the Delaware Trustee shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any Trust Unitholder or any other Person.

Section 6.03 _Resignation of Delaware Trustee and Trustee._ Any Entity serving as the Delaware Trustee or the Trustee may resign, as such, with or without cause, at any time by written notice to PCEC and to any other Entity serving as the Delaware Trustee or the Trustee. Upon receiving the notice of resignation from the Delaware Trustee or the Trustee, as applicable, the resigning Delaware Trustee or the Trustee, as the case may be, shall provide notice to each of the then Trust Unitholders of record in accordance with Section 12.09. Such notice shall specify a date when such resignation shall take effect, which shall be a Business Day not less than 60 days after the date such notice is mailed; _provided_, _however_, that in no event shall any resignation of the Trustee be effective until a successor Trustee has accepted its appointment as Trustee (including a temporary trustee appointed pursuant to Section 6.05) pursuant to the terms hereof; and _provided, further,_ that in no event shall any resignation of the Delaware Trustee be effective until a successor Delaware Trustee has accepted its appointment as Delaware Trustee pursuant to the terms hereof.

Section 6.04 _Removal of Delaware Trustee and Trustee._ Each Entity serving as the Delaware Trustee or the Trustee may be removed as trustee hereunder, with or without cause, by the affirmative vote of not less than a majority of the Trust Units present in person or by proxy at a meeting held in accordance with the requirements of Article VIII; _provided_, _however_, that any removal of the Delaware Trustee shall be effective only at such time as a successor Delaware Trustee, fulfilling the requirements of Section 3807(a) of the Trust Act, has been appointed and has accepted such appointment; and _provided_, _further_, that any removal of the Trustee shall be effective only at such time as a successor Trustee has been appointed and has accepted such appointment in accordance with Section 6.05. The Trust Unitholders present or represented at any such

meeting where a trustee is removed may elect, in accordance with the requirements of Article VIII, a successor trustee at such meeting, who may accept such appointment effective as of the close of such meeting.

23

Section 6.05 *Appointment of Successor Delaware Trustee or Trustee*. In the event of the resignation or removal of the Entity serving as the Delaware Trustee or the Trustee or if any such Entity has given notice of its intention to resign as the Delaware Trustee or the Trustee, (i) with respect to the Delaware Trustee, the Trustee may appoint a successor Delaware Trustee, or (ii) with respect to either the Delaware Trustee or the Trustee, the Trust Unitholders represented at a meeting held in accordance with the requirements of Article VIII may appoint a successor trustee. Nominees for appointment may be made by (i) PCEC, (ii) the resigned, resigning or removed trustee or (iii) any Trust Unitholder or Trust Unitholders owning of record at least 10% of the then outstanding Trust Units. Any successor to the Trustee shall be a bank or trust company having combined capital, surplus and undivided profits of at least $100,000,000. Any successor to the Delaware Trustee shall be a bank or trust company having its principal place of business in the State of Delaware and having combined capital, surplus and undivided profits of at least $20,000,000. Notwithstanding any provision herein to the contrary, in the event that a new trustee has not been approved within 60 days after a notice of resignation, a vote of Trust Unitholders removing a Trustee or other occurrence of a vacancy, a successor trustee may be appointed by any State or Federal District Court having jurisdiction in New Castle County, Delaware, upon the application of any Trust Unitholder, PCEC or the Entity tendering its resignation or being removed as trustee filed with such court, and in the event any such application is filed, such court may appoint a temporary trustee at any time after such application is filed, which shall, pending the final appointment of a trustee, have such powers and duties as the court appointing such temporary trustee shall provide in its order of appointment, consistent with the provisions of this Agreement. Any such temporary trustee need not meet the minimum standards of capital, surplus and undivided profits otherwise required of a successor trustee under this Section 6.05. Nothing herein shall prevent the same Entity from serving as both the Delaware Trustee and the Trustee if it meets the qualifications thereof.

Immediately upon the appointment of any successor trustee, all rights, titles, duties, powers and authority of the predecessor trustee hereunder (except to the predecessor trustee's rights to amounts payable under Article VII or Section 6.02 accruing through the appointment of such successor trustee) shall be vested in and undertaken by the successor trustee, which shall be entitled to receive from the predecessor trustee all of the Trust Estate held by it hereunder and all records and files of the predecessor trustee in connection therewith. Any resigning or removed trustee shall account to its successor for its administration of the Trust. All successor trustees shall be fully protected in relying upon such accounting and no successor trustee shall be obligated to examine or seek alteration of any account of any preceding trustee, nor shall any successor trustee be personally liable for failing to do so or for any act or omission of any preceding trustee. The preceding sentence shall not prevent any successor trustee or anyone else from taking any action otherwise permissible in connection with any such account.

Section 6.06 *Laws of Other Jurisdictions*. If notwithstanding the other provisions of this Agreement (including, without limitation, Section 12.07) the laws of jurisdictions other than the State of Delaware (each being referred to below as "such jurisdiction") apply to the administration of the Trust or the Trust Estate under this Agreement, the following provisions shall apply. If it is necessary or advisable for a trustee to serve in such jurisdiction and if the Trustee is disqualified from serving in such jurisdiction or for any other reason fails or ceases to serve there, the ancillary trustee in such

24

jurisdiction shall be such Entity, which need not meet the requirements set forth in the third sentence of Section 6.05, as shall be designated in writing by PCEC and the Trustee. To the extent permitted under the laws of such jurisdiction, PCEC and the Trustee may remove the trustee in such jurisdiction, without cause and without necessity of court proceeding, and may or may not appoint a successor trustee in such jurisdiction from time to time. The trustee serving in such jurisdiction shall, to the extent not prohibited under the laws of such jurisdiction, appoint the Trustee to handle the details of administration in such jurisdiction. The trustee in such jurisdiction shall have all rights, powers, discretions, responsibilities and duties as are delegated in writing by the Trustee, subject to such limitations and directions as shall be specified by the Trustee in the instrument evidencing such appointment. Any trustee in such jurisdiction shall be responsible to the Trustee for all assets with respect to which such trustee is empowered to act. To the extent the provisions of this Agreement and Delaware law cannot be made applicable to the administration in such jurisdiction, the rights, powers, duties and liabilities of the trustee in such jurisdiction shall be the same (or as near the same as permitted under the laws of such jurisdiction if applicable) as if governed by Delaware law. In all events, the administration in such jurisdiction shall be as free and independent of court control and supervision as permitted under the laws of such jurisdiction. The fees and expenses of any ancillary trustee shall constitute an administrative expense of the Trust payable from the Trust Estate. Whenever the term "Trustee" is applied in this Agreement to the administration in such jurisdiction, it shall refer only to the trustee then serving in such jurisdiction.

Section 6.07 *Reliance on Experts*. The Trustee and the Delaware Trustee may, but shall not be required to, consult with counsel (which may but need not be counsel to PCEC), accountants, tax advisors, geologists, engineers and other parties (including employees of the Trustee or Delaware Trustee, as applicable) deemed by the Trustee or the Delaware Trustee to be qualified as experts on the matters submitted to them, and, subject to Section 6.01, but notwithstanding any other provision of this Agreement, the opinion or advice of any such party on any matter submitted to it by the Trustee or the Delaware Trustee shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by the Trustee or the Delaware Trustee hereunder in good faith in reliance upon and in accordance with the opinion or advice of any such

party. The Trustee is hereby authorized and directed to make payment for all reasonable fees for services and expenses thus incurred by the Trustee or the Delaware Trustee out of the Trust Estate. Neither the Delaware Trustee nor the Trustee shall incur any liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Delaware Trustee and the Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner or ascertainment of which is not specifically prescribed herein, the Delaware Trustee and the Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or any assistant treasurer and by the secretary or any assistant secretary of the relevant party (including without limitation PCEC or its Affiliates), as to such fact or matter, and such certificate shall constitute full protection and authorization to the Delaware Trustee and the Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

25

Section 6.08 *Force Majeure*. The Trustee and the Delaware Trustee shall not incur any liability to any Trust Unitholder if, by reason of any current or future law or regulation thereunder of the federal government or any other governmental authority, or by reason of any act of God, war or other circumstance beyond its control (whether or not similar to any of the foregoing), the Trustee or the Delaware Trustee is prevented or forbidden from doing or performing any act or thing required by the terms hereof to be done or performed; nor shall the Trustee or the Delaware Trustee incur any liability to any Trust Unitholder by reason of any nonperformance or delay caused as aforesaid in the performance of any act or thing required by the terms hereof to be done or performed, or by reason of any exercise of, or failure to exercise, any discretion provided for herein caused as aforesaid.

Section 6.09 *Failure of Action by PCEC*. In the event that PCEC shall fail or is unable to take any action as required under any provision of the Transaction Documents, the Trustee is empowered (but shall not be required) to take such action.

Section 6.10 *Action Upon Instructions*. Whenever the Delaware Trustee is unable to decide between alternative courses of action permitted or required by the terms of this Agreement, or is unsure as to the application, intent, interpretation or meaning of any provision of this Agreement, the Delaware Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the Trustee requesting instruction as to the course of action to be adopted, and, to the extent the Delaware Trustee acts in good faith in accordance with any such instruction received, the Delaware Trustee shall not be liable on account of such action to any Person. If the Delaware Trustee shall not have received appropriate instructions within ten calendar days of sending such notice to the Trustee (or within such shorter period of time as reasonably may be specified in such notice or may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking such action which is consistent, in its view, with this Agreement, and the Delaware Trustee shall have no liability to any Person for any such action or inaction.

Section 6.11 *Management of Trust Estate*. The Delaware Trustee shall have no duty or obligation to manage, control, prepare, file or maintain any report, license or registration, use, sell, dispose of or otherwise deal with the Trust Estate, or otherwise to take or refrain from taking any action under or in connection with this Agreement, or any other document or instrument, except as expressly required hereby.

26

Section 6.12 *Validity*. The Delaware Trustee shall not be responsible for or in respect of and makes no representations as to the validity or sufficiency of any provision of this Agreement or for the due execution hereof by the other parties hereto or for the form, character, genuineness, sufficiency, value or validity of any of the Trust Estate, and the Delaware Trustee shall in no event assume or incur any liability, duty or obligation to PCEC, the Trustee or any Trust Unitholder, other than as expressly provided for herein. Neither the Trustee nor the Delaware Trustee shall at any time have any responsibility or liability for or with respect to the legality, validity and enforceability of any of the Trust Units.

Section 6.13 *Rights and Powers; Litigation*. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement, or to institute, conduct or defend any litigation or arbitration under this Agreement or otherwise or in relation to this Agreement, at the request, order or direction of the Trustee, any Trust Unitholder or PCEC unless the Trustee, Trust Unitholder or PCEC, as the case may be, has or have offered to the Delaware Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities that may be incurred by the Delaware Trustee therein or thereby. The Delaware Trustee shall be under no obligation to appear in, prosecute or defend any action, or to take any other action other than the giving of notices, which in its opinion may require it to incur any out-of-pocket expense or any liability unless it shall be furnished with such security and indemnity against such expense or liability as it may reasonably require. The right of the Delaware Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty, and the Delaware Trustee shall not be personally liable or accountable for the performance of any such act except as specifically provided in <u>Section 6.01</u>.

Section 6.14 *No Duty to Act Under Certain Circumstances*. Notwithstanding anything contained herein to the contrary, the Delaware Trustee will not be required to take any action in any jurisdiction other than in the State of Delaware if the taking of such action would (i) require the consent of approval or authorization or order of or the giving of notice to, or the registration with or taking of any action in respect of, any state or other governmental authority or agency of any jurisdiction other than in the State of Delaware, (ii) result in any fee, tax or governmental charge under the laws of any jurisdiction or any political subdivisions thereof other than the State of Delaware becoming payable by the Delaware Trustee or (iii) subject the Delaware Trustee to personal jurisdiction in any jurisdiction other than the State of Delaware for causes of action arising from

acts unrelated to the consummation of the transactions by the Delaware Trustee contemplated hereby.

Section 6.15 *Indemnification of Trust*. PCEC agrees to indemnify and hold harmless the Trust from and against any and all losses, claims, damages, liabilities and expenses, including reasonable costs of investigation and attorney's fees and expenses, (i) incurred under Section 10 of the Underwriting Agreement and (ii) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in any Preliminary Prospectus (as defined in the Underwriting Agreement), the Securities Act Registration Statement, the Pricing Disclosure Package (as defined in the Underwriting Agreement), any Issuer Free Writing Prospectus (as defined in the Underwriting Agreement) or the Prospectus (as defined in the Underwriting Agreement) or in any amendment

27

or supplement thereto, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of the Preliminary Prospectus, the Pricing Disclosure Package, any Issuer Free Writing Prospectus or the Prospectus or in any amendment or supplement thereto, in the light of the circumstances under which they were made) not misleading.

# ARTICLE VII
## COMPENSATION OF THE TRUSTEE AND THE DELAWARE TRUSTEE

Section 7.01 *Compensation of Trustee and Delaware Trustee*. The Entity serving as the Trustee hereunder shall receive an annual fee of $200,000 as compensation for its services as the Trustee hereunder. The Entity serving as the Delaware Trustee hereunder shall receive an annual fee of $2,000 as compensation for its services as the Delaware Trustee hereunder. Entities serving as the Trustee or the Delaware Trustee hereunder shall be reimbursed for all actual expenditures made in connection with administration of the Trust, including those made on account of any unusual duties in connection with matters pertaining to the Trust and the reasonable compensation and expenses of their counsel, accountants or other skilled persons and of all other persons not regularly in their employ. Any unusual or extraordinary services rendered by the Entity serving as Trustee or by the Entity serving as Delaware Trustee in connection with the administration of the Trust shall be treated as trustee administrative services for purpose of computing the respective administrative fee to be paid to each Entity serving as trustee hereunder.

Section 7.02 *Reimbursement of PCEC*. PCEC shall be entitled to reimbursement from the Trust for all out-of-pocket costs and expenses paid by PCEC, acting in its capacity as Agent of the Trust (including without limitation legal, accounting, engineering and printing costs), but excluding those costs and expenses specified in Section 3.12(d) and in Section 6.02(b) as costs and expenses to be paid by PCEC, promptly upon submission of written evidence thereof to the Trustee.

Section 7.03 *Source of Funds*. Except as provided in Section 3.12(d) and Section 6.02(b), all compensation, reimbursements, and other charges owing to any Entity as a result of its services as a trustee hereunder shall constitute indebtedness hereunder, shall be payable by the Trust out of the Trust Estate and such Entity shall have a lien on the Trust Estate for payment of such compensation, reimbursements and other charges, entitling such Entity to priority as to payment thereof over payment to any other Person under this Agreement.

Section 7.04 *Ownership of Units by PCEC, the Delaware Trustee and the Trustee*. Each of the Delaware Trustee and the Trustee, in its individual or other capacity, may become the owner or pledgee of Trust Units with the same rights it would have if it were not a trustee hereunder. PCEC is an owner of Trust Units, and each of PCEC and its Affiliates may become the owner of additional Trust Units, with the same rights and entitled to the same benefits as any other Trust Unitholder.

28

# ARTICLE VIII
## MEETINGS OF TRUST UNITHOLDERS

Section 8.01 *Purpose of Meetings*. A meeting of the Trust Unitholders may be called at any time and from time to time pursuant to the provisions of this Article VIII to transact any matter that the Trust Unitholders may be authorized to transact.

Section 8.02 *Call and Notice of Meetings*. Any such meeting of the Trust Unitholders may be called by the Trustee or by Trust Unitholders owning of record not less than 10% in number of the then outstanding Trust Units. The Trustee may, but shall not be obligated to, call meetings of Trust Unitholders to consider amendments, waivers, consents and other changes relating to the Transaction Documents to which the Trust (or the Trustee as trustee of the Trust) is a party. In addition, at the written request of the Delaware Trustee, unless the Trustee appoints a successor Delaware Trustee in accordance with Section 6.05, the Trustee shall call such a meeting but only for the purpose of appointing a successor to the Delaware Trustee upon its resignation. All such meetings shall be held at such time and at such place as the notice of any such meeting may designate. Except as may otherwise be required by any applicable law or by the rules of any securities exchange or quotation system on which the Trust Units may be listed or admitted to trading, the Trustee shall provide notice of every meeting of the Trust Unitholders authorized by the Trustee or the Trust Unitholders calling the meeting, setting forth the time and place of the meeting and in general terms the matters proposed to be acted upon at such meeting, which notice shall be given in accordance with Section 12.09 of this Agreement not more than 60 nor less than 20 days before such meeting is to be held to all of the Trust Unitholders of record at the close of business on a record date selected by the Trustee (the

"**Record Date Trust Unitholders**"), which shall be not more than 60 days before the date of such notice. If such notice is given to any Trust Unitholder by mail, it shall be directed to such Trust Unitholder at its last address as shown by the ownership ledger of the Trustee and shall be deemed duly given when so addressed and deposited in the United States mail, postage paid. No matter other than that stated in the notice shall be acted upon at any meeting. Only Record Date Trust Unitholders shall be entitled to notice of and to exercise rights at or in connection with the meeting. All costs associated with calling any meeting of the Trust Unitholders shall be borne by the Trust other than a meeting of the Trust Unitholders called by Trust Unitholders owning of record not less than 10% in number of the then outstanding Trust Units, which costs shall be borne by the Trust Unitholders that called such meeting of Trust Unitholders.

Section 8.03 *Method of Voting and Vote Required*. Each Record Date Trust Unitholder shall be entitled to one vote for each Trust Unit owned by such Record Date Trust Unitholder, and any Record Date Trust Unitholder may vote in person or by duly executed written proxy. Abstentions and broker non-votes shall not be deemed to be a vote cast. At any such meeting, the presence in person or by proxy of Record Date Trust Unitholders holding a majority of the Trust Units held by all Record Date Trust Unitholders shall constitute a quorum, and, except as otherwise provided herein, any matter shall

29

be deemed to have been approved by the Trust Unitholders (including, but not limited to, appointment of a successor trustee) if it is approved by the affirmative vote of Record Date Trust Unitholders holding a majority of the Trust Units present in person or by proxy at a meeting where there is a quorum present.

Section 8.04 *Conduct of Meetings*. The Trustee may make such reasonable regulations consistent with the provisions hereof as it may deem advisable for any meeting of the Trust Unitholders, for the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, the preparation and use at the meeting of a list authenticated by or on behalf of the Trustee of the Trust Unitholders entitled to vote at the meeting and such other matters concerning the conduct of the meeting as it shall deem advisable.

## ARTICLE IX
## DURATION, REVOCATION AND TERMINATION OF TRUST

Section 9.01 *Revocation*. Subject to the last sentence of this Section 9.01, the Trust is and shall be irrevocable, and PCEC, as trustor, after the Closing, retains no power to alter, amend (except as provided otherwise in this Article IX and in Section 10.02), revoke or terminate the Trust. The Trust shall be terminable only as provided in Section 9.02, and shall continue until so terminated.

Section 9.02 *Termination*. The Trust shall dissolve and commence winding-up its business and affairs upon the first to occur of the following events or times:

(a) the disposition of all of the Conveyed Interests and any assets (other than cash), tangible or intangible, including accounts receivable and claims or rights to payment, constituting the Trust Estate in accordance with Section 3.02;

(b) the action by Trust Unitholders of record holding at least 75% of the then outstanding Trust Units at a meeting held in accordance with the requirements of Article VIII to terminate the Trust;

(c) annual cash proceeds received by the Trust attributable to the Conveyed Interests, in the aggregate, are less than $2.0 million for each of any two consecutive years; and

(d) the entry of a decree of judicial dissolution of the Trust.

Section 9.03 *Disposition and Distribution of Assets and Properties*. Notwithstanding the dissolution of the Trust pursuant to Section 9.02, the Trustee and the Delaware Trustee shall continue to act as trustees of the Trust Estate and as such shall exercise the powers granted under this Agreement until their duties have been fully performed

30

and the Trust Estate finally distributed so that the affairs of the Trust may be liquidated and wound up. Upon the dissolution of the Trust, the Trustee shall sell for cash in one or more sales all the properties other than cash then constituting the Trust Estate. The net proceeds from any sale of the Conveyed Interests made as provided in Section 3.02 or the properties other than cash then constituting the Trust Estate shall be treated as cash receipts of the Trust during the Monthly Period in which the net proceeds are received; *provided* that the Trustee shall first pay, satisfy and discharge all liabilities of the Trust, or if necessary, set up cash reserves in such amounts as the Trustee in its discretion deems appropriate for contingent liabilities in accordance with Section 3808 of the Trust Act. The Trustee shall not be required to obtain approval of the Trust Unitholders prior to performing any of its duties pursuant to this Section 9.03. Notwithstanding anything herein to the contrary, in no event may the Trustee distribute the Conveyed Interests to the Trust Unitholders. Upon completion of the dissolution and winding up of the Trust in accordance with Section 9.02 and Section 9.03 hereof and Section 3808 of the Trust Act, the Trustee shall direct the Delaware Trustee to file, and Delaware Trustee shall file or cause to be filed at the expense of PCEC, a certificate of cancellation of the Trust's Certificate of Trust in accordance

with Section 2.01 and Section 3811 of the Trust Act. Upon the filing of such certificate of cancellation, neither of the Trustees nor the Entities serving in such capacity shall have any further duty or obligation hereunder, and neither of the Trustees nor the Entities serving in such capacity shall be under further liability except as provided in Section 6.01.

Section 9.04 *Reorganization or Business Combination*.

(a) The Trust may merge or consolidate with or convert into one or more limited partnerships, general partnerships, corporations, statutory trusts, common law trusts, limited liability companies, associations, or unincorporated businesses in accordance with the Trust Act if such transaction (i) is agreed to by the Trustee and by the affirmative vote of holders of a majority of the Trust Units present in person or by proxy at a meeting where a quorum is present, and (ii) is permitted under the Trust Act and any other applicable law. The Trustee shall give prompt notice of such reorganization or business combination to the Delaware Trustee. Pursuant to and in accordance with the provisions of Section 3815(f) of the Trust Act, and notwithstanding anything else herein, an agreement of merger or consolidation approved in accordance with this Section 9.04 and Section 3815(a) of the Trust Act may effect any amendment to this Agreement or effect the adoption of a new trust agreement if it is the surviving or resulting trust in the merger or consolidation.

(b) Upon the effective date of a certificate of merger duly filed in accordance with the Trust Act, the following shall be deemed to occur, in addition to such effects as may be specified under the Trust Act as then in effect:

(i) all of the rights, privileges and powers of each of the business entities that have merged or consolidated, and all property, real, personal and mixed, and all debts due to any of those business entities and all other things and causes of action belonging to each of those business entities shall be vested in the surviving business entity and, after the merger or consolidation, shall be the property of the surviving business entity to the extent they were part of each constituent business entity;

31

(ii) the title to any real property vested by deed or otherwise in any of those constituent business entities shall not revert and shall not be in any way impaired because of the merger or consolidation;

(iii) all rights of creditors and all liens on or security interest in property of any of those constituent business entities shall be preserved unimpaired;

(iv) all debts, liabilities and duties of those constituent business entities shall attach to the surviving or resulting business entity, and may be enforced against it to the same extent as if the debts, liabilities and duties had been incurred or contacted by it; and

(v) if the Trust is the surviving or resulting entity, the certificate of trust of the Trust may be amended as set forth in the certificate of merger.

(c) A merger or consolidation effected pursuant to this Section 9.04 shall not be deemed to result in a transfer or assignment of assets or liabilities from one entity to another having occurred.

**ARTICLE X
AMENDMENTS**

Section 10.01 *Prohibited Amendments*. After the Closing, no amendment may be made to any provision of this Agreement that would:

(a) increase the power of the Delaware Trustee or the Trustee to engage in business or investment activities;

(b) alter the rights of the Trust Unitholders vis-à-vis each other; or

(c) unless consented to in writing by PCEC, have the effect of amending Sections 3.02, 6.02, 7.02, 9.02, 9.03, 10.01 or 10.02 hereof.

Section 10.02 *Permitted Amendments*. Subject to Section 10.01, the Trustee and the Delaware Trustee may amend the Transaction Documents to which the Trust (or the Trustee as trustee of the Trust) is a party as follows:

(a) The Delaware Trustee and the Trustee may, jointly, from time to time supplement or amend this Agreement, and the Trustee on behalf of the Trust may from time to time supplement or amend the other Transaction Documents to which the Trust (or the Trustee as trustee of the Trust) is a party, without the approval of Trust Unitholders in order to cure any ambiguity, to correct or supplement any provision contained herein or therein which may be defective or inconsistent with any other provisions herein or therein, to grant any benefit to all of the Trust Unitholders, to comply with changes in applicable law or to change the name of the Trust; *provided* that such supplement or amendment does not materially adversely affect the

32

interests of the Trust Unitholders; and *provided*, *further*, that any amendment to this Agreement made to change the name of the Trust in accordance with Section 12.05 or otherwise shall be conclusively deemed not to materially affect adversely the interests of the Trust Unitholders or result in a material variance of the investment of the Trust or the Trust Unitholders. Additionally, the Trustee may, from time to time, supplement

or amend the Transaction Documents without the approval of the Trust Unitholders; *provided* that such supplement or amendment would not materially increase the costs or expenses of the Trust or adversely affect the economic interest of the Trust Unitholders; and *provided, further,* that the Trustee shall not modify or amend the Conveyance if such modification or amendment would change the character of the Conveyed Interests in such a way that the Conveyed Interests become working interests or that the trust would fail to continue to qualify as a grantor trust for U.S. federal income tax purposes. The Trustee and the Delaware Trustee are entitled to, and may rely upon, a written opinion of counsel or certification of PCEC as conclusive evidence that any amendment or supplement pursuant to the immediately preceding sentences is authorized and permitted under this Agreement and the other Transaction Documents and complies with the provisions of this Section 10.02.

(b) All other permitted amendments to the provisions of this Agreement may be made only by the affirmative vote of the Trust Unitholders of record holding at least 75% of the then outstanding Trust Units at a meeting held in accordance with the requirements of Article VIII.

(c) No amendment that increases the obligations, duties or liabilities or affects the rights of the Delaware Trustee, the Trustee or any Entity serving in any such capacity shall be effective without the express written approval of such trustee or Entity.

## ARTICLE XI
## ARBITRATION

THE TRUST UNITHOLDERS, TRUSTEE AND PCEC AGREE THAT, EXCEPT AS PROVIDED IN PARAGRAPH (I) OF THIS ARTICLE XI, ANY DISPUTE, CONTROVERSY OR CLAIM THAT MAY ARISE BETWEEN OR AMONG PCEC (ON THE ONE HAND) AND THE TRUST OR THE TRUSTEE (ON THE OTHER HAND) IN CONNECTION WITH OR OTHERWISE RELATING TO THE TRANSACTION DOCUMENTS TO WHICH THE TRUST (OR THE TRUSTEE AS TRUSTEE OF THE TRUST) IS A PARTY, OR THE APPLICATION, IMPLEMENTATION, VALIDITY OR BREACH OF THE TRANSACTION DOCUMENTS TO WHICH THE TRUST (OR THE TRUSTEE AS TRUSTEE OF THE TRUST) IS A PARTY OR ANY PROVISION OF THE TRANSACTION DOCUMENTS TO WHICH THE TRUST (OR THE TRUSTEE AS TRUSTEE OF THE TRUST) IS A PARTY (INCLUDING, WITHOUT LIMITATION, CLAIMS BASED ON CONTRACT, TORT OR STATUTE), SHALL BE FINALLY, CONCLUSIVELY AND EXCLUSIVELY SETTLED BY BINDING ARBITRATION IN LOS ANGELES, CALIFORNIA IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES (THE "***RULES***") OF THE AMERICAN ARBITRATION ASSOCIATION OR ANY SUCCESSOR THERETO ("***AAA***") THEN IN EFFECT. THE TRUST UNITHOLDERS, THE TRUSTEE (FOR ITSELF AND ON BEHALF OF THE TRUST) AND PCEC HEREBY EXPRESSLY WAIVE THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO TRIAL BY JURY, WITH RESPECT TO ANY MATTER SUBJECT TO ARBITRATION PURSUANT

33

TO THIS ARTICLE XI. THE TRUST UNITHOLDERS, TRUSTEE OR PCEC MAY BRING AN ACTION, INCLUDING, WITHOUT LIMITATION, A SUMMARY OR EXPEDITED PROCEEDING, IN ANY COURT HAVING JURISDICTION, TO COMPEL ARBITRATION OF ANY DISPUTE, CONTROVERSY OR CLAIM TO WHICH THIS ARTICLE XI APPLIES. EXCEPT WITH RESPECT TO THE FOLLOWING PROVISIONS (THE "***SPECIAL PROVISIONS***"), WHICH SHALL APPLY WITH RESPECT TO ANY ARBITRATION PURSUANT TO THIS ARTICLE XI, THE INITIATION AND CONDUCT OF ARBITRATION SHALL BE AS SET FORTH IN THE RULES, WHICH RULES ARE INCORPORATED IN THIS AGREEMENT BY REFERENCE WITH THE SAME EFFECT AS IF THEY WERE SET FORTH IN THIS AGREEMENT.

(a) In the event of any inconsistency between the Rules and the Special Provisions, the Special Provisions shall control. References in the Rules to a sole arbitrator shall be deemed to refer to the tribunal of arbitrators provided for under subparagraph (c) below in this Article XI.

(b) The arbitration shall be administered by AAA.

(c) The arbitration shall be conducted by a tribunal of three arbitrators. Within ten days after arbitration is initiated pursuant to the Rules, the initiating party or parties (the "*Claimant*") shall send written notice to the other party or parties (the "*Respondent*"), with a copy to the Los Angeles, California office of AAA, designating the first arbitrator (who shall not be a representative or agent of any party but may or may not be an AAA panel member and, in any case, shall be reasonably believed by the Claimant to possess the requisite experience, education and expertise in respect of the matters to which the claim relates to enable such person to competently perform arbitral duties). Within ten days after receipt of such notice, the Respondent shall send written notice to the Claimant, with a copy to the Los Angeles, California office of AAA and to the first arbitrator, designating the second arbitrator (who shall not be a representative or agent of any party, but may or may not be an AAA panel member and, in any case, shall be reasonably believed by the Respondent to possess the requisite experience, education and expertise in respect of the matters to which the claim relates to enable such person to competently perform arbitral duties). Within ten days after such notice from the Respondent is received by the Claimant, the Respondent and the Claimant shall cause their respective designated arbitrators to select any mutually agreeable AAA panel member as the third arbitrator. If the respective designated arbitrators of the Respondent and the Claimant cannot so agree within said ten day period, then the third arbitrator will be determined pursuant to the Rules. For purposes of this Article XI, PCEC (on the one hand) and the Trust and the Trustee (on the other hand) shall each be entitled to the selection of one arbitrator. Prior to commencement of the arbitration proceeding, each arbitrator shall have provided the parties with a resume outlining such arbitrator's background and qualifications and shall certify that such arbitrator is not a representative or agent of any of the parties. If any arbitrator shall die, fail to act, resign, become disqualified or otherwise cease to act, then the arbitration proceeding shall be delayed for 15 days and the party by or on behalf of whom such arbitrator was appointed shall be entitled to appoint a substitute arbitrator (meeting the qualifications set forth in this Article XI) within such 15-

day period; *provided*, *however*, that if the party by or on behalf of whom such arbitrator was appointed shall fail to appoint a substitute arbitrator within such 15-day period, the substitute arbitrator shall be a neutral arbitrator appointed by the AAA arbitrator within 15 days thereafter.

34

(d) All arbitration hearings shall be commenced within 120 days after arbitration is initiated pursuant to the Rules, unless, upon a showing of good cause by a party to the arbitration, the tribunal of arbitrators permits the extension of the commencement of such hearing; *provided*, *however*, that any such extension shall not be longer than 60 days.

(e) All claims presented for arbitration shall be particularly identified and the parties to the arbitration shall each prepare a statement of their position with recommended courses of action. These statements of position and recommended courses of action shall be submitted to the tribunal of arbitrators chosen as provided hereinabove for binding decision. The tribunal of arbitrators shall not be empowered to make decisions beyond the scope of the position papers.

(f) The arbitration proceeding will be governed by the substantive laws of the State of Delaware and will be conducted in accordance with such procedures as shall be fixed for such purpose by the tribunal of arbitrators, except that (i) discovery in connection with any arbitration proceeding shall be conducted in accordance with the Federal Rules of Civil Procedure and applicable case law, (ii) the tribunal of arbitrators shall have the power to compel discovery and (iii) unless the parties otherwise agree and except as may be provided in this <u>Article XI</u>, the arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16, to the exclusion of any provision of state law or other applicable law or procedure inconsistent therewith or which would produce a different result. The parties shall preserve their right to assert and to avail themselves of the attorney-client and attorney-work-product privileges, and any other privileges to which they may be entitled pursuant to applicable law. No party to the arbitration or any arbitrator may compel or require mediation and/or settlement conferences without the prior written consent of all such parties and the tribunal of arbitrators.

(g) The tribunal of arbitrators shall make an arbitration award as soon as possible after the later of the close of evidence or the submission of final briefs, and in all cases the award shall be made not later than 30 days following submission of the matter. The finding and decision of a majority of the arbitrators shall be final and shall be binding upon the parties. Judgment upon the arbitration award or decision may be entered in any court having jurisdiction thereof or application may be made to any such court for a judicial acceptance of the award and an order of enforcement, as the case may be. The tribunal of arbitrators shall have the authority to assess liability for pre-award and post-award interest on the claims, attorneys' fees, expert witness fees and all other expenses of arbitration as such arbitrators shall deem appropriate based on the outcome of the claims arbitrated. Unless otherwise agreed by the parties to the arbitration in writing, the arbitration award shall include findings of fact and conclusions of law.

(h) Nothing in this <u>Article XI</u> shall be deemed to (i) limit the applicability of any otherwise applicable statute of limitations or repose or any waivers contained in this Agreement, (ii) constitute a waiver by any party hereto of the protections afforded by 12 U.S.C. § 91 or any successor statute thereto or any substantially equivalent state law, (iii) restrict the right of the Trustee to make application to any state or federal district court having jurisdiction in Los Angeles, California, to appoint a successor Trustee or to request instructions with regard to any provision in this Agreement when the Trustee is unsure of its obligations thereunder, or (iv) apply to the Delaware Trustee.

35

(i) This <u>Article XI</u> shall preclude participation by the Trust (or the Trustee as trustee of the Trust) in any class action brought against PCEC by any Person who is not a Trust Unitholder and the Trustee shall opt out of any such class action in which the Trust (or the Trustee as trustee of the Trust) is a purported class member, but shall not preclude participation by the Trust (or the Trustee as trustee of the Trust) in any such action brought by Trust Unitholders or in which Trust Unitholders holding more than 50% of the Trust Units represented at a duly called and held meeting of the Trust Unitholders in accordance with <u>Section 8.02</u> request the Trustee to participate.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01 *Inspection of Books*. Each Trust Unitholder and its duly authorized agents and attorneys shall have the right, at its own expense and during reasonable business hours upon reasonable prior notice, to examine and inspect the records (including, without limitation, the ownership ledger) of the Trust and the Trustee in reference thereto for any purpose reasonably related to the Trust Unitholder's interest as a Trust Unitholder. The Trustee and its duly authorized Agents (including attorneys) shall have the right, at the expense of the Trust and during reasonable business hours upon reasonable prior written notice, to examine and inspect the records of PCEC relating to the Conveyed Interests and the Underlying Properties.

Section 12.02 *Disability of a Trust Unitholder*. Any payment or distribution to a Trust Unitholder may be made by check of the Trustee drawn to the order of the Trust Unitholder, regardless of whether or not the Trust Unitholder is a minor or under other legal disability, without the Trustee having further responsibility with respect to such payment or distribution. This <u>Section 12.02</u> shall not be deemed to prevent the Trustee from making any payment or distribution by any other method that is appropriate under law.

Section 12.03 *Interpretation*. It is intended that this Agreement shall be interpreted in a manner such that the Trustee shall be prohibited from taking any action if the effect of such action would constitute a power under this Trust Agreement to "vary the investment of the certificate holders" as set forth in Section 301.7701-4(c)(1) of the Treasury Regulations promulgated under the Internal Revenue Code of 1986, as amended, as such regulations may be amended, and as further interpreted by Revenue Ruling 2004-86, 2004-2 C.B. 191, or any successor ruling, notice or other pronouncement by the Internal Revenue Service.

Section 12.04 *Merger or Consolidation of Delaware Trustee or Trustee*. Neither a change of name of either the Delaware Trustee or the Trustee, nor any merger or consolidation of its corporate powers with another bank or with a trust company or other Entity, nor the sale or transfer of all or substantially all of its institutional and corporate trust operations to a separate bank, trust company, corporation or other Entity shall adversely affect

36

such resulting or successor party's right or capacity to act hereunder and any such successor shall be the successor Delaware Trustee or the Trustee hereunder without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by law; *provided*, *however*, that the Delaware Trustee or any successor thereto shall maintain its principal place of business in the State of Delaware; and *provided*, *further*, that, in the case of any successor Trustee or Delaware Trustee, it shall continue to meet the requirements of <u>Section 6.05</u>.

Section 12.05 *Change in Trust Name*. Upon the written request by PCEC submitted to the Trustee and the Delaware Trustee, the Trustee shall, without the vote or consent of any Trust Unitholders, take all action necessary to change the name of the Trust to a name mutually agreeable to the Trustee and PCEC and, upon effecting such name change, the Delaware Trustee, acting pursuant to the written instructions of the Trustee, shall amend the Certificate of Trust on file in the office of the Secretary of State of Delaware to reflect such name change.

Section 12.06 *Filing of this Agreement*. There is no obligation on the part of the Trustee that this Agreement or any executed copy hereof be filed in any county or parish in which any of the Trust Estate is located or elsewhere, but the same may be filed for record in any county or parish by the Trustee. In order to avoid the necessity of filing this Agreement for record, each of the Delaware Trustee and the Trustee agrees that for the purpose of vesting the record title to the Trust Estate in any successor trustee, the succeeded trustee shall, upon appointment of any successor trustee, execute and deliver to such successor trustee appropriate assignments or conveyances.

Section 12.07 *Choice of Law*. This Agreement and the Trust shall be governed by the laws of the State of Delaware (without regard to the conflict of laws principles thereof) in effect at any applicable time in all matters, including the validity, construction and administration of this Agreement and the Trust, the enforceability of the provisions of this Agreement, all rights and remedies hereunder, and the services of the Delaware Trustee and Trustee hereunder. Furthermore, except as otherwise provided in this Agreement, the rights, powers, duties and liabilities of the Delaware Trustee, the Trustee and the Trust Unitholders shall be as provided under the Trust Act and other applicable laws of the State of Delaware in effect at any applicable time; *provided*, *however*, that to the fullest extent permitted by applicable law there shall not be applicable to the Trustee, the Delaware Trustee, the Trust Unitholders, the Trust or this Agreement any provision of the laws (common or statutory) of the State of Delaware pertaining to trusts (other than the Trust Act) that relate to or regulate, in a manner inconsistent with the terms hereof, (i) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (ii) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (iii) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (iv) fees or other sums payable to trustees, officers, agents or employees of a trust, (v) the allocation of receipts and expenditures to income or principal, (vi) restrictions or limitations on the permissible nature, amount or concentration of

37

trust investments or requirements relating to the titling, storage or other manner of holding or investing trust assets or (vii) the establishment of fiduciary or other standards of responsibility or limitations on the acts or powers of trustees that are inconsistent with the limitations or authorities and powers of the trustees hereunder as set forth or referenced in this Agreement. Section 3540 of Title 12 of the Delaware Code shall not apply to the Trust.

Section 12.08 *Separability*. If any provision of this Agreement or the application thereof to any Person or circumstances shall be finally determined by a court of proper jurisdiction to be illegal, invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those as to which it is held illegal, invalid or unenforceable shall not be affected thereby, and every remaining provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 12.09 *Notices*. Any and all notices or demands permitted or required to be given under this Agreement shall be in writing (or be capable of being reproduced in paper format) and shall be validly given or made if (a) personally delivered, (b) delivered and confirmed by facsimile or like instantaneous transmission service, or by Federal Express or other overnight courier delivery service, which shall be effective as of confirmation of receipt by the courier at the address for notice hereinafter stated, (c) solely in the case of notice to any Trust Unitholder, by press release in a nationally recognized and distributed media or by means of electronic transmission or as otherwise permitted by applicable law, or

(d) deposited in the United States mail, first class, postage prepaid, certified or registered, return receipt requested, addressed as follows:

If to the Trustee, to:

> The Bank of New York Mellon Trust Company, N.A.
> Institutional Trust Services
> 919 Congress Avenue, Suite 500
> Austin, Texas 78701
> Attention: Michael J. Ulrich
> Facsimile No.: (512) 479-2253

With a copy to:

> Bracewell & Giuliani LLP
> 111 Congress Avenue, Suite 2300
> Austin, Texas 78701
> Attention: Thomas Adkins
> Facsimile No.: (512) 479-3940

38

---

If to the Delaware Trustee, to:

> Wilmington Trust, National Association
> 1100 North Market Street
> Wilmington, Delaware 19890-1615
> Attention: Corporate Trust Administration
> Facsimile No.: (302) 636-4140

With a copy to:

> Richards, Layton & Finger, P.A.
> 920 N. King Street
> Wilmington, Delaware 19801
> Attention: Eric A. Mazie
> Facsimile No.: (302) 498-7678

If to PCEC, to:

> 515 South Flower Street, Suite 4800
> Los Angeles, California 90071
> Attention: Gregory C. Brown
> Facsimile No.: (213) 225-5916

With a copy to:

> Latham & Watkins LLP
> 811 Main Street, Suite 3700
> Houston, Texas 77002
> Attention: Sean T. Wheeler
> Facsimile No.: (713) 546-5401

If to a Trust Unitholder, to:

> The Trust Unitholder at its last address as shown on the ownership records maintained by the Trustee.

Notice that is mailed in the manner specified shall be conclusively deemed given three days after the date postmarked or upon receipt, whichever is sooner. Any party to this Agreement may change its address for the purpose of receiving notices or demands by notice given as provided in this <u>Section 12.09</u>.

Section 12.10 *Counterparts*. This Agreement may be executed in a number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

39

Section 12.11 *No Fiduciary Duty of PCEC or its Affiliates*. The parties hereto and the Trust Unitholders expressly acknowledge and agree that PCEC and its Affiliates are entering into the Transaction Documents and may exercise their rights and discharge their obligations fully, without hindrance or regard to conflict of interest principles, duty of loyalty principles or other breach of fiduciary duties, all of which defenses, claims or assertions are hereby expressly waived by the other parties hereto and the Trust Unitholders. Neither PCEC nor any of its Affiliates shall be a fiduciary with respect to the Trust or the Trust Unitholders. To the extent that, at law or in equity, PCEC or its Affiliates have duties (including fiduciary duties) and liabilities relating thereto to the Trust or to the Trust Unitholders, such duties and liabilities are hereby eliminated and waived to the fullest extent permitted by law.

*[Signature page follows]*

40

IN WITNESS WHEREOF, PCEC, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed the day and year first above written.

**PACIFIC COAST ENERGY COMPANY LP**

By:  PCEC (GP) LLC,
    its general partner

By: /s/ Randall H. Breitenbach
    Name: Randall H. Breitenbach
    Title:   Chief Executive Officer

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By: /s/ Jessica Williams
    Name: Jessica Williams
    Title:   Banking Officer

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**

By: /s/ Michael J. Ulrich
    Name: Michael J. Ulrich
    Title:   Vice President

[Signature Page to Amended and Restated Trust Agreement]

# EXHIBIT 2

# PCOT CONVEYANCE

## Pacific Coast Oil Trust



## CONVEYANCE OF NET PROFITS INTERESTS
## AND OVERRIDING ROYALTY INTEREST

This Conveyance of Net Profits Interests and Overriding Royalty Interest (as may be amended, supplemented or otherwise modified from time to time, this "Conveyance") has been executed on May ___, 2012 (the "Execution Date"), but is made effective as of the Effective Time (as defined below), from Pacific Coast Energy Company LP, a Delaware limited partnership ("Grantor") to The Bank of New York Mellon Trust Company, N.A., with offices at 919 Congress Avenue, Suite 500, Austin, Texas 78701, Attention: Michael J. Ulrich, as trustee ("Trustee"), acting not in its individual capacity but solely as trustee of the Pacific Coast Oil Trust (the "Trust"), a statutory trust created under the Delaware Statutory Trust Act as of January 3, 2012 (such Trust being the "Grantee").

Grantor and Grantee are sometimes referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used in this Conveyance shall have the respective meanings ascribed to them in Article II.

## ARTICLE I
## GRANT OF NET PROFITS INTERESTS
## AND OVERRIDING ROYALTY INTEREST

For and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to Grantor paid by Grantee, the receipt and sufficiency of which are hereby acknowledged by Grantor, Grantor has bargained, sold, granted, conveyed, transferred, assigned, set over, and delivered, and by this Conveyance does hereby bargain, sell, grant, convey, transfer, assign, set over, and deliver unto Grantee, its successors and assigns, effective as of the Effective Time, (i) the Developed Properties Net Profits Interest, which shall be calculated in accordance with the provisions of Article IV and payable solely out of the Developed Properties Net Profits, all as more fully provided hereinbelow; (ii) the Remaining Properties Net Profits Interest, which shall be calculated in accordance with the provisions of Article IV and payable solely out of the Remaining Properties Net Profits, all as more fully provided hereinbelow; and (iii) the Overriding Royalty Interest, which shall be calculated and paid in accordance with the provisions of Article IV and payable solely out of the balance in the Overriding Royalty Account, all as more fully provided hereinbelow.

TO HAVE AND TO HOLD the Developed Properties Net Profits Interest and the Remaining Properties Net Profits Interest, and the Overriding Royalty Interest, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its successors and assigns, subject, however, to the following terms and provisions:

## ARTICLE II
## INTERPRETATION; DEFINITIONS

Section 2.1    Interpretation.   All references in this Conveyance to Exhibits, Articles, Sections, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Articles, Sections, subsections, clauses and other subdivisions of or to this Conveyance unless expressly provided otherwise. Titles or headings appearing at the beginning of any Exhibits,

Articles, Sections, subsections, clauses and other subdivisions of this Conveyance are for convenience only, do not constitute any part of this Conveyance and shall be disregarded in construing the language hereof. The words "this Conveyance," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Conveyance as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause," and words of similar import, refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to United States dollars. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the date of this Conveyance. Unless expressly provided to the contrary, the word "or" is not exclusive. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Exhibits referred to herein are attached to and by this reference incorporated herein for all purposes. Reference herein to any federal, state, local or foreign law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

Section 2.2    Definitions.  As used herein, the following terms shall have the respective meanings ascribed to them below:

"Administrative Charge" shall mean an amount equal to one million dollars ($1,000,000), which amount shall change on an annual basis commencing on April 1, 2013 based on the CPI.

"Administrative Hedge Costs" shall mean those costs paid by Grantor from and after the Effective Time to counterparties under the Existing Hedges or to Persons that provide credit to maintain any Existing Hedge, but excluding any Hedge Settlement Costs.

"Affiliate" shall mean with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" (and the related terms "controlling," "controlled by," and "under common control") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise; *provided* that Breitburn Energy Partners L.P. and its subsidiaries shall not be considered or deemed to be Affiliates of Grantor.

"Business Day" shall mean any day that is not a Saturday, Sunday, a holiday determined by the NYSE Regulation, Inc. as affecting "ex" dates" or any other day on which national banking institutions in New York, New York or Austin, Texas are closed as authorized or required by law.

"Conveyance" shall have the meaning ascribed to it in the Preamble to this Conveyance.

"CPI" shall mean the year-over-year unadjusted percent change of the all items index (as of December of the then-current calendar year) of the Consumer Price Index for All Urban Consumers (CPI-U) for the US City Average, 1982-1984 = 100, published by the United States Department of Labor, Bureau of Labor Statistics.

2

"Deepest Producing Formation" shall mean, for each Developed Properties Subject Well, the deepest horizon currently producing, or capable of producing, Hydrocarbons in that Developed Properties Subject Well, as set forth on Exhibit D.

"Developed Properties Debit Balance" shall have the meaning given such term in Section 4.2(b).

"Developed Properties Eligible Materials" shall mean Materials for which amounts in respect of the cost of such Materials were properly debited to the Developed Properties Net Profits Account.

"Developed Properties Excluded Deductions" shall mean deduction amounts related to any of the following items:  (a) any amount that has also been used to reduce or offset the amount of the Developed Properties Subject Hydrocarbons (or proceeds of production thereof) or has otherwise not been included therein (including proceeds attributable to royalties, overriding royalties, production payments and other charges burdening the Developed Properties Subject Interests as of the Effective Time if such charges have been used to reduce or offset the amount of the Developed Properties Subject Hydrocarbons (or proceeds of production thereof)); (b) any overriding royalty, production payment or other charge burdening the Developed Properties Subject Interests which was created by Grantor after the Effective Time; (c) any general, administrative or overhead costs paid or incurred by Grantor or its Affiliates, except for those expressly permitted hereunder; (d) any interest, premiums, fees or similar charges arising out of borrowings or purchases of any goods, equipment or other items on credit, whether or not used on or otherwise related to the Developed Properties Subject Interests; (e) all Developed Properties Processing Costs; (f) any amounts paid by Grantor (initial or a successor) to such Grantor's predecessor in interest with respect to part or all of the Developed Properties Subject Interests (including without limitation any purchase price or other consideration paid by Grantor to such predecessor in interest to acquire all or part of the Developed Properties Subject Interests); (g) any amount arising from any condition, circumstance, activity, practice, incident, action, or plan that gives rise to any material liability, or otherwise forms the basis of any claim, action, suit, proceeding, hearing or investigation, based on or related to the processing, distribution, use, treatment, storage, disposal, transport, or handling, or the emission, discharge, Release or threatened Release into the environment, of any pollutant, contaminant, or hazardous substance or other toxic material or waste from or attributable to the use or operation of any of the Developed Properties Subject Interests which either occurred prior to, on or after the Effective Time and are attributable to Grantor's gross negligence or willful misconduct; and (h) costs and expenses arising out of operations covered by the AFEs shown on Exhibit B-1.

"Developed Properties Excluded Proceeds" shall mean the following proceeds and amounts:

(a)     any Developed Properties Offset Amounts, except that, for purposes of determining the proceeds and amounts that constitute "Developed Properties Excluded Proceeds" for purposes hereof, (i) there shall not be any deductions to such proceeds and amounts, in the cases of subsections (c), (h) and (j) of the definition for "Developed Properties Offset Amounts," for the actual costs of salvage or disposition or any Developed Properties Processing Costs, as applicable, (ii) cash payments received by Grantor as a result of any pooling or unitization of the

3

Developed Properties Subject Interests shall be considered Developed Properties Excluded Proceeds regardless of whether the costs giving rise to such payments were charged to the Developed Properties Net Profits Interest, and (iii) insurance proceeds received by Grantor shall be considered Developed Properties Excluded Proceeds regardless of whether the cost of such insurance was charged to the Developed Properties Net Profits Account;

(b)     any proceeds that are withheld from Grantor for any reason (other than at the request of Grantor), until such time that the proceeds are actually received by Grantor, *provided* that proceeds that are received by Grantor and promptly deposited by it with an escrow agent in order to resolve a dispute with respect thereto shall not be considered to be "received" by Grantor for purposes of this definition until the time that such amounts are actually collected by Grantor;

(c)     if Grantor becomes an underproduced party under any Gas balancing or similar arrangement affecting the Developed Properties Subject Interests, any amounts for any Gas attributable to the Developed Properties Subject Interests for which Grantor is entitled to receive "make-up" Gas in the future that would otherwise be attributable to the Developed Properties Subject Interests;

(d)     if Grantor becomes an overproduced party under any Gas balancing or similar arrangement affecting the Developed Properties Subject Interests, any amounts for any Gas taken by an underproduced party as "make-up" Gas that would otherwise be attributable to the Developed Properties Subject Interests;

(e)     any amount received by Grantor after the Effective Time in respect of any production of Developed Properties Subject Hydrocarbons prior to the Effective Time;

(f)     any amount to which Grantor is entitled by virtue of a judgment of a court of competent jurisdiction resolving a dispute hereunder between Grantee and Grantor in favor of Grantor, or any amount paid to Grantor in settlement of such dispute;

(g)     any amounts or compensation received by Grantor in connection with any Prior Reversionary Interest; and

(h)     any additional proceeds (*i.e.,* proceeds attributable to the non-participating party) from the sale of Hydrocarbons related to any Developed Properties Subject Well with respect to which Grantor elects to be a participating party (whether such rights are available pursuant to an operating agreement or other agreement or arrangement) with respect to any operation with respect to such Developed Properties Subject Well for which another party or parties have elected not to participate in such operation (or have elected to abandon such Developed Properties Subject Well) and Grantor elects to pay the costs of such nonparticipating or abandoning party and as a result of which Grantor becomes entitled to receive, either temporarily (*i.e.,* through a period of recoupment) or permanently such additional proceeds from the sale of Hydrocarbons related to such Developed Properties Subject Well.

"Developed Properties Gross Deductions" shall mean the following costs and expenses (and, where applicable, losses, liabilities and damages), to the extent that the same (x) are

4

properly allocable to the Developed Properties Subject Interests (and any related equipment or property used in connection therewith) and the production and marketing of Developed Properties Subject Hydrocarbons therefrom and (y) have been incurred or accrued by Grantor, from and after the Effective Time, but that are not attributable to a production month that occurs prior to the Effective Time (*excluding*, in all instances, the Developed Properties Excluded Deductions):

(a)     all costs paid by Grantor (i) for drilling, development, production and abandonment operations (including activities necessary to gain access to and prepare well locations for drilling; operations and activities related to drilling and equipping Developed Properties Subject Wells and service and injector wells; operations constituting or associated with workovers; the plugging and abandoning of any well or facility on the Developed Properties Subject Interests; and secondary recovery, pressure maintenance, repressuring, recycling and other operations conducted for the purpose of enhancing production from the Developed Properties Subject Interests), (ii) for all direct labor (including employee and fringe benefits) and other services necessary for drilling, operating, producing and maintaining the Developed Properties Subject Interests and workovers of any Developed Properties Subject Well, (iii) for treatment, dehydration, compression, separation and transportation of the Developed Properties Subject Hydrocarbons (including activities related to the acquisition, construction and installation of production and injection facilities), (iv) for all Materials purchased for use on, or in connection with, any of the Developed Properties Subject Interests and (v) for any other operations with respect to the exploration, development or operation of Developed Properties Subject Hydrocarbons (including costs for the maintenance of any Developed Properties Subject Well or facility on the Leases; replacement of any facilities; the restoration or remediation of the surface or subsurface sites associated with the Developed Properties Subject Interests or lands pooled or unitized therewith; and any marketing fees paid to non-Affiliates of Grantor); *provided, however,* that (A) the costs charged to the Developed Properties Net Profits Account for such items shall be made (1) on the same basis as such costs are charged under the operating agreement associated with the applicable portion of the Developed Properties Subject Interests at the time the transaction giving rise to such costs occurred, or (2) in the absence of such operating agreement, on the same basis as Grantor is charged under existing third party arrangements, or (3) in the absence of both such operating agreement and such third-party arrangements, on the same basis as costs are typically charged under operating agreements generally used for onshore operations in the State of California; and (B) if Grantor elects to pay the costs of a nonconsenting party or nonparticipating party with respect to which the gross proceeds derived from such costs are not credited to the Developed Properties Net Profits Account, Grantor shall be solely responsible for such costs;

(b)     (i) all losses, costs, expenses, liabilities and damages (including outside legal, accounting and engineering services) attributable to, or incident to the operation or maintenance of, the Developed Properties Subject Interests associated with (A) defending, prosecuting, handling, investigating or settling litigation, administrative proceedings, claims (including lien claims other than liens for borrowed funds), damages, judgments, fines, penalties and other liabilities, (B) the payment of judgments, penalties and other liabilities (including interest thereon), paid by Grantor and not reimbursed under insurance maintained by Grantor or others (including all losses, costs, expenses, liabilities and damages arising from third-party

claims, lawsuits or causes of action for personal injury or death or damage to personal or real property (both surface and subsurface), including those losses, costs, expenses, liabilities and damages arising under Environmental Laws with respect to the Developed Properties Subject Interests or in any way from the environmental condition of the Developed Properties Subject Interests), (C) the payment or restitution of any proceeds of Developed Properties Subject Hydrocarbons, (D) complying with applicable local, state and federal statutes, ordinances, rules and regulations, and (E) tax or royalty audits, and (ii) any other loss, cost, expense, liability or damage (including settlement costs and reasonable attorneys' fees) incurred by Grantor in relation to the Developed Properties Subject Interests not paid or reimbursed under insurance; excluding, in each instance, any expenses incurred by Grantor in litigation of any claim or dispute arising hereunder between the Parties or amounts paid by Grantor to Grantee pursuant to a final order entered by a court of competent jurisdiction resolving any such claim or dispute or amounts paid by Grantor to Grantee in connection with the settlement of any such claim or dispute;

(c)     all taxes, charges and assessments (*excluding* federal and state income, transfer, mortgage, inheritance, estate, franchise and like taxes) incurred, accrued or paid by Grantor with respect to the ownership of the Developed Properties Subject Interests or the extraction of the Developed Properties Subject Hydrocarbons, including production, severance or excise and other similar taxes, charges and assessments assessed against, or measured by, the production of (or the proceeds or value of production of) Developed Properties Subject Hydrocarbons, occupation taxes, gathering, pipeline, excise, sales, use and other taxes, and ad valorem and property taxes, charges and assessments assessed against or attributable to the Developed Properties Subject Interests or any equipment used in connection with production from any of the Developed Properties Subject Interests and any extraordinary or windfall profits taxes, charges and assessments that may be assessed in the future based upon profits realized or prices received from the sale of Developed Properties Subject Hydrocarbons;

(d)     all insurance premiums attributable to the ownership or operation of the Developed Properties Subject Interests paid by Grantor for insurance actually carried for periods after the Effective Time with respect to the Developed Properties Subject Interests, or any equipment located on any of the Developed Properties Subject Interests, or incident to the operation or maintenance of the Developed Properties Subject Interests;

(e)     all amounts and other consideration paid by Grantor for (i) rent and the use of or damage to the surface, (ii) delay rentals, shut-in well payments, minimum royalties and similar payments, and (iii) fees for renewal, extension, modification, amendment, replacement or supplementation of the Leases included in the Developed Properties Subject Interests;

(f)     all amounts charged by the relevant operator as overhead, administrative or indirect charges specified in the applicable operating agreements or other arrangements now or hereafter covering the Developed Properties Subject Interests or operations with respect thereto;

(g)     to the extent Grantor is the operator of certain of the Developed Properties Subject Interests and there is no operating agreement covering such portion of the Developed Properties Subject Interests, those overhead, all administrative or indirect charges that are

6

allocated by Grantor to such portion of the Developed Properties Subject Interests, to the extent that such charges are allocated in the same manner that Grantor allocates to other similarly owned and operated properties;

(h)     if, as a result of the occurrence of the bankruptcy or insolvency or similar occurrence of the purchaser of Developed Properties Subject Hydrocarbons, any and all amounts previously credited to the Developed Properties Net Profits Account are reclaimed from Grantor or its representative, then the amounts reclaimed as promptly as practicable following Grantor's payment thereof;

(i)     all costs and expenses paid by Grantor for recording this Conveyance and, immediately prior to the last Payment Period, costs estimated in good faith to record the termination or release of this Conveyance;

(j)     all Gross Administrative Hedge Costs;

(k)     all Gross Hedge Settlement Costs;

(l)     all amounts previously included, or otherwise accounted for, in the calculation of Developed Properties Gross Profits but subsequently paid by Grantor as a refund, interest or penalty;

(m)     at the option of Grantor, all amounts reserved for approved development expenditure projects on the Developed Properties Subject Interests, including amounts for drilling, recompletion and workover costs, *provided* that, such amounts, (i) to the extent not already spent or incurred by Grantor, will, together with such amounts on the Remaining Properties Subject Interests, at no time exceed two million dollars ($2,000,000) in the aggregate, and (ii) shall not be included as part of the Developed Properties Gross Deductions in subsequent Payment Periods; and

(n)     all costs accrued for future plugging and abandonment of any well or facility on the Developed Properties Subject Interests; *provided* that such amounts shall not be included as part of the Developed Properties Gross Deductions in subsequent Payment Periods.

"Developed Properties Gross Fair Value" means an amount equal to the Fair Value divided by eighty percent (80%).

"Developed Properties Gross Profits" shall mean, for each Payment Period following the Effective Time, an amount equal to the sum of (*excluding*, in all instances, the Developed Properties Excluded Proceeds) the gross proceeds received by Grantor during the applicable Payment Period (and that are not attributable to a production month that occurs prior to the Effective Time) from the sale of all Developed Properties Subject Hydrocarbons, including the following proceeds and amounts: (a) all proceeds and consideration received, directly or indirectly, for advance payments and payments under take-or-pay and similar provisions of Production Sales Contracts when credited against the price for delivery of production; and (b) all proceeds and amounts received by Grantor (i) from any "make up" Gas taken by Grantor as a result of its position as an underproduced party under any Gas balancing or similar arrangement

7

affecting the Developed Properties Subject Interests, (ii) received as a balancing of accounts under a Gas balancing or other similar arrangement affecting the Developed Properties Subject Interests either as an interim balancing or at the depletion of the reservoir, and (iii) for any Gas taken by Grantor attributable to the Developed Properties Subject Interests in excess of its entitlement share of such Gas; *provided, however,* that Developed Properties Gross Profits (A) shall not include any Developed Properties Processing Proceeds and (B) in the event that Developed Properties Subject Hydrocarbons are Processed prior to sale, shall only include the Payment Value of such Developed Properties Subject Hydrocarbons before any such Processing.

"Developed Properties Net Deductions" shall mean, for each Payment Period following the Effective Time, an amount equal to the excess, if any, of (a) the sum of the Developed Properties Gross Deductions over (b) the sum of the Developed Properties Offset Amounts.

"Developed Properties Net Profits" shall have the meaning given such term in Section 4.2(a).

"Developed Properties Net Profits Account" shall mean the account maintained in accordance with the provisions of Sections 4.1(a), (b), (e) and (f).

"Developed Properties Net Profits Interest" shall mean an overriding royalty interest calculated as a variable undivided percentage interest in and to the Developed Properties Subject Hydrocarbons entitling Grantee to receive a sum equal to the Developed Properties Proceeds Percentage of the Developed Properties Net Profits, if any, for each Payment Period for the term of this Conveyance.

"Developed Properties NPI Calculation" shall have the meaning given such term in Section 4.2(a).

"Developed Properties NPI Payment Amount" shall have the meaning given such term in Section 4.2(a).

"Developed Properties Offset Amounts" shall mean the following amounts (net of any applicable taxes):

(a) any amounts received by Grantor as delay rentals, bonus, royalty or other similar payments in relation to the Developed Properties Subject Interests;

(b) any amounts received by Grantor in connection with, or for dry hole, bottom hole or other similar contributions related to, the Developed Properties Subject Interests;

(c) upon salvage or other disposition, the applicable actual salvage value (determined in accordance with the applicable operating agreement then in effect and binding upon Grantor or, in the absence of such agreement, based on the fair market value of such items in the region in which they are located) of any Developed Properties Eligible Materials, less, in each instance, the actual costs of salvage or other disposition paid or incurred by Grantor in connection with such sale;

(d)    any cash payments received by Grantor as a result of any pooling or unitization of the Developed Properties Subject Interests if the costs giving rise to such payments were charged to the Developed Properties Net Profits Account, directly or indirectly;

(e)    any insurance proceeds received by Grantor as a result of any loss, liability or damage relating to the Developed Properties Subject Interests, Developed Properties Eligible Materials or Developed Properties Subject Hydrocarbons if the cost of such insurance was charged to the Developed Properties Net Profits Account;

(f)    any amounts received by Grantor from third parties as rental or use fees for Developed Properties Eligible Materials;

(g)    the gross proceeds of any judgments or claims received by Grantor for damages occurring on or after the Effective Time to (i) the Developed Properties Subject Interests, (ii) any Developed Properties Eligible Materials and (iii) any Developed Properties Subject Hydrocarbons;

(h)    to the extent not covered under subsection (c) above, any proceeds received by Grantor from the sale of Developed Properties Eligible Materials less the actual costs paid or incurred by Grantor in connection with such sale;

(i)    any payments made to Grantor in connection with the drilling or deferring of drilling of any Developed Properties Subject Well;

(j)    for any Developed Properties Subject Hydrocarbons that are Processed before sale, the excess, if any, of the Developed Properties Processing Proceeds arising therefrom (that are received by Grantor) over the Developed Properties Processing Costs of such Processing (that are paid or incurred by Grantor);

(k)    any interest, penalty or other amount not derived from the sale of the Developed Properties Subject Hydrocarbons that is paid to Grantor by the purchaser of production or escrow agent in connection with proceeds withheld or deposited with an escrow agent;

(l)    any Gross Hedge Settlement Revenues;

(m)    in the event that any Transfers described in Section 6.1(a)(ii) occur, the Developed Properties Gross Fair Value of the Developed Properties Net Profits Interest released during the relevant Payment Period in connection with such Transfers;

(n)    in the event of cessation of production of Developed Properties Subject Hydrocarbons as described in Section 5.9(b), the Developed Properties Gross Fair Value of the Developed Properties Net Profits Interest released during the relevant Payment Period as described in Section 5.9(b); and

(o)    any amounts of Gross Reversionary Compensation associated with a conveyance of all or any portion of the Developed Properties Subject Interests, or cessation of

9

production from any Developed Properties Subject Well, in connection with a Prior Reversionary Interest pursuant to Section 6.2.

"Developed Properties Proceeds Percentage" shall mean eighty percent (80%).

"Developed Properties Processing Costs" shall mean the costs of Processing that generate Developed Properties Processing Proceeds received by Grantor.

"Developed Properties Processing Proceeds" shall mean the excess, if any, of (a) proceeds received by Grantor from the sale of Developed Properties Subject Hydrocarbons that are the result of any Processing over (b) the part of such proceeds that represents the Payment Value of such Developed Properties Subject Hydrocarbons before any Processing.

"Developed Properties Subject Hydrocarbons" shall mean all Hydrocarbons in and under and that may be produced, saved, and sold from, and are attributable to, the Developed Properties Subject Interests from and after the Effective Time, after deducting the appropriate share of all royalties and any overriding royalties, production payments, net profits interests and other similar charges (except the Developed Properties Net Profits Interest) burdening the Developed Properties Subject Interests as of the Effective Time, *provided* that, (a) there shall not be included in the Developed Properties Subject Hydrocarbons (i) any Hydrocarbons attributable to non-consent operations conducted with respect to the Developed Properties Subject Interests (or any portion thereof) as to which Grantor shall be a non-consenting party as of the Effective Time that are dedicated to the recoupment or reimbursement of costs and expenses of the consenting party or parties by the terms of the relevant operating agreement, unit agreement, contract for development, or other instrument providing for such non-consent operations (including any interest, penalty or other amounts related thereto), or (ii) any Hydrocarbons lost in production or marketing or used by Grantor for drilling, production or plant operations (including fuel, secondary or tertiary recovery) conducted solely for the purpose of producing Developed Properties Subject Hydrocarbons from the Developed Properties Subject Interests, and (b) there shall be included in the Developed Properties Subject Hydrocarbons any Hydrocarbons attributable to non-consent operations conducted with respect to the Developed Properties Subject Interests (or any portion thereof) as to which Grantor shall be a non-consenting party as of the Effective Time that are produced, saved, and sold from, and are attributable to the Developed Properties Subject Interests after the Effective Time from and after the recoupment or reimbursement of costs and expenses (including any interest, penalty or other amounts related thereto) of the consenting party or parties by the terms of the relevant operating agreement, unit agreement, contract agreement, contract development, or other instruments providing for such non-consent operations.

"Developed Properties Subject Interests" shall mean each kind and character of right, title, claim, or interest (solely for purposes of this definition, collectively "rights") that Grantor has or owns in the Developed Properties Subject Wells, insofar and only insofar as such rights pertain to the Targeted Formations, whether such rights be under or by virtue of a lease, a unitization or pooling order or agreement, an operating agreement, a farmout agreement, a division order, or a transfer order or be under or by virtue of any other type of claim or title, legal or equitable, recorded or unrecorded, even though Grantor's interest be incorrectly or incompletely described in, or a description thereof omitted from, Exhibit A, all as such rights

10

shall be (a) enlarged or diminished by virtue of the provisions of Section 5.2, and (b) enlarged by the discharge of any obligations for payments out of production or by the removal of any charges or encumbrances to which any of such rights are subject at the Effective Time (*provided* that such discharge or removal is pursuant to the express terms of the instrument that created such charge, obligation or encumbrance) and any and all renewals, extensions and replacements of the right occurring within one year after the expiration of such rights.

"Developed Properties Subject Well" shall mean (i) each well set forth on Exhibit D, (ii) any well drilled on the Leases as a Replacement Well for a Developed Properties Subject Well, and (iii) any surface expression that produces Hydrocarbons that are contained in a controlled manner.

"Effective Time" shall mean 12:01 a.m., Pacific Coast Time, on April 1, 2012.

"Environmental Laws" shall mean, as the same have been amended to the date hereof, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; and all similar laws as of the date hereof of any governmental body having jurisdiction over the property in question addressing pollution or protection of the environment and all regulations implementing the foregoing that are applicable to the operation and maintenance of the Subject Interests.

"Execution Date" shall have the meaning ascribed to it in the Preamble to this Conveyance.

"Existing Hedges" shall mean the Hedges entered into by Grantor and described on Exhibit C.

"Fair Value" shall mean an amount equal to the excess, if any, of (a) the proceeds which could reasonably be expected to be obtained from the sale of such portion of the applicable Net Profits Interest to a party which is not an Affiliate of either Grantor or Grantee on an arms-length negotiated basis, taking into account relevant market conditions and factors existing at the time of any such proposed sale or release, over (b) any sales costs, commissions and brokerage fees that would reasonably be expected in relation to such sale.

"GAAP" shall mean U.S. generally accepted accounting principles.

"Gas" shall mean natural gas and other gaseous hydrocarbons or minerals, including helium, but excluding any Gas Liquids.

"Gas Liquids" shall mean those natural gas liquids and other liquid hydrocarbons, including ethane, propane, butane and natural gasoline, and mixtures thereof, that are removed

11

from a Gas stream by the liquids extraction process of any field facility or gas processing plant and delivered by the facility or plant as natural gas liquids.

"Grantee" shall have the meaning ascribed to it in the Preamble to this Conveyance.

"Grantor" shall have the meaning ascribed to it in the Preamble to this Conveyance.

"Gross Administrative Hedge Costs" shall mean all Administrative Hedge Costs paid by Grantor divided by eighty percent (80%).

"Gross Hedge Settlement Costs" shall mean all Hedge Settlement Costs paid by Grantor divided by eighty percent (80%).

"Gross Hedge Settlement Revenues" shall mean any Hedge Settlement Revenues divided by eighty percent (80%).

"Gross Reversionary Compensation" means an amount equal to (a) that portion of the Reversionary Compensation that is attributable to the Net Profits Interest released pursuant to Section 6.2 divided by (b) eighty percent (80%) in the case of the Developed Properties Net Profits Interest, or twenty-five percent (25%) in the case of the Remaining Properties Net Profits Interest.

"Hedge" shall mean any commodity hedging transaction pertaining to Hydrocarbons, whether in the form of (a) forward sales and options to acquire or dispose of a futures contract solely on an organized commodities exchange, (b) derivative agreements for a swap, cap, collar or floor of the commodity price, or (c) similar types of financial transactions classified as "notional principal contracts" pursuant to Treasury Regulation § 1.988-1(a)(2)(iii)(B)(2).

"Hedge Settlement Costs" shall mean any and all payments required to be made by Grantor from and after the Effective Time to the counterparties in connection with the settlement or mark-to-market of trades made under any Existing Hedge and all payments made by Grantor for any early termination of any Existing Hedge.

"Hedge Settlement Revenues" shall mean any and all payments received by Grantor from and after the Effective Time, and attributable to periods after the Effective Time, from the counterparties in connection with the settlement or mark-to-market of trades made under any Existing Hedge and all payments received by Grantor for any early termination of any Existing Hedge.

"Hydrocarbons" shall mean Oil, Gas and Gas Liquids.

"Leases" shall mean, subject to the depth limitations and other restrictions that may be set forth therein, (a) the oil and gas leases, oil, gas and mineral leases, subleases and other leaseholds, contractual rights, and other rights to hydrocarbons set forth on Exhibit A as to all lands and depths described in such lease (or the applicable part or portion thereof, if limited in depth or areal extent in Exhibit A) and any interest therein and any leasehold interest in any other lease of Hydrocarbons derived from the pooling or unitization of each such lease (or portion

thereof, if limited in depth or areal extent in Exhibit A) with other leases, together with any interest acquired or maintained in any and all renewals and extensions of such lease, (b) any replacement lease taken upon or in anticipation of termination of such lease (if executed and delivered during the term of or within one year after the expiration of the predecessor lease), as to all lands and depths described in the predecessor lease and in which Grantor had an interest under the predecessor lease (unless the extended or predecessor lease is specifically limited in depth or areal extent in Exhibit A, in which event only the corresponding portion of such lease shall be considered a renewal or extension or a replacement lease subject to this Conveyance), and (c) any other leasehold, royalty, overriding royalty or fee interest described on Exhibit A.

"Materials" shall mean materials, supplies, equipment and other personal property or fixtures located on or used in connection with the Subject Interests.

"Mcf" shall mean one thousand cubic feet.

"Monthly Administrative Fee" shall mean a monthly administrative fee equal to one-twelfth ($\frac{1}{12}$) of the Administrative Charge.

"Monthly Statement" shall have the meaning given such term in Section 4.6.

"Net Profits Interests" shall mean the Developed Properties Net Profits Interest and the Remaining Properties Net Profits Interest, or if the context allows or requires, the Developed Properties Net Profits Interest or the Remaining Properties Net Profits Interest.

"Oil" shall mean crude oil, condensate and other liquid hydrocarbons recovered by field equipment or facilities, excluding Gas Liquids.

"ORI Properties Gross Profits" shall mean, for each Payment Period following the Effective Time, an amount equal to the sum of (a) the gross proceeds received by Grantor during the applicable Payment Period (and that are not attributable to a production month that occurs prior to the Effective Time) from the sale of all ORI Properties Subject Hydrocarbons, including the following proceeds and amounts: (i) all proceeds and consideration received, directly or indirectly, for advance payments and payments under take-or-pay and similar provisions of Production Sales Contracts when credited against the price for delivery of production; and (ii) all proceeds and amounts received by Grantor (A) from any "make up" Gas taken by Grantor as a result of its position as an underproduced party under any Gas balancing or similar arrangement affecting the ORI Properties Subject Interests, (B) received as a balancing of accounts under a Gas balancing or other similar arrangement affecting the ORI Properties Subject Interests either as an interim balancing or at the depletion of the reservoir, and (C) for any Gas taken by Grantor attributable to the ORI Properties Subject Interests in excess of its entitlement share of such Gas; and (b) the gross proceeds received by other working interest owners during the applicable Payment Period (and that are not attributable to a production month that occurs prior to the Effective Time) from the sale of Hydrocarbons produced, saved and sold from the properties and lands covered by the ORI Properties Subject Interests, including proceeds and amounts of the types described in subsections (a)(i) and (ii) above.

13

"ORI Properties Subject Hydrocarbons" shall mean all Hydrocarbons in and under and that may be produced, saved, and sold from, and are attributable to, the ORI Properties Subject Interests from and after the Effective Time, *provided* that, (a) there shall not be included in the ORI Properties Subject Hydrocarbons (i) any Hydrocarbons attributable to non-consent operations conducted with respect to the ORI Properties Subject Interests (or any portion thereof) as to which Grantor shall be a non-consenting party as of the Effective Time that are dedicated to the recoupment or reimbursement of costs and expenses of the consenting party or parties by the terms of the relevant operating agreement, unit agreement, contract for development, or other instrument providing for such non-consent operations (including any interest, penalty or other amounts related thereto), or (ii) any Hydrocarbons lost in production or marketing or used by Grantor for drilling, production or plant operations (including fuel, secondary or tertiary recovery) conducted solely for the purpose of producing ORI Properties Subject Hydrocarbons from the ORI Properties Subject Interests, and (b) there shall be included in the ORI Properties Subject Hydrocarbons any Hydrocarbons attributable to non-consent operations conducted with respect to the ORI Properties Subject Interests (or any portion thereof) as to which Grantor shall be a non-consenting party as of the Effective Time that are produced, saved, and sold from, and are attributable to the ORI Properties Subject Interests after the Effective Time from and after the recoupment or reimbursement of costs and expenses (including any interest, penalty or other amounts related thereto) of the consenting party or parties by the terms of the relevant operating agreement, unit agreement, contract agreement, contract development, or other instruments providing for such non-consent operations.

"ORI Properties Subject Interests" shall mean those Remaining Properties Subject Interests, and only those Remaining Properties Subject Interests, included in the Leases set forth on Exhibit E, but shall not include any Developed Properties Subject Interests.

"Overriding Royalty Account" shall mean the account maintained in accordance with the provisions of Sections 4.1(a), (d), (e) and (f).

"Overriding Royalty Interest" shall mean an overriding royalty interest calculated as an undivided percentage interest in and to the ORI Properties Subject Hydrocarbons entitling Grantee to receive, under certain circumstances described herein, a sum equal to the Overriding Royalty Interest Proceeds for any Payment Period for which Grantee is entitled to receive the Overriding Royalty Interest Proceeds. The Overriding Royalty Interest shall be free and clear of, and shall bear no burden or part of costs and expenses of exploration, drilling, testing, completing, development, production or operation, but shall bear its proportionate share of costs and expenses of gathering, handling, processing, treating, compression, transportation and marketing, and shall bear its proportionate share of ad valorem and production taxes.

"Overriding Royalty Interest Proceeds" shall have the meaning ascribed to it in Section 4.3(b).

"Party" or "Parties" shall have the meaning ascribed to it in the Preamble to this Conveyance.

"Payment Period" shall mean a calendar month, *provided* that for purposes of each Net Profits Interest and the Overriding Royalty Interest, (a) the initial Payment Period shall mean the

14

HN\932900.2

period from and after the Effective Time until April 30, 2012, and (b) the last Payment Period shall mean any portion of the calendar month during which the expiration of the term of this Agreement occurs from the beginning of such calendar month until and including the date of such expiration.

"Payment Value" of any Subject Hydrocarbons shall mean:

(a)     With respect to Oil and Gas Liquids, (i) the price actually received by Grantor pursuant to a Production Sales Contract with a non-Affiliated purchaser, or (ii) if there is no such Production Sales Contract, the fair market value of such Oil or Gas Liquids, on the date of delivery at the Lease, determined in accordance with generally accepted and usual industry practices; and

(b)     With respect to Gas, (i) the price specified in any Production Sales Contract for the sale of such Gas, or (ii) if such Gas cannot be sold pursuant to a Production Sales Contract, (A) the average of the three highest prices (adjusted for all material differences in quality) being paid at the time of production for Gas produced from the same field in sales between non-affiliated Persons (or, if there are not three such prices within such field, within a 50-mile radius of such field) but, for any Gas subject to price restrictions established, prescribed or otherwise imposed by any governmental authority having jurisdiction over the sale of such Gas, no more than the highest price permitted for such category or type of Gas after all applicable adjustments (including tax reimbursement, dehydration, compression and gathering allowances, inflation and other permitted escalations), or (B) if subsection (b)(ii)(A) above is not applicable, the fair market value of such Gas, on the date of delivery, at the Lease, determined in accordance with generally accepted and usual industry practices.

"Permitted Encumbrances" shall mean the following insofar as they cover, describe or relate to the Subject Interests or the lands described in any Lease:

(a)     the terms, conditions, restrictions, exceptions, reservations, limitations and other matters contained in the agreements, instruments and documents that create or reserve to Grantor its interests in any of the Leases, including any Prior Reversionary Interest; provided, however, that none of the foregoing shall operate to (i) reduce Grantor's "Net Revenue Interest" for any Developed Properties Subject Well to below the "Net Revenue Interest" set forth on Exhibit D for such Developed Properties Subject Well or increase the "Working Interest" of Grantor for any Developed Properties Subject Well above that "Working Interest" set forth on Exhibit D for such Developed Properties Subject Well (unless there is a proportionate increase in Grantor's corresponding "Net Revenue Interest" for such Developed Properties Subject Well); or (ii) reduce Grantor's average "Net Revenue Interest" for the Remaining Properties Leases to below the average "Net Revenue Interest" set forth on Exhibit A for such Remaining Properties Leases or increase the average "Working Interest" of Grantor for the Remaining Properties Leases above that average "Working Interest" set forth on Exhibit A for such Remaining Properties Leases (unless there is a proportionate increase in Grantor's corresponding average "Net Revenue Interest" for such Remaining Properties Leases);

(b)     any (i) undetermined or inchoate liens or charges constituting or securing the payment of expenses that were incurred incidental to maintenance, development, production

HN\932900.2

or operation of the Leases or for the purpose of developing, producing or processing Hydrocarbons therefrom or therein, and (ii) materialman's, mechanics', repairman's, employees', contractors', operators' or other similar liens or charges for liquidated amounts, in each case, arising in the ordinary course of business that Grantor has agreed to pay or is contesting in good faith in the ordinary course of business;

(c)     any liens for taxes and assessments not yet delinquent or, if delinquent, that are being contested in good faith by Grantor in the ordinary course of business;

(d)     any liens or security interests created by law or reserved in any Lease for the payment of royalty, bonus or rental, or created to secure compliance with the terms of the agreements, instruments and documents that create or reserve to Grantor its interests in the Leases;

(e)     any obligations or duties affecting the Leases to any municipality or public authority with respect to any franchise, grant, license or permit, and all applicable laws, rules, regulations and orders of any governmental authority;

(f)     any (i) easements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations, pipelines, grazing, hunting, lodging, canals, ditches, reservoirs or the like, and (ii) easements for streets, alleys, highways, pipelines, telephone lines, power lines, railways and other similar rights-of-way, on, over or in respect of the lands described in the Leases provided that, in the case of clauses (i) and (ii), such easements, rights-of-way, servitudes, permits, surface leases and other rights do not materially impair the value of any applicable Net Profits Interest;

(g)     all lessors' royalties, overriding royalties, net profits interests, carried interests, production payments, reversionary interests and other burdens on the Subject Interests or deductions from the proceeds of production attributable to the Subject Interests created or in existence as of the Effective Time; provided, however, that none of the foregoing (other than the Net Profits Interests and the Overriding Royalty Interest) shall operate to (i) reduce Grantor's "Net Revenue Interest" for any Developed Properties Subject Well to below the "Net Revenue Interest" set forth on Exhibit D for such Developed Properties Subject Well or increase the "Working Interest" of Grantor for any Developed Properties Subject Well above that "Working Interest" set forth on Exhibit D for such Developed Properties Subject Well (unless there is a proportionate increase in Grantor's corresponding "Net Revenue Interest" for such Developed Properties Subject Well); or (ii) reduce Grantor's average "Net Revenue Interest" for the Remaining Properties Leases to below the average "Net Revenue Interest" set forth on Exhibit A for such Remaining Properties Leases or increase the average "Working Interest" of Grantor for the Remaining Properties Leases above that average "Working Interest" set forth on Exhibit A for such Remaining Properties Leases (unless there is a proportionate increase in Grantor's corresponding average "Net Revenue Interest" for such Remaining Properties Leases);

(h)     preferential rights to purchase or similar agreements and required third party consents to assignments or similar agreements created or in existence as of the Effective Time;

HN\932900.2

      (i)    all rights to consent by, required notices to, filings with, or other actions by any Person in connection with the Transfer of the Leases or interests therein;

      (j)    production sales contracts; division orders; contracts for sale, purchase, exchange, refining or processing of Hydrocarbons; unitization and pooling designations, declarations, orders and agreements; operating agreements; agreements for development; area of mutual interest agreements; gas balancing or deferred production agreements; processing agreements; plant agreements; pipeline, gathering and transportation agreements; injection, repressuring and recycling agreements; salt water or other disposal agreements; seismic or geophysical permits or agreements; and any and all other agreements entered into by Grantor or its Affiliates in connection with the exploration or development of the Leases or the extraction, processing or marketing of production therefrom or to which any of the Leases were subject as of the Effective Time; provided, however, that none of the foregoing shall operate to (i) reduce Grantor's "Net Revenue Interest" for any Developed Properties Subject Well to below the "Net Revenue Interest" set forth on Exhibit D for such Developed Properties Subject Well or increase the "Working Interest" of Grantor for any Developed Properties Subject Well above that "Working Interest" set forth on Exhibit D for such Developed Properties Subject Well (unless there is a proportionate increase in Grantor's corresponding "Net Revenue Interest" for such Developed Properties Subject Well); or (ii) reduce Grantor's average "Net Revenue Interest" for the Remaining Properties Leases to below the average "Net Revenue Interest" set forth on Exhibit A for such Remaining Properties Leases or increase the average "Working Interest" of Grantor for the Remaining Properties Leases above that average "Working Interest" set forth on Exhibit A for such Remaining Properties Leases (unless there is a proportionate increase in Grantor's corresponding average "Net Revenue Interest" for such Remaining Properties Leases); and

      (k)    conventional rights of reassignment that obligate Grantor to reassign all or part of a property to a third party if Grantor intends to release or abandon such property, including any Prior Reversionary Interest.

"Person" shall mean any individual, partnership, limited liability company, corporation, trust, unincorporated association, governmental agency, subdivision, instrumentality, or other entity or association.

"Prime Rate" means the rate of interest published from time to time as the "Prime Rate" in the "Money Rates" section of The Wall Street Journal.

"Prior Reversionary Interest" shall mean any contract, agreement, lease, deed, conveyance or operating agreement that exists as of the Effective Time, that by the terms thereof requires a Person to convey a part of the applicable Subject Interests (or the applicable Net Profits Interest (and the Overriding Royalty Interest if applicable) with respect to any part of the Subject Interests) to another Person or to permanently cease production of any Subject Well, including obligations arising pursuant to any operating agreements, Leases, and other similar agreements or instruments affecting or burdening the Subject Interests.

"Processing" or "Processed" shall mean to manufacture, fractionate or refine Subject Hydrocarbons, but such terms do not mean or include activities involving the use of normal lease

17

or well equipment (such as dehydrators, gas treating facilities, mechanical separators, heater-treaters, lease compression facilities, injection or recycling equipment, tank batteries, field gathering systems, pipelines and equipment and similar items) to treat or condition Hydrocarbons or other normal operations on any of the Subject Interests.

"Production Sales Contracts" shall mean all contracts, agreements and arrangements for the sale or disposition of Hydrocarbons.

"Release" shall mean any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping or disposing into the environment; provided however, that Release shall not include Hydrocarbons emanating from surface expressions located on the Subject Interests which are controlled upon discovery.

"Remaining Properties Debit Balance" shall have the meaning given such term in Section 4.3(c).

"Remaining Properties Debit Balance Amount" shall have the meaning given such term in Section 4.3(c).

"Remaining Properties Eligible Materials" shall mean Materials for which amounts in respect of the cost of such Materials were properly debited to the Remaining Properties Net Profits Account.

"Remaining Properties Excluded Deductions" shall mean deduction amounts related to any of the following items: (a) any amount that has also been used to reduce or offset the amount of the Remaining Properties Subject Hydrocarbons (or proceeds of production thereof) or has otherwise not been included therein (including proceeds attributable to royalties, overriding royalties, production payments and other charges burdening the Remaining Properties Subject Interests as of the Effective Time if such charges have been used to reduce or offset the amount of the Remaining Properties Subject Hydrocarbons (or proceeds of production thereof)); (b) any overriding royalty, production payment or other charge burdening the Remaining Properties Subject Interests which was created by Grantor after the Effective Time; (c) any general, administrative or overhead costs paid or incurred by Grantor or its Affiliates, except for those expressly permitted hereunder; (d) any interest, premiums, fees or similar charges arising out of borrowings or purchases of any goods, equipment or other items on credit, whether or not used on or otherwise related to the Remaining Properties Subject Interests; (e) all Remaining Properties Processing Costs; (f) any amounts paid by Grantor (initial or a successor) to such Grantor's predecessor in interest with respect to part or all of the Remaining Properties Subject Interests (including without limitation any purchase price or other consideration paid by Grantor to such predecessor in interest to acquire all or part of the Remaining Properties Subject Interests); (g) any amount arising from any condition, circumstance, activity, practice, incident, action, or plan that gives rise to any material liability, or otherwise forms the basis of any claim, action, suit, proceeding, hearing or investigation, based on or related to the processing, distribution, use, treatment, storage, disposal, transport, or handling, or the emission, discharge, Release or threatened Release into the environment, of any pollutant, contaminant, or hazardous substance or other toxic material or waste from or attributable to the use or operation of any of

the Remaining Properties Subject Interests which either occurred prior to, on or after the
Effective Time and are attributable to Grantor's gross negligence or willful misconduct; and
(h) costs and expenses arising out of operations covered by the AFEs shown on Exhibit B-2.

"Remaining Properties Excluded Proceeds" shall mean the following proceeds and
amounts:

(a)     any Remaining Properties Offset Amounts, except that, for purposes of
determining the proceeds and amounts that constitute "Remaining Properties Excluded
Proceeds" for purposes hereof, (i) there shall not be any deductions to such proceeds and
amounts, in the cases of subsections (c), (h) and (j) of the definition for "Remaining Properties
Offset Amounts," for the actual costs of salvage or disposition or any Remaining Properties
Processing Costs, as applicable, (ii) cash payments received by Grantor as a result of any pooling
or unitization of the Remaining Properties Subject Interests shall be considered Remaining
Properties Excluded Proceeds regardless of whether the costs giving rise to such payments were
charged to the Remaining Properties Net Profits Interest and (iii) insurance proceeds received by
Grantor shall be considered Remaining Properties Excluded Proceeds regardless of whether the
cost of such insurance was charged to the Remaining Properties Net Profits Account;

(b)     any proceeds that are withheld from Grantor for any reason (other than at
the request of Grantor), until such time that the proceeds are actually received by Grantor,
*provided* that proceeds that are received by Grantor and promptly deposited by it with an escrow
agent in order to resolve a dispute with respect thereto shall not be considered to be "received"
by Grantor for purposes of this definition until the time that such amounts are actually collected
by Grantor;

(c)     if Grantor becomes an underproduced party under any Gas balancing or
similar arrangement affecting the Remaining Properties Subject Interests, any amounts for any
Gas attributable to the Remaining Properties Subject Interests for which Grantor is entitled to
receive "make-up" Gas in the future that would otherwise be attributable to the Remaining
Properties Subject Interests;

(d)     if Grantor becomes an overproduced party under any Gas balancing or
similar arrangement affecting the Remaining Properties Subject Interests, any amounts for any
Gas taken by an underproduced party as "make-up" Gas that would otherwise be attributable to
the Remaining Properties Subject Interests;

(e)     any amount received by Grantor after the Effective Time in respect of any
production of Remaining Properties Subject Hydrocarbons prior to the Effective Time;

(f)     any amount to which Grantor is entitled by virtue of a judgment of a court
of competent jurisdiction resolving a dispute hereunder between Grantee and Grantor in favor of
Grantor, or any amount paid to Grantor in settlement of such dispute;

(g)     any amounts or compensation received by Grantor in connection with any
Prior Reversionary Interest; and

(h)     any additional proceeds (*i.e.,* proceeds attributable to the non-participating party) from the sale of Hydrocarbons related to any Remaining Properties Subject Well with respect to which Grantor elects to be a participating party (whether such rights are available pursuant to an operating agreement or other agreement or arrangement) with respect to any operation with respect to such Remaining Properties Subject Well for which another party or parties have elected not to participate in such operation (or have elected to abandon such Remaining Properties Subject Well) and Grantor elects to pay the costs of such nonparticipating or abandoning party and as a result of which Grantor becomes entitled to receive, either temporarily (*i.e.,* through a period of recoupment) or permanently such additional proceeds from the sale of Hydrocarbons related to such Remaining Properties Subject Well.

"Remaining Properties Gross Deductions" shall mean the following costs and expenses (and, where applicable, losses, liabilities and damages), to the extent that the same (x) are properly allocable to the Remaining Properties Subject Interests (and any related equipment or property used in connection therewith) and the production and marketing of Remaining Properties Subject Hydrocarbons therefrom and (y) have been incurred or accrued by Grantor, from and after the Effective Time, but that are not attributable to a production month that occurs prior to the Effective Time (*excluding*, in all instances, the Remaining Properties Excluded Deductions):

(a)     all costs paid by Grantor (i) for drilling, development, production and abandonment operations (including activities necessary to gain access to and prepare well locations for drilling; operations and activities related to drilling and equipping Remaining Properties Subject Wells and service and injector wells; operations constituting or associated with workovers; the plugging and abandoning of any well or facility on the Remaining Properties Subject Interests; and secondary recovery, pressure maintenance, repressuring, recycling and other operations conducted for the purpose of enhancing production from the Remaining Properties Subject Interests), (ii) for all direct labor (including employee and fringe benefits) and other services necessary for drilling, operating, producing and maintaining the Remaining Properties Subject Interests and workovers of any Remaining Properties Subject Well, (iii) for treatment, dehydration, compression, separation and transportation of the Remaining Properties Subject Hydrocarbons (including activities related to the acquisition, construction and installation of production and injection facilities), (iv) for all Materials purchased for use on, or in connection with, any of the Remaining Properties Subject Interests and (v) for any other operations with respect to the exploration, development or operation of Remaining Properties Subject Hydrocarbons (including costs for the maintenance of any Remaining Properties Subject Well or facility on the Leases; replacement of any facilities; the restoration or remediation of the surface or subsurface sites associated with the Remaining Properties Subject Interests or lands pooled or unitized therewith; and any marketing fees paid to non-Affiliates of Grantor); *provided, however,* that (A) the costs charged to the Remaining Properties Net Profits Account for such items shall be made (1) on the same basis as such costs are charged under the operating agreement associated with the applicable portion of the Remaining Properties Subject Interests at the time the transaction giving rise to such costs occurred, or (2) in the absence of such operating agreement, on the same basis as Grantor is charged under existing third party arrangements, or (3) in the absence of both such operating agreement and such third-party arrangements, on the same basis as costs are typically charged under operating agreements generally used for onshore

operations in the State of California; and (B) if Grantor elects to pay the costs of a nonconsenting party or nonparticipating party with respect to which the gross proceeds derived from such costs are not credited to the Remaining Properties Net Profits Account, Grantor shall be solely responsible for such costs;

(b)    (i) all losses, costs, expenses, liabilities and damages (including outside legal, accounting and engineering services) attributable to, or incident to the operation or maintenance of, the Remaining Properties Subject Interests associated with (A) defending, prosecuting, handling, investigating or settling litigation, administrative proceedings, claims (including lien claims other than liens for borrowed funds), damages, judgments, fines, penalties and other liabilities, (B) the payment of judgments, penalties and other liabilities (including interest thereon), paid by Grantor and not reimbursed under insurance maintained by Grantor or others (including all losses, costs, expenses, liabilities and damages arising from third-party claims, lawsuits or causes of action for personal injury or death or damage to personal or real property (both surface and subsurface), including those losses, costs, expenses, liabilities and damages arising under Environmental Laws with respect to the Remaining Properties Subject Interests or in any way from the environmental condition of the Remaining Properties Subject Interests), (C) the payment or restitution of any proceeds of Remaining Properties Subject Hydrocarbons, (D) complying with applicable local, state and federal statutes, ordinances, rules and regulations, and (E) tax or royalty audits, and (ii) any other loss, cost, expense, liability or damage (including settlement costs and reasonable attorneys' fees) incurred by Grantor in relation to the Remaining Properties Subject Interests not paid or reimbursed under insurance; excluding, in each instance, any expenses incurred by Grantor in litigation of any claim or dispute arising hereunder between the Parties or amounts paid by Grantor to Grantee pursuant to a final order entered by a court of competent jurisdiction resolving any such claim or dispute or amounts paid by Grantor to Grantee in connection with the settlement of any such claim or dispute;

(c)    all taxes, charges and assessments (*excluding* federal and state income, transfer, mortgage, inheritance, estate, franchise and like taxes) incurred, accrued or paid by Grantor with respect to the ownership of the Remaining Properties Subject Interests or the extraction of the Remaining Properties Subject Hydrocarbons, including production, severance or excise and other similar taxes, charges and assessments assessed against, or measured by, the production of (or the proceeds or value of production of) Remaining Properties Subject Hydrocarbons, occupation taxes, gathering, pipeline, excise, sales, use and other taxes, and ad valorem and property taxes, charges and assessments assessed against or attributable to the Remaining Properties Subject Interests or any equipment used in connection with production from any of the Remaining Properties Subject Interests and any extraordinary or windfall profits taxes, charges and assessments that may be assessed in the future based upon profits realized or prices received from the sale of Remaining Properties Subject Hydrocarbons;

(d)    all insurance premiums attributable to the ownership or operation of the Remaining Properties Subject Interests paid by Grantor for insurance actually carried for periods after the Effective Time with respect to the Remaining Properties Subject Interests, or any equipment located on any of the Remaining Properties Subject Interests, or incident to the operation or maintenance of the Remaining Properties Subject Interests;

21

HN\932900.2

(e)      all amounts and other consideration paid by Grantor for (i) rent and the use of or damage to the surface, (ii) delay rentals, shut-in well payments, minimum royalties and similar payments, and (iii) fees for renewal, extension, modification, amendment, replacement or supplementation of the Leases included in the Remaining Properties Subject Interests;

(f)      all amounts charged by the relevant operator as overhead, administrative or indirect charges specified in the applicable operating agreements or other arrangements now or hereafter covering the Remaining Properties Subject Interests or operations with respect thereto;

(g)      to the extent Grantor is the operator of certain of the Remaining Properties Subject Interests and there is no operating agreement covering such portion of the Remaining Properties Subject Interests, those overhead, all administrative or indirect charges that are allocated by Grantor to such portion of the Remaining Properties Subject Interests, to the extent that such charges are allocated in the same manner that Grantor allocates to other similarly owned and operated properties;

(h)      if, as a result of the occurrence of the bankruptcy or insolvency or similar occurrence of the purchaser of Remaining Properties Subject Hydrocarbons, any and all amounts previously credited to the Remaining Properties Net Profits Account are reclaimed from Grantor or its representative, then the amounts reclaimed as promptly as practicable following Grantor's payment thereof;

(i)      all costs and expenses paid by Grantor for recording this Conveyance and, immediately prior to the last Payment Period, costs estimated in good faith to record the termination or release of this Conveyance;

(j)      all amounts previously included, or otherwise accounted for, in the calculation of Remaining Properties Gross Profits but subsequently paid by Grantor as a refund, interest or penalty;

(k)      at the option of Grantor, all amounts reserved for approved development expenditure projects on the Remaining Properties Subject Interests, including amounts for drilling, recompletion and workover costs, *provided* that, such amounts, (i) to the extent not already spent or incurred by Grantor, will, together with such amounts on the Developed Properties Subject Interests, at no time exceed two million dollars ($2,000,000) in the aggregate, and (ii) shall not be included as part of the Remaining Properties Gross Deductions in subsequent Payment Periods; and

(l)      all costs accrued for future plugging and abandonment of any well or facility on the Remaining Properties Subject Interests, *provided* that such amounts shall not be included as part of the Remaining Properties Gross Deductions in subsequent Payment Periods.

"Remaining Properties Gross Fair Value" means an amount equal to the Fair Value divided by twenty-five percent (25%).

HN\932900.2

"Remaining Properties Gross Profits" shall mean, for each Payment Period following the Effective Time, an amount equal to the sum of (*excluding*, in all instances, the Remaining Properties Excluded Proceeds) the gross proceeds received by Grantor during the applicable Payment Period (and that are not attributable to a production month that occurs prior to the Effective Time) from the sale of all Remaining Properties Subject Hydrocarbons, including the following proceeds and amounts: (a) all proceeds and consideration received, directly or indirectly, for advance payments and payments under take-or-pay and similar provisions of Production Sales Contracts when credited against the price for delivery of production; and (b) all proceeds and amounts received by Grantor (i) from any "make up" Gas taken by Grantor as a result of its position as an underproduced party under any Gas balancing or similar arrangement affecting the Remaining Properties Subject Interests, (ii) received as a balancing of accounts under a Gas balancing or other similar arrangement affecting the Remaining Properties Subject Interests either as an interim balancing or at the depletion of the reservoir, and (iii) for any Gas taken by Grantor attributable to the Remaining Properties Subject Interests in excess of its entitlement share of such Gas; *provided, however,* that Remaining Properties Gross Profits (A) shall not include any Remaining Properties Processing Proceeds and (B) in the event that Remaining Properties Subject Hydrocarbons are Processed prior to sale, shall only include the Payment Value of such Remaining Properties Subject Hydrocarbons before any such Processing.

"Remaining Properties Leases" shall mean, subject to the depth limitations and other restrictions that may be set forth therein, and excluding the Targeted Formations within a Developed Properties Subject Well, (a) the oil and gas leases, oil, gas and mineral leases, subleases and other leaseholds, contractual rights, and other rights to hydrocarbons set forth on Exhibit A as to all lands and depths described in such lease (or the applicable part or portion thereof, if limited in depth or areal extent in Exhibit A) and any interest therein and any leasehold interest in any other lease of Hydrocarbons derived from the pooling or unitization of each such lease (or portion thereof, if limited in depth or areal extent in Exhibit A) with other leases, together with any interest acquired or maintained in any and all renewals and extensions of such lease, (b) any replacement lease taken upon or in anticipation of termination of such lease (if executed and delivered during the term of or within one year after the expiration of the predecessor lease), as to all lands and depths described in the predecessor lease and in which Grantor had an interest under the predecessor lease (unless the extended or predecessor lease is specifically limited in depth or areal extent in Exhibit A, in which event only the corresponding portion of such lease shall be considered a renewal or extension or a replacement lease subject to this Conveyance), and (c) any other leasehold, royalty, overriding royalty or fee interest described on Exhibit A.

"Remaining Properties Processing Costs" shall mean the costs of Processing that generate Remaining Properties Processing Proceeds received by Grantor.

"Remaining Properties Processing Proceeds" shall mean the excess, if any, of (a) proceeds received by Grantor from the sale of Remaining Properties Subject Hydrocarbons that are the result of any Processing over (b) the part of such proceeds that represents the Payment Value of such Remaining Properties Subject Hydrocarbons before any Processing.

HN\932900.2

"Remaining Properties Net Deductions" shall mean, for each Payment Period following the Effective Time, an amount equal to the excess, if any, of (a) the sum of the Remaining Properties Gross Deductions over (b) the sum of the Remaining Properties Offset Amounts.

"Remaining Properties Net Profits" shall have the meaning given such term in Section 4.3(a).

"Remaining Properties Net Profits Account" shall mean the account maintained in accordance with the provisions of Sections 4.1(a), (c), (e) and (f).

"Remaining Properties Net Profits Interest" shall mean an overriding royalty interest calculated as a variable undivided percentage interest in and to the Remaining Properties Subject Hydrocarbons entitling Grantee to receive a sum equal to the Remaining Properties Proceeds Percentage of the Remaining Properties Net Profits, if any, for each Payment Period for the term of this Conveyance.

"Remaining Properties NPI Calculation" shall have the meaning given such term in Section 4.3(a).

"Remaining Properties NPI Payment Amount" shall have the meaning given such term in Section 4.3(a).

"Remaining Properties Offset Amounts" shall mean the following amounts (net of any applicable taxes):

(a) any amounts received by Grantor as delay rentals, bonus, royalty or other similar payments in relation to the Remaining Properties Subject Interests;

(b) any amounts received by Grantor in connection with, or for dry hole, bottom hole or other similar contributions related to, the Remaining Properties Subject Interests;

(c) upon salvage or other disposition, the applicable actual salvage value (determined in accordance with the applicable operating agreement then in effect and binding upon Grantor or, in the absence of such agreement, based on the fair market value of such items in the region in which they are located) of any Remaining Properties Eligible Materials, less, in each instance, the actual costs of salvage or other disposition paid or incurred by Grantor in connection with such sale;

(d) any cash payments received by Grantor as a result of any pooling or unitization of the Remaining Properties Subject Interests if the costs giving rise to such payments were charged to the Remaining Properties Net Profits Account, directly or indirectly;

(e) any insurance proceeds received by Grantor as a result of any loss, liability or damage relating to the Remaining Properties Subject Interests, Remaining Properties Eligible Materials or Remaining Properties Subject Hydrocarbons if the cost of such insurance was charged to the Remaining Properties Net Profits Account;

24

HN\932900.2

(f)     any amounts received by Grantor from third parties as rental or use fees for Remaining Properties Eligible Materials;

(g)     the gross proceeds of any judgments or claims received by Grantor for damages occurring on or after the Effective Time to (i) the Remaining Properties Subject Interests, (ii) any Remaining Properties Eligible Materials and (iii) any Remaining Properties Subject Hydrocarbons;

(h)     to the extent not covered under subsection (c) above, any proceeds received by Grantor from the sale of Remaining Properties Eligible Materials less the actual costs paid or incurred by Grantor in connection with such sale;

(i)     any payments made to Grantor in connection with the drilling or deferring of drilling of any Remaining Properties Subject Well;

(j)     for any Remaining Properties Subject Hydrocarbons that are Processed before sale, the excess, if any, of the Remaining Properties Processing Proceeds arising therefrom (that are received by Grantor) over the Remaining Properties Processing Costs of such Processing (that are paid or incurred by Grantor);

(k)     any interest, penalty or other amount not derived from the sale of the Remaining Properties Subject Hydrocarbons that is paid to Grantor by the purchaser of production or escrow agent in connection with proceeds withheld or deposited with an escrow agent;

(l)     in the event that any Transfers described in Section 6.1(a)(ii) occur, the Remaining Properties Gross Fair Value of the Remaining Properties Net Profits Interest released during the relevant Payment Period in connection with such Transfers; and

(m)     any amounts of Gross Reversionary Compensation associated with a conveyance of all or any portion of the Remaining Properties Subject Interests, or cessation of production from any Remaining Properties Subject Well, in connection with a Prior Reversionary Interest pursuant to Section 6.2.

"Remaining Properties Proceeds Percentage" shall mean twenty-five percent (25%).

"Remaining Properties Subject Hydrocarbons" shall mean all Hydrocarbons in and under and that may be produced, saved, and sold from, and are attributable to, the Remaining Properties Subject Interests from and after the Effective Time, after deducting the appropriate share of all royalties and any overriding royalties, production payments, net profits interests and other similar charges (except the Remaining Properties Net Profits Interest) burdening the Remaining Properties Subject Interests as of the Effective Time, *provided* that, (a) there shall not be included in the Remaining Properties Subject Hydrocarbons (i) any Hydrocarbons attributable to non-consent operations conducted with respect to the Remaining Properties Subject Interests (or any portion thereof) as to which Grantor shall be a non-consenting party as of the Effective Time that are dedicated to the recoupment or reimbursement of costs and expenses of the consenting party or parties by the terms of the relevant operating agreement, unit agreement,

25

contract for development, or other instrument providing for such non-consent operations (including any interest, penalty or other amounts related thereto), or (ii) any Hydrocarbons lost in production or marketing or used by Grantor for drilling, production or plant operations (including fuel, secondary or tertiary recovery) conducted solely for the purpose of producing Remaining Properties Subject Hydrocarbons from the Remaining Properties Subject Interests, and (b) there shall be included in the Remaining Properties Subject Hydrocarbons any Hydrocarbons attributable to non-consent operations conducted with respect to the Remaining Properties Subject Interests (or any portion thereof) as to which Grantor shall be a non-consenting party as of the Effective Time that are produced, saved, and sold from, and are attributable to the Remaining Properties Subject Interests after the Effective Time from and after the recoupment or reimbursement of costs and expenses (including any interest, penalty or other amounts related thereto) of the consenting party or parties by the terms of the relevant operating agreement, unit agreement, contract agreement, contract development, or other instruments providing for such non-consent operations.

"Remaining Properties Subject Interests" shall mean each kind and character of right, title, claim, or interest (solely for purposes of this definition, collectively "rights") that Grantor has or owns in the Leases and the Remaining Properties Subject Wells, whether such rights be under or by virtue of a lease, a unitization or pooling order or agreement, an operating agreement, a farm-out agreement, a division order, or a transfer order or be under or by virtue of any other type of claim or title, legal or equitable, recorded or unrecorded, even though Grantor's interest be incorrectly or incompletely described in, or a description thereof omitted from, Exhibit A, all as such rights shall be (a) enlarged or diminished by virtue of the provisions of Section 5.2, and (b) enlarged by the discharge of any obligations for payments out of production or by the removal of any charges or encumbrances to which any of such rights are subject at the Effective Time (*provided* that such discharge or removal is pursuant to the express terms of the instrument that created such charge, obligation or encumbrance) and any and all renewals, extensions and replacements of the right occurring within one year after the expiration of such rights.

"Remaining Properties Subject Well" shall mean each well (whether now existing or hereinafter drilled) on the Leases, in respect of which Grantor owns any interest or is entitled to any of the Hydrocarbons production or the proceeds therefrom (including directly or indirectly by virtue of the effect of any farmout or farmin provisions or other provisions), excluding each Developed Properties Subject Well (but such exclusion being only to the extent of the Targeted Formations within that Developed Properties Subject Well).

"Replacement Well" shall mean a well drilled to replace a Developed Properties Subject Well in order to produce Hydrocarbons intended to be produced from the Developed Properties Subject Well but which were not produced from the Developed Properties Subject Well due to mechanical, technical or similar reasons.

"Reversionary Compensation" shall have the meaning given such term in Section 6.2.

"Subject Hydrocarbons" shall mean the Developed Properties Subject Hydrocarbons and the Remaining Properties Subject Hydrocarbons, or if the context allows or requires, the Developed Properties Subject Hydrocarbons or the Remaining Properties Subject Hydrocarbons.

26

"Subject Interests" shall mean the Developed Properties Subject Interests and the Remaining Properties Subject Interests, or if the context allows or requires, the Developed Properties Subject Interests or the Remaining Properties Subject Interests.

"Subject Well" shall mean a Developed Properties Subject Well or a Remaining Properties Subject Well.

"Targeted Formations" shall mean, for each Developed Properties Subject Well, any formation located between the surface of the earth and the base of the Deepest Producing Formation.

"Transfer" shall mean any assignment, sale, transfer, conveyance, or disposition of any property (and shall include any derivative variants of each such term); *provided, however,* that, as used herein, the term "Transfer" shall not include the granting of a security interest, pledge, or mortgage in or of Grantor's interest in any property, including the Subject Interests or the Subject Hydrocarbons.

"Trust" shall have the meaning ascribed to it in the Preamble to this Conveyance.

"Trust Agreement" shall mean that certain Amended and Restated Trust Agreement of the Trust of even date herewith among the Grantor, the Trustee and Wilmington Trust, National Association, as the same may be amended from time to time.

"Trust Documents" shall mean the Trust Agreement and that certain Operating and Services Agreement of even date herewith between the Grantor and Trust.

"Trustee" shall have the meaning ascribed to it in the Preamble to this Conveyance.

## ARTICLE III
## WARRANTY

Grantor represents and warrants that Exhibit A is, in all material respects, a complete and accurate listing of all of Grantor's assets that currently produce Hydrocarbons or that are reasonably expected to produce Hydrocarbons in the future. Grantor warrants title to the Developed Properties Net Profits Interest, the Remaining Properties Net Profits Interest, and the Overriding Royalty Interest, subject to the Permitted Encumbrances, unto Grantee, its successors and assigns, against all persons whomsoever lawfully claiming or to claim the same, or any part thereof, by, through or under Grantor or its Affiliates, but not otherwise. Subject to the Net Profits Interests, the Overriding Royalty Interest and the Permitted Encumbrances, Grantor further warrants to Grantee, with respect to claims made by, through or under Grantor or its Affiliates, that immediately prior to the transfer made pursuant to this Conveyance, (a) with respect to each Developed Properties Subject Well set forth in Exhibit D, as to Grantor's interest therein, Grantor is (i) entitled to receive not less than the percentage set forth in Exhibit D hereto as the "Net Revenue Interest" of all Hydrocarbons produced, saved and marketed from such Developed Properties Subject Well to which such "Net Revenue Interest" corresponds without reduction of such interest throughout the duration of the life of such Developed Properties Subject Well, except as specifically set forth in Exhibit D, and (ii) obligated to bear the percentage of the costs and

27

expenses relating to the maintenance, development and operation of such Developed Properties Subject Well not greater than the "Working Interest" set forth in Exhibit D with respect to such Developed Properties Subject Well, without increase throughout the duration of the life of such Developed Properties Subject Well, except as specifically set forth in Exhibit D or unless there is a proportionate increase in Grantor's corresponding "Net Revenue Interest" for such Developed Properties Subject Well; and (b) with respect to each of the Remaining Properties Leases set forth in Exhibit A, as to Grantor's interest therein, Grantor is (i) entitled to receive, on average, not less than the percentage set forth in Exhibit A hereto as the average "Net Revenue Interest" of all Hydrocarbons produced, saved and marketed from such Remaining Properties Leases to which such average "Net Revenue Interest" corresponds without reduction of such interest throughout the duration of the life of such Remaining Properties Leases, except as specifically set forth in Exhibit A, and (ii) obligated to bear, on average, the percentage of the costs and expenses relating to the maintenance, development and operation of each of such Remaining Properties Leases not greater than the average "Working Interest" set forth in Exhibit A with respect to such Remaining Properties Leases, without increase throughout the duration of the life of such Remaining Properties Leases, except as specifically set forth in Exhibit A or unless there is a proportionate increase in Grantor's corresponding "Net Revenue Interest" for such Remaining Properties Leases. Grantor transfers to Grantee by way of substitution and subrogation (to the fullest extent that same may be transferred), all rights or actions over and against all of Grantor's predecessors, covenantors or warrantors of title (other than Affiliates of Grantor).

## ARTICLE IV
## ESTABLISHMENT OF NET PROFITS ACCOUNTS
## AND OVERRIDING ROYALTY ACCOUNT

Section 4.1      Net Profits Accounts and Overriding Royalty Account.

(a)      In order to account for, track and make the payments associated with the Net Profits Interests and the Overriding Royalty Interest, Grantor shall establish and maintain true and correct books and records in order to determine the credits and debits to a Developed Properties Net Profits Account, a Remaining Properties Net Profits Account, and an Overriding Royalty Account to be maintained by Grantor at all times during the term hereof. The Developed Properties Net Profit Account, the Remaining Properties Net Profits Account and the Overriding Royalty Account will be maintained in accordance with the terms of this Conveyance and prudent and accepted accounting principles.

(b)      From and after the Execution Date with respect to each Payment Period, the Developed Properties Net Profits Account shall be (i) credited with an amount equal to the Developed Properties Gross Profits (subject to the deduction described in Section 4.5(a)), and (ii) debited with an amount equal to the Developed Properties Net Deductions (subject to the following two sentences). If, in calculating the amount of Developed Properties Net Deductions for any Payment Period, the Developed Properties Offset Amounts exceed the Developed Properties Gross Deductions, then the Developed Properties Net Deductions for that Payment Period shall be zero, and such excess shall be applied to reduce the Developed Properties Net Deductions in each succeeding Payment Period until exhausted. Under no circumstances shall

the amount paid in respect of any Payment Period exceed eighty percent (80%) of Developed Properties Gross Profits for such Payment Period.

(c)     From and after the Execution Date with respect to each Payment Period, the Remaining Properties Net Profits Account shall be (i) credited with an amount equal to the Remaining Properties Gross Profits (subject to the deduction described in Section 4.5(a)), and (ii) debited with an amount equal to the Remaining Properties Net Deductions (subject to the following two sentences). If, in calculating the amount of Remaining Properties Net Deductions for any Payment Period, the Remaining Properties Offset Amounts exceed the Remaining Properties Gross Deductions, then the Remaining Properties Net Deductions for that Payment Period shall be zero, and such excess shall be applied to reduce the Remaining Properties Net Deductions in each succeeding Payment Period until exhausted. Under no circumstances shall the amount paid in respect of any Payment Period exceed twenty-five percent (25%) of Remaining Properties Gross Profits for such Payment Period.

(d)     From and after the Execution Date with respect to each Payment Period, the Overriding Royalty Account shall be (i) credited with an amount equal to the ORI Properties Gross Profits (subject to the deduction described in Section 4.5(a)), and (ii) debited with an amount equal to the sum of all gathering, handling, processing, treating, compression, transportation and marketing costs and expenses and all ad valorem and production taxes attributable to the ORI Properties Subject Hydrocarbons sold during the applicable Payment Period.

(e)     The Developed Properties Gross Profits, Developed Properties Net Deductions, Remaining Properties Gross Profits and Remaining Properties Net Deductions shall not be interpreted or applied in any manner that (i) results in any duplication of all or any part of any such credit or debit (or reduction thereto) in the Developed Properties Net Profits Account or Remaining Properties Net Profits Account, or (ii) ever results in the inclusion of any charge to the Developed Properties Net Profits Account or the Remaining Properties Net Profits Account that is reimbursed to Grantor by any Person.

(f)     GRANTEE ACKNOWLEDGES AND AGREES THAT THE PROVISIONS ESTABLISHING AND MAINTAINING THE DEVELOPED PROPERTIES NET PROFITS ACCOUNT AND THE REMAINING PROPERTIES NET PROFITS ACCOUNT AND THE DEBITING OF ITEMS THERETO SHALL BE APPLICABLE REGARDLESS OF WHETHER THE LOSSES, COSTS, EXPENSES, LIABILITIES AND DAMAGES THAT MAY BE DEBITED IN ACCORDANCE WITH THIS CONVEYANCE AROSE SOLELY OR IN PART FROM THE ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF GRANTOR OR ANY OF ITS AFFILIATES, OTHER THAN LOSSES, COSTS, EXPENSES, LIABILITIES AND DAMAGES THAT AROSE FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF GRANTOR OR ANY OF ITS AFFILIATES, WHICH SHALL NOT BE DEBITED TO THE DEVELOPED PROPERTIES NET PROFITS ACCOUNT OR THE REMAINING PROPERTIES NET PROFITS ACCOUNT. NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS CONVEYANCE SHALL BE CONSTRUED AS A

WAIVER OR RELEASE OF GRANTOR FROM ANY CLAIM, ACTION OR LIABILITY
ARISING UNDER SECTION 5.1(a).

Section 4.2    Accounting and Payment – Developed Properties.

(a)    Following the conclusion of each Payment Period, a calculation (the
"Developed Properties NPI Calculation") shall be made by Grantor for the Developed Properties
Net Profits Account by deducting (i) the sum of (A) the total Developed Properties Net
Deductions for such Payment Period and (B) the absolute value of the Developed Properties
Debit Balance (as defined below), if any, carried forward in the Developed Properties Net Profits
Account at the beginning of such Payment Period from (ii) the total Developed Properties Gross
Profits for such Payment Period.  If the Developed Properties NPI Calculation results in a
positive amount with respect to the Payment Period (the "Developed Properties Net Profits"),
then (i) that positive amount shall be multiplied by the Developed Properties Proceeds
Percentage, (ii) the resulting product thereof (the "Developed Properties NPI Payment Amount")
shall be payable to Grantee as specified in Section 4.4, and (iii) that positive amount shall be
subtracted from the balance of the Developed Properties Net Profits Account to cause the
Developed Properties Net Profits Account to have a zero balance immediately following the end
of such Payment Period.

(b)    If the Developed Properties NPI Calculation results in a negative amount
with respect to a Payment Period, the negative sum shall be deemed the "Developed Properties
Debit Balance" for purposes hereof; and no payments shall be made to Grantee in respect of the
Developed Properties Net Profits Interest nor shall Grantee ever be liable to make any payment
to Grantor in respect of the Developed Properties Debit Balance.  Any Developed Properties
Debit Balance shall be carried forward in the Developed Properties Net Profits Account for the
following Payment Period.

(c)    All amounts received by Grantor from the sale of the Developed
Properties Subject Hydrocarbons for any Payment Period shall be held by Grantor in one of its
general bank accounts and Grantor shall not be required to maintain a segregated account for
such funds.

Section 4.3    Accounting and Payment – Remaining Properties.

(a)    Following the conclusion of each Payment Period, a calculation (the
"Remaining Properties NPI Calculation") shall be made by Grantor for the Remaining Properties
Net Profits Account by deducting (i) the sum of (A) the total Remaining Properties Net
Deductions for such Payment Period and (B) the absolute value of the Remaining Properties
Debit Balance Amount (as defined below), if any, carried forward in the Remaining Properties
Net Profits Account at the beginning of such Payment Period from (ii) the total Remaining
Properties Gross Profits for such Payment Period.  If the Remaining Properties NPI Calculation
results in a positive amount with respect to the Payment Period (the "Remaining Properties Net
Profits"), then (i) that positive amount shall be multiplied by the Remaining Properties Proceeds
Percentage, (ii) the resulting product thereof (the "Remaining Properties NPI Payment Amount")
shall be payable to Grantee as specified in Section 4.4, and (iii) that positive amount shall be
subtracted from the balance of the Remaining Properties Net Profits Account to cause the

30

HN\932900.2

Remaining Properties Net Profits Account to have a zero balance immediately following the end of such Payment Period,.

(b)     Following the conclusion of each Payment Period, (i) the balance in the Overriding Royalty Account shall be multiplied by seven and one-half percent (7.5%), (ii) the resulting product thereof (the "Overriding Royalty Interest Proceeds") shall be available for payment to Grantee, but only if called for by Section 4.3(c), and (iii) the balance of the Overriding Royalty Account shall be reduced to zero immediately following the end of such Payment Period.

(c)     If the Remaining Properties NPI Calculation results in a negative amount with respect to a Payment Period, the negative sum shall be deemed the "Remaining Properties Debit Balance" for purposes hereof; and (i) no payments shall be made to Grantee in respect of the Remaining Properties Net Profits Interest nor shall Grantee ever be liable to make any payment to Grantor in respect of the Remaining Properties Debit Balance; (ii) the Overriding Royalty Interest Proceeds for the Payment Period shall be payable to Grantee as specified in Section 4.4; and (iii) any Remaining Properties Debit Balance, plus an amount equal to the Overriding Royalty Interest Proceeds for the Payment Period, (the "Remaining Properties Debit Balance Amount") shall be carried forward in the Remaining Properties Net Profits Account for the following Payment Period.

(d)     All amounts received by Grantor from the sale of the Remaining Properties Subject Hydrocarbons for any Payment Period shall be held by Grantor in one of its general bank accounts and Grantor shall not be required to maintain a segregated account for such funds.

Section 4.4     Payment of NPI Payouts and Overriding Royalty Interest Proceeds.  For each Payment Period, Grantor shall transfer or cause to be transferred to Grantee an amount equal to the sum of (a) the Developed Properties NPI Payment Amount, if any, plus (b)(i) the Remaining Properties NPI Payment Amount, if any, or (ii) the Overriding Royalty Interest Proceeds if payable pursuant to Section 4.3(c), less (c) the Monthly Administrative Fee, with respect to the Payment Period on or before the eighth (8th) Business Day following the last Business Day of the month that follows such period (other than with respect to the initial Payment Period, which transfer shall occur on or before June 15, 2012).  All funds payable to Grantee on account of the Developed Properties Net Profits Interest shall be calculated and paid entirely and exclusively out of the Developed Properties Net Profits.  All funds payable to Grantee on account of the Remaining Properties Net Profits Interest shall be calculated and paid entirely and exclusively out of the Remaining Properties Net Profits. All funds payable to Grantee on account of the Overriding Royalty Interest shall be calculated and paid entirely and exclusively out of the balance in the Overriding Royalty Account.

Section 4.5     Overpayment; Past Due Payments.

(a)     If Grantor ever pays Grantee more than the amount of money then due and payable to Grantee under this Conveyance, Grantee shall not be obligated to return the overpayment, but Grantor may at any time thereafter reduce the Developed Properties NPI Payment Amount, the Remaining Properties NPI Payment Amount or the Overriding Royalty

HN\932900.2

Interest Proceeds by, and retain for its own account, an amount equal to the overpayment, plus interest at the Prime Rate on such amount for the period between the fifteenth (15th) day after the date of the overpayment and the date such amount is recovered by Grantor. In order to exercise its rights under this Section 4.5(a), Grantor must give Grantee written notice with respect to any such overpayment, together with supporting information and data.

(b)     Any amount not paid by Grantor to Grantee with respect to either of the Net Profits Interests or the Overriding Royalty Interest when due shall bear, and Grantor hereby agrees to pay, interest at the Prime Rate from the due date until such amount has been paid. Grantor shall give Grantee written notice with respect to any such past due payment, together with supporting information and data.

Section 4.6     Statements.   For each Payment Period, for each Net Profits Interest (and the Overriding Royalty Interest, if the Overriding Royalty Interest Proceeds are payable for the Payment Period), Grantor shall deliver to Grantee a statement ("Monthly Statement") showing the Developed Properties NPI Calculation and the Remaining Properties NPI Calculation (or the calculation of the Overriding Royalty Interest Proceeds, if such amount is payable for the Payment Period), respectively, with respect to the Payment Period on or before the eighth (8th) Business Day following the last Business Day of the month that follows such period.   In order for Grantee to take exception to any item or items included in any Monthly Statement, Grantee must notify Grantor in writing within two hundred seventy (270) days after the end of the calendar year with respect to which such Monthly Statement relates. Such notice must set forth in reasonable detail the specific debits or credits to which exception is taken. Adjustments shall be made for all exceptions that are agreed to by the Parties. All matters contained in Monthly Statements that are not objected to by Grantee in the manner provided by this Section 4.6 shall be conclusively deemed correct.

Section 4.7     Information; Access.   Grantor shall maintain true and correct books, records and accounts of (a) all transactions required or permitted by this Conveyance (including all financial information necessary to reflect such transactions), and (b) the financial information necessary to make the Developed Properties NPI Calculation, the Remaining Properties NPI Calculation and the calculation of the Overriding Royalty Interest Proceeds with respect to any Payment Period. Grantee or its representative, at Grantee's expense and upon reasonable prior written notice, may inspect and copy such books, records, and accounts, and such other documents, contracts and information as may be reasonably requested by Grantee, in Grantor's office during normal business hours. At Grantee's request, subject to applicable restrictions on disclosure and transfer of information, Grantor shall give Grantee and its designated representatives reasonable access in Grantor's office during normal business hours to (i) all production data and sales documentation (including third-party sales documentation) in Grantor's possession or Grantor's Affiliates' possession, relating to operations on the Subject Interests, (ii) all other information and supporting documentation relevant to expenditures and other amounts relevant to the calculation of the amounts payable to Grantee hereunder and (iii) all reserve reports and reserve studies in the possession of Grantor or of Grantor's Affiliates, relating to the Subject Interests, whether prepared by Grantor, by Grantor's Affiliates, or by consulting engineers. GRANTOR MAKES NO (AND GRANTEE HEREBY WAIVES ANY) REPRESENTATIONS     OR     WARRANTIES     ABOUT     THE     ACCURACY     OR

32

COMPLETENESS OF ANY SUCH DATA, REPORTS, OR STUDIES REFERRED TO IN THIS SECTION 4.7 AND GRANTOR SHALL HAVE NO LIABILITY TO GRANTEE, THE TRUST OR ANY OTHER PERSON RESULTING FROM SUCH DATA, STUDIES, OR REPORTS OR THE USE THEREOF.

## ARTICLE V
## OPERATION OF THE SUBJECT INTERESTS

Section 5.1    Operations Standard.

(a)    To the extent Grantor controls such matters and notwithstanding anything to the contrary herein, with respect to the Subject Interests, Grantor agrees that it will conduct and carry on, or use commercially reasonable efforts to cause the operator thereof to conduct and carry on, the operation and maintenance of the Subject Interests in the same manner as a reasonably prudent operator in the State of California would under the same or similar circumstances acting with respect to its own properties.

(b)    As to any third Person, the acts of Grantor shall be binding on Grantee, and it shall not be necessary for Grantee to join with Grantor in the execution or ratification of any operating agreement, unit operating agreement, contract for development, or similar instrument affecting or pertaining to any of the Subject Interests.

(c)    Grantee acknowledges that Grantor is not the only undivided interest owner in the properties underlying the Subject Interests. As such, Grantee agrees that the acts or omissions of Grantor's co-owners shall not be deemed to constitute a violation of the provisions of Section 5.1(a), nor shall any action required by a vote of co-owners be deemed to constitute such a violation so long as Grantor has voted its interest in a manner designed to comply with Section 5.1(a).

(d)    WITHOUT LIMITING THE FOREGOING, (i) THE PARTIES ACKNOWLEDGE THAT GRANTEE HAS NO RIGHT OR POWER TO PROPOSE THE DRILLING OF A WELL OR ANY OTHER OPERATIONS, TO DETERMINE THE TIMING OR SEQUENCE OF ANY OPERATIONS, TO COMMENCE OR SHUT DOWN PRODUCTION, TO TAKE OVER OPERATIONS, OR TO MAKE OR SHARE OR PARTICIPATE IN OR OTHERWISE BE INVOLVED IN ANY MANNER WHATSOEVER IN ANY OPERATING DECISION WHATSOEVER OR IN ANY DECISION PERTAINING TO THE MARKETING AND SALE OF PRODUCTION WHATSOEVER OR ANY OTHER ASPECT OF ANY OPERATIONS OR DECISIONS AFFECTING OPERATIONS OR OTHER ACTIVITIES ON OR RELATING TO THE SUBJECT INTERESTS AND, (ii) THE PARTIES HEREBY EXPRESSLY NEGATE ANY INTENT TO CREATE (AND THIS CONVEYANCE SHALL NEVER BE CONSTRUED AS CREATING) A MINING OR OTHER PARTNERSHIP OR JOINT VENTURE OR OTHER RELATIONSHIP SUBJECTING GRANTOR AND GRANTEE TO JOINT LIABILITY OR ANY OTHER DUTIES BETWEEN GRANTOR AND GRANTEE (EXCEPT THOSE EXPRESSLY SET FORTH HEREIN).

Section 5.2    Pooling and Unitization.

HN\932900.2

(a)    Certain of the Subject Interests may have been heretofore pooled or unitized for the production of Hydrocarbons. Such Subject Interests are and shall be subject to the terms and provisions of such pooling or unitization agreements, and this Conveyance shall apply to and affect only the production of Hydrocarbons from such units which accrues to such Subject Interests under and by virtue of the applicable pooling and unitization agreements.

(b)    Grantor shall have (without further consent of or notice to Grantee) the right to pool or unitize all or any of the Subject Interests (and the Net Profits Interests and Overriding Royalty Interest) and to alter, change, amend or terminate any pooling or unitization agreements heretofore or hereafter entered into, as to all or any part of the lands covered by the Leases, as to one or more of the formations or horizons thereunder, when, in the reasonable judgment of Grantor, it is necessary or advisable to do so in order to facilitate the orderly development of the Subject Interests or to comply with the requirements of any law or governmental order or regulation relating to the spacing of wells or proration of the production therefrom. For purposes of computing Developed Properties Net Profits, Remaining Properties Net Profits or ORI Properties Gross Profits, as applicable, there shall be allocated to the Subject Interests included in such unit a pro rata portion of the Hydrocarbons produced from the pooled unit on the same basis that production from the pool or unit is allocated to other working interests in such pool or unit by virtue of the applicable pooling or unitization agreement. The interest in any such unit allocable to the Subject Interests included therein shall become a part of the Subject Interests and shall be subject to the applicable Net Profits Interest, and to the Overriding Royalty Interest, if applicable.

Section 5.3    <u>Non-Consent</u>.  Grantor shall have (without the further consent of or notice to Grantee) the right to elect not to participate in any operations that are to be conducted under the terms of any operating agreement, unit operating agreement, contract for development, or similar instrument affecting or pertaining to any of the Subject Interests. If Grantor elects to be a non-participating party under any such arrangement with respect to any operation on any portion of the Subject Interests or elects to be an abandoning party with respect to a Subject Well, the consequence of which election is that Grantor's interest in such Subject Well is temporarily (*i.e.,* during a recoupment period) or permanently relinquished to the parties participating in such operations, or electing not to abandon such Subject Well, then the costs and proceeds attributable to such relinquished interest shall not, for the period of such relinquishment (which may be a continuous and permanent period), be debited or credited to the Developed Properties Net Profits Account or the Remaining Properties Net Profits Account, and such relinquished interest shall not, for the period of such relinquishment, be considered to be subject to the Developed Properties Net Profits Interest or the Remaining Properties Net Profits Interest. Notwithstanding the foregoing, Grantor shall not elect, as to any portion of the Subject Interests, to be a non-participating party with respect to any operation contemplated in this Section 5.3 in the event any Affiliate of Grantor will also be a participating party in such operation.

Section 5.4    <u>Marketing</u>.  Grantor shall have exclusive charge and control of the marketing of all Subject Hydrocarbons. Grantor shall market or cause to be marketed all commercial quantities of the Subject Hydrocarbons in accordance with Section 5.1(a), and shall not be entitled to deduct from the calculation of Developed Properties Net Profits or Remaining Properties Net Profits any fee for marketing the Subject Hydrocarbons allocable to the

34

Development Properties Net Profits Interest or the Remaining Properties Net Profits Interest other than fees for marketing paid to non-Affiliates. Grantor shall not enter into any Hedges (other than the Existing Hedges) with respect to the Subject Hydrocarbons from and after the Effective Time or modify or terminate the Existing Hedges. Grantee shall have no right to take in kind any Subject Hydrocarbons.

Section 5.5  Leases. Grantor shall have the right to renew, extend, modify, amend or supplement the Leases with respect to any of the lands or depths covered thereby without the consent of Grantee. The Developed Properties Net Profits Interest shall apply to all such renewals, extensions, modifications, amendments and supplements of the Leases (but only as to Developed Properties Subject Wells and to Targeted Formations covered by the predecessor lease and in which Grantor had an interest under the predecessor lease). The Remaining Properties Net Profits Interest shall apply to all such renewals, extensions, modifications, amendments and supplements of the Remaining Properties Leases (but only to the extent that the predecessor lease (including the lands and depths covered thereby) was subject to the Remaining Properties Net Profits Interest. The Overriding Royalty Interest shall apply to all such renewals, extensions, modifications, amendments and supplements of the Remaining Properties Leases (but only to the extent that the predecessor lease (including the lands and depths, covered thereby) was subject to the Overriding Royalty Interest. No renewal, extension, modification, amendment, or supplement shall adversely affect any of Grantee's rights hereunder disproportionately. Any fees payable with respect to such renewal, extension, modification, amendment or supplement shall be considered Developed Properties Gross Deductions or Remaining Properties Gross Deductions, as appropriate, for purposes hereof. Grantor shall promptly furnish Grantee with written notice of any renewal, extension, modification, amendment, or supplementation that materially affects a Net Profits Interest or the Overriding Royalty Interest, identifying the location and the acreage covered thereby.

Section 5.6  Abandonment. Grantor shall have (without the further consent of or notice to Grantee) the right to release, surrender or abandon its interest in any portion of the Subject Interests that Grantor reasonably believes, in accordance with the standard set forth in Section 5.1(a), will no longer produce (or be capable of producing) Subject Hydrocarbons in paying quantities. The effect of such release, surrender or abandonment will be to release, surrender or abandon the Net Profits Interests and the Overriding Royalty Interest insofar as the Net Profits Interests or the Overriding Royalty Interest cover the applicable portion of the Subject Interests so released, surrendered or abandoned by Grantor. Following any such release, surrender or abandonment, Grantor will promptly notify Grantee in writing of the portion of the Subject Interests that has been released, surrendered or abandoned, and the date on which such release, surrender or abandonment has occurred. Further, Grantor shall have the right to release, surrender or abandon any portion of the Subject Interests if (a) such release, surrender or abandonment is necessary for health, safety or environmental reasons, or (b) in the case of Developed Properties Subject Interests, the Developed Properties Subject Hydrocarbons that would have been produced from the released, surrendered or abandoned portion of the Developed Properties Subject Interests would reasonably be expected to be produced from Developed Properties Subject Wells located on the remaining portion of the Developed Properties Subject Interests; or in the case of Remaining Properties Subject Interests, the Remaining Properties Subject Hydrocarbons that would have been produced from the released,

35

surrendered or abandoned portion of the Remaining Properties Subject Interests would reasonably be expected to be produced from Remaining Properties Subject Wells located on the remaining portion of the Remaining Properties Subject Interests.

Section 5.7 Contracts with Affiliates. Grantor and its Affiliates may perform services and furnish supplies or equipment with respect to the Subject Interests that are required to operate the Subject Interests and treat the costs of such services or furnishing of such supplies or equipment as Developed Properties Gross Deductions or Remaining Properties Gross Deductions, as appropriate, for purposes hereof. The terms of the provision of such services or furnishing of supplies or equipment shall be substantially similar to those terms available from non-Affiliates in the same area as the applicable portion of the Subject Interests that are engaged in the business of rendering comparable services or furnishing comparable equipment and supplies, taking into consideration all such terms, including the price, term, condition of supplies or equipment, and availability of supplies or equipment.

Section 5.8 Common Usage. If Materials, or wells or facilities located on or used in connection with the Developed Properties Subject Interests, are used in connection with the Remaining Properties Subject Interests, or *vice versa*, costs attributable to such Materials, wells or facilities shall be allocated between the Subject Interests by Grantor on a fair and equitable basis (without regard to the existence of the Net Profits Interests).

Section 5.9 Well Take-Over.

(a) If prior to the plugging and abandonment of a Developed Properties Subject Well, such well is taken over for use, exclusively, in connection with the Remaining Properties Subject Interests, costs attributable to the plugging and abandonment thereof shall not be Developed Properties Gross Deductions.

(b) Grantor shall have the right to cease production of Developed Properties Subject Hydrocarbons from a Developed Properties Subject Well, and to use such well exclusively in connection with the Remaining Properties Subject Interests, even though such well is producing Developed Properties Subject Hydrocarbons in paying quantities; provided that the number of such wells does not exceed ten percent (10%) of the Developed Properties Subject Wells in any rolling ten-year period. In the event that Grantor does so, (i) Grantee shall, upon receiving a written request from Grantor, immediately execute, acknowledge and deliver to Grantor a recordable instrument (reasonably acceptable to Grantor) that terminates and releases the Developed Properties Net Profits Interest with respect to the Developed Properties Subject Interest represented by the affected Developed Properties Subject Well, and (ii) the Developed Properties Gross Fair Value of the released portion of the Developed Properties Net Profits Interest shall be considered a Developed Properties Offset Amount for purposes hereof during the Payment Period in which the release occurs.

Section 5.10 No Personal Liability. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS CONVEYANCE, GRANTEE SHALL NEVER BE PERSONALLY RESPONSIBLE FOR THE PAYMENT OF ANY PART OF ANY LOSSES, COSTS, EXPENSES, LIABILITIES, DAMAGES OR ANY OTHER AMOUNTS WHATSOEVER INCURRED IN CONNECTION WITH THE EXPLORING, DEVELOPING,

36

OPERATING OR MAINTAINING OF THE SUBJECT INTERESTS OR OTHERWISE
INCURRED IN CONNECTION WITH ANY ASPECT OF ANY ACTIVITIES ON OR
RELATING TO THE SUBJECT INTERESTS, AND, SUBJECT TO SECTION 4.1(f), ALL
SUCH LOSSES, COSTS, EXPENSES, LIABILITIES OR DAMAGES SHALL, TO THE
EXTENT THE SAME RELATE TO ACTS, OMISSIONS, EVENTS, CONDITIONS OR
CIRCUMSTANCES OCCURRING FROM AND AFTER THE EFFECTIVE TIME, BE
TREATED AS DEVELOPED PROPERTIES GROSS DEDUCTIONS OR REMAINING
PROPERTIES GROSS DEDUCTIONS, AS APPROPRIATE, FOR PURPOSES HEREOF.

Section 5.11  Real Property Interest. IT IS THE EXPRESS INTENT OF THE
PARTIES THAT: (i) THE DEVELOPED PROPERTIES NET PROFITS INTEREST SHALL
FOR ALL PURPOSES CONSTITUTE (AND THIS CONVEYANCE SHALL
CONCLUSIVELY BE CONSTRUED FOR ALL PURPOSES AS CREATING) A SINGLE
AND SEPARATE NON-POSSESSORY, NON-OPERATING, ROYALTY INTEREST (IN
THE FORM OF AN OVERRIDING ROYALTY INTEREST) IN AND TO THE DEVELOPED
PROPERTIES SUBJECT INTERESTS AND A FULLY VESTED AND FULLY CONVEYED
INTEREST IN REAL PROPERTY RUNNING WITH THE DEVELOPED PROPERTIES
SUBJECT INTERESTS, (ii) THE REMAINING PROPERTIES NET PROFITS INTEREST
SHALL FOR ALL PURPOSES CONSTITUTE (AND THIS CONVEYANCE SHALL
CONCLUSIVELY BE CONSTRUED FOR ALL PURPOSES AS CREATING) A SINGLE
AND SEPARATE NON-POSSESSORY, NON-OPERATING, ROYALTY INTEREST (IN
THE FORM OF AN OVERRIDING ROYALTY INTEREST) IN AND TO THE REMAINING
PROPERTIES SUBJECT INTERESTS AND A FULLY VESTED AND FULLY CONVEYED
INTEREST IN REAL PROPERTY RUNNING WITH THE REMAINING PROPERTIES
SUBJECT INTERESTS, AND (iii) THE OVERRIDING ROYALTY INTEREST SHALL FOR
ALL PURPOSES CONSTITUTE (AND THIS CONVEYANCE SHALL CONCLUSIVELY BE
CONSTRUED FOR ALL PURPOSES AS CREATING) A SINGLE AND SEPARATE NON-
POSSESSORY, NON-OPERATING, ROYALTY INTEREST (IN THE FORM OF AN
OVERRIDING ROYALTY INTEREST) IN AND TO THE ORI PROPERTIES SUBJECT
INTERESTS AND A FULLY VESTED AND FULLY CONVEYED INTEREST IN REAL
PROPERTY RUNNING WITH THE ORI PROPERTIES SUBJECT INTERESTS.

## ARTICLE VI
## TRANSFERS AND CHARGES

Section 6.1    Assignment by Grantor Subject to Net Profits Interests.

(a)    Right to Sell.

(i)    Grantor may from time to time Transfer its interest in the Subject
Interests, or any part thereof or undivided interest therein, subject to the applicable Net
Profits Interest (and the Developed Properties Debit Balance, if any, in the corresponding
portion of the Developed Properties Net Profits Account, and the Remaining Properties
Debit Balance Amount, if any, in the corresponding portion of the Remaining Properties
Net Profits Account, as applicable), the Overriding Royalty Interest if applicable, and this
Conveyance.  Subject to Section 6.1(a)(ii), Grantor shall cause the assignee, purchaser,
transferee or grantee of any such transaction to take the affected Subject Interests subject

37

to the applicable Net Profits Interest, the Overriding Royalty Interest, if applicable, and this Conveyance and, from and after the actual date of any such Transfer, to assume Grantor's obligations under this Conveyance with respect to such Subject Interests.

(ii)    Notwithstanding the foregoing, Grantor may from time to time Transfer to non-Affiliates of Grantor, free and clear of the applicable Net Profits Interest, the Overriding Royalty Interest and this Conveyance, any of the Developed Properties Subject Interests and any of the Remaining Properties Subject Interests that, together, account for less than or equal to 0.25% of the total production of Developed Properties Subject Hydrocarbons from the Developed Properties Subject Interests in the preceding twelve (12) month period and Remaining Properties Subject Hydrocarbons from the Remaining Properties Subject Interests in the preceding twelve (12) month period. The aggregate Fair Value of all portions of the Developed Properties Net Profits Interest and the Remaining Properties Net Profits Interest released in connection with such Transfers shall not exceed an aggregate Fair Value of five hundred thousand dollars ($500,000) during any consecutive twelve (12) month period. In the event of any such Transfer, (A) Grantor shall deliver a certificate to Grantee certifying Grantor's compliance with the relevant provisions of this Conveyance, (B) the Developed Properties Gross Fair Value of the released portion of the Developed Properties Net Profits Interest shall be considered a Developed Properties Offset Amount, and the Remaining Properties Gross Fair Value of the released portion of the Remaining Properties Net Profits Interest shall be considered a Remaining Properties Offset Amount, for purposes hereof during the Payment Period in which the Transfer occurs, and (C) Grantee shall, upon receiving a written request from Grantor, immediately prior to any such Transfer, execute, acknowledge, and deliver to Grantor a recordable instrument (reasonably acceptable to Grantor) that terminates and releases the applicable Net Profits Interest (and the Overriding Royalty Interest if applicable) with respect to the Subject Interests being Transferred.

(b)    Effect of Sale. From and after the actual date of any of the Transfers described in Section 6.1(a) by Grantor, Grantor (and in the case of Section 6.1(a)(ii) only, any assignee, purchaser, transferee or grantee of the Subject Interests) shall be relieved of all obligations, requirements, and responsibilities arising under this Conveyance with respect to the Subject Interests Transferred, except for those that accrued prior to such date.

(c)    Allocation of Consideration. Grantee is not entitled to receive any share of the sales proceeds received by Grantor in any transaction permitted by this Section 6.1.

(d)    Separate Interest. Effective on the effective date of any Transfer of any Subject Interest pursuant to Section 6.1(a)(i), Developed Properties Gross Profits, Remaining Properties Gross Profits, Developed Properties Excluded Proceeds, Remaining Properties Excluded Proceeds, Developed Properties Net Deductions, Remaining Properties Net Deductions, Developed Properties Gross Deductions, Remaining Properties Gross Deductions, Developed Properties Offset Amounts, Remaining Properties Offset Amounts, Developed Properties Net Profits, Remaining Properties Net Profits, ORI Properties Gross Profits and Overriding Royalty Interest Proceeds shall thereafter be calculated and determined separately (by

the assignee, purchaser, transferee or grantee) with respect to such Transferred Subject Interests, taking into consideration the Developed Properties Debit Balance, if any, in the corresponding portion of the Developed Properties Net Profits Account, and the Remaining Properties Debit Balance Amount, if any, in the corresponding portion of the Remaining Properties Net Profits Account, as applicable; and Developed Properties Net Deductions, Remaining Properties Net Deductions, Developed Properties Gross Profits,  Remaining Properties Gross Profits and Overriding Royalty Interest Proceeds during each Payment Period in respect of the Subject Interests Transferred shall reflect items received or incurred by the assignee, purchaser, transferee or grantee, and shall be calculated in accordance with Article IV hereof.

Section 6.2   Release of Other Properties.  Notwithstanding anything herein to the contrary, in the event that any Person notifies Grantor that, pursuant to a Prior Reversionary Interest, Grantor is required to convey all or any portion of the Subject Interests (or the Net Profits Interests (and the Overriding Royalty Interest if applicable) with respect to all or any portion of the Subject Interests) to such Person or cease production from any Subject Well, Grantor shall have the right (without further consent or notice to Grantee) to provide such conveyance with respect to such portion of the Subject Interests (or the Net Profits Interests (and the Overriding Royalty Interest if applicable) with respect to such portion of the Subject Interests) or permanently cease production from any such Subject Well.  If in connection with any such conveyance or permanent cessation of production pursuant to any Prior Reversionary Interest, Grantor receives compensation attributable to all or any portion of the Net Profits Interests (and the Overriding Royalty Interest if applicable) ("Reversionary Compensation"), an amount equal to the Gross Reversionary Compensation shall be considered a Developed Properties Offset Amount in the case of the Developed Properties Net Profits Interest or a Remaining Properties Offset Amount in the case of the Remaining Properties Net Profits Interest, for purposes hereof during the Payment Period in which Grantor receives the Reversionary Compensation.  In connection with any such conveyance or permanent cessation of production, Grantee shall, on request, immediately prior to such event, execute, acknowledge, and deliver to Grantor a recordable instrument (reasonably acceptable to Grantor) that terminates and releases the applicable Net Profits Interest (and the Overriding Royalty Interest if applicable) with respect to any such portion of the Subject Interests or Subject Well, as applicable, to Grantor.  From and after the actual date of any such conveyance or permanent cessation of production, Grantor and any assignee, purchaser, transferee or grantee of such Subject Interest (or the applicable Net Profits Interest (and the Overriding Royalty Interest if applicable) with respect to such Subject Interest) shall be relieved of all obligations, requirements, and responsibilities arising under the applicable Net Profits Interest (and the Overriding Royalty Interest if applicable) or this Conveyance with respect to such portion of the Subject Interests, except for those that accrued prior to such date.

Section 6.3   Mortgages and Security Interests.  Nothing herein shall prevent Grantor from granting a lien, mortgage, security interest or other charge in Grantor's interest in any property, including the Subject Interests and the Subject Hydrocarbons.  Grantor agrees that it shall cause each agreement, indenture, bond, deed of trust, filing, application or other instrument that creates or purports to create a lien, mortgage, security interest or other charge secured by the Subject Interests, the Subject Hydrocarbons or the proceeds from the sale of the Subject Hydrocarbons to include an express agreement and acknowledgement by the parties thereto that

the Net Profits Interests (and the Overriding Royalty Interest if applicable) are senior in right of payment and collection to any and all obligations created thereby in respect of the Subject Interests, the Subject Hydrocarbons or the proceeds from the sale of the Subject Hydrocarbons. The preceding sentence shall not apply to any agreement, indenture, bond, deed of trust, filing, application or other instrument that creates a lien, mortgage, security interest or other charge secured by not more than Grantor's residual interest in the Subject Interests, the Subject Hydrocarbons or the proceeds from the sale of the Subject Hydrocarbons.

Section 6.4    Rights of Mortgagee, Pledgee or Trustee.   If Grantee shall at any time execute a mortgage, pledge or deed of trust covering all or part of the Net Profits Interests or the Overriding Royalty Interest, the mortgagee(s), pledge(s) or trustee(s) therein named or the holder of any obligation secured thereby shall be entitled, to the extent such mortgage, pledge or deed of trust so provides, to exercise all the rights, remedies, powers, and privileges conferred upon Grantee by the terms of this Conveyance and to give or withhold all consents required to be obtained hereunder by Grantee, but the provisions of this Section 6.4 shall in no way be deemed or construed to impose upon Grantor any obligation or liability undertaken by Grantee under such mortgage, pledge or deed of trust or under any obligation secured thereby.

Section 6.5    Assignment or Mortgage by Grantee.   Grantee shall provide Grantor with written notice of any Transfer, mortgage or pledge of all or any portion of the Net Profits Interests or Overriding Royalty Interest.   No such Transfer, mortgage or pledge will affect the method of computing Developed Properties Gross Profits, Remaining Properties Gross Profits, Developed Properties Excluded Proceeds, Remaining Properties Excluded Proceeds, Developed Properties Net Deductions, Remaining Properties Net Deductions, Developed Properties Gross Deductions, Remaining Properties Gross Deductions, Developed Properties Offset Amounts, Remaining Properties Offset Amounts, Developed Properties Net Profits, Remaining Properties Net Profits, ORI Properties Gross Profits or Overriding Royalty Interest Proceeds or impose any obligation or liability on Grantor.   Grantor shall never be obligated to pay the Developed Properties NPI Payment Amount, Remaining Properties NPI Payment Amount and Overriding Royalty Interest Proceeds (or portions thereof) to more than one Person.  If more than one Person is ever entitled to receive payment of any part of the Developed Properties NPI Payment Amount, Remaining Properties NPI Payment Amount or Overriding Royalty Interest Proceeds, Grantor may suspend payments of the Developed Properties NPI Payment Amount, Remaining Properties NPI Payment Amount and Overriding Royalty Interest until the concurrent owners or claimants of the Net Profits Interests and the Overriding Royalty Interest or the right to receive payment of the Developed Properties NPI Payment Amount, Remaining Properties NPI Payment Amount or Overriding Royalty Interest Proceeds, appoint one Person in writing to receive all payments of the Developed Properties NPI Payment Amount, Remaining Properties NPI Payment Amount and Overriding Royalty Interest Proceeds on their behalf.   Grantor may thereafter conclusively rely upon the authority of that Person to receive payments of the Developed Properties NPI Payment Amount, Remaining Properties NPI Payment Amount and Overriding Royalty Interest Proceeds and shall be under no further duty to inquire into the authority or performance of such Person.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1    <u>Notices</u>.  All notices and other communications which are required or may be given pursuant to this Conveyance must be given in writing, in English and delivered personally, by courier, by telecopy or by registered or certified mail, postage prepaid, as follows:

*If to Grantor:*

> Pacific Coast Energy Company LP
> 515 South Flower Street, Suite 4800
> Los Angeles, California 90071
> Attn:  Gregory C. Brown
> Facsimile:  (213) 225-5917

*If to Grantee:*

> Pacific Coast Oil Trust
> c/o The Bank of New York Mellon Trust Company, N.A.
> 919 Congress Avenue, Suite 500
> Austin, Texas 78701
> Attn:  Michael J. Ulrich
> Facsimile:  (512) 479-2253

Either Party may change its address for notice purposes by giving notice to the other Party in the manner set forth above.  All notices shall be deemed to have been duly given at the time of receipt by the Party to which such notice is addressed.

Section 7.2    <u>Ownership of Certain Property</u>.    The Net Profits Interests and the Overriding Royalty Interest do not include any right, title, or interest in and to any personal property, fixtures, or equipment and are exclusively interests in and to the applicable Subject Interests and the applicable Subject Hydrocarbons.

Section 7.3    <u>Non-Recourse</u>.  Grantee shall look solely to the Developed Properties Net Profits for the satisfaction and discharge of the Developed Properties Net Profits Interest, to the Remaining Properties Net Profits for the satisfaction and discharge of the Remaining Properties Net Profits Interest and to the balance in the Overriding Royalty Account for the satisfaction and discharge of the Overriding Royalty Interest, and except in the event of Grantor's failure to pay as required by Section 4.4, Grantor shall not be liable for such satisfaction or discharge.  Grantor shall not have any liability (and Grantee shall have no recourse or remedy against Grantor) in the event that (i) the Developed Properties Subject Interests terminate without having generated the Developed Properties Subject Hydrocarbons, Developed Properties Net Profits or Developed Properties NPI Payment Amount that are expected to be generated during the term of the Developed Properties Net Profits Interest, (ii) the Remaining Properties Subject Interests terminate without having generated the Remaining Properties Subject Hydrocarbons, Remaining Properties Net Profits or Remaining Properties NPI Payment Amount that are expected to be generated during the term of the Remaining Properties Net Profits Interests, or (iii) the ORI Properties Subject Interests terminate without having generated the ORI Properties Subject

41

HN\932900.2

Hydrocarbons or Overriding Royalty Interest Proceeds that are expected to be generated during the term of the Overriding Royalty Interest.

Section 7.4   Payments. Grantor shall transfer or cause to be transferred all monies to which Grantee is entitled hereunder by Federal funds wire transfer not later than the date when due, to Grantee at the bank account specified by Grantee in writing to Grantor.

Section 7.5   Amendments. This Conveyance may not be amended, altered or modified except pursuant to a written instrument executed by the Parties.

Section 7.6   Further Assurances. The Parties shall from time to time do and perform such further acts and execute and deliver such further instruments, conveyances, and documents as may be required or reasonably requested by the other Party to establish, maintain, or protect the respective rights and remedies of the Parties and to carry out and effectuate the intentions and purposes of this Conveyance.

Section 7.7   Waivers. Any failure by either Party to comply with any of its obligations, agreements or conditions herein contained may be waived by the Party to whom such compliance is owed by an instrument signed by such Party and expressly identified as a waiver, but not in any other manner. No waiver of, or consent to a change in, any of the provisions of this Conveyance shall be deemed or shall constitute a waiver of, or consent to a change in, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

Section 7.8   Severability. The invalidity or unenforceability of any term or provision of this Conveyance in any situation or jurisdiction shall not affect the validity or enforceability of the other terms or provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction and the remaining terms and provisions shall remain in full force and effect, unless doing so would result in an interpretation of this Conveyance which is manifestly unjust.

Section 7.9   No Partition. The Parties acknowledge that Grantee has no right or interest that would permit Grantee to partition any portion of the Leases or Subject Interests, and Grantee hereby waives any such right.

Section 7.10  Governing Law. THIS CONVEYANCE AND THE LEGAL RELATIONS BETWEEN THE PARTIES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REFERENCE TO CONFLICTS OF LAW RULES OR PRINCIPLES THAT MAY REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

Section 7.11  Rule Against Perpetuities. It is not the intent of the Parties that any provision herein violate any applicable law regarding the rule against perpetuities or other rules regarding the vesting or duration of estates, and this Conveyance shall be construed as not violating any such rule to the extent the same can be so construed consistent with the expressed intent of the Parties as set forth herein. In the event, however, that any provision hereof is determined to violate any such rule, then such provision shall nevertheless be effective for the

maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To extent that the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last survivor of the descendents of the late Joseph P. Kennedy (the father of the late John F. Kennedy, the 35th President of the United States of America) living as of the Effective Time.

Section 7.12   Tax Matters. Without limiting the disclaimer in Section 5.1(d)(ii), nothing herein contained shall be construed to constitute a partnership or to cause either Party (under state law or for tax purposes) to be treated as being the agent of, or in partnership with, the other Party. Grantor may cause to be withheld from any payment hereunder any tax withholding required by law or regulations, including, in the case of any withholding obligation arising from income that does not give rise to any cash or property from which any applicable withholding tax could be satisfied, by way of set off against any subsequent payment of cash or property hereunder.

Section 7.13   Counterparts. This Conveyance may be executed in counterparts, each of which shall be deemed an original instrument, but all such counterparts together shall constitute but one instrument. No Party shall be bound until such time as all of the Parties have executed counterparts of this Conveyance. To facilitate recordation, there may be omitted from the Exhibits to this Conveyance in certain counterparts descriptions of property located in recording jurisdictions other than the jurisdiction in which the particular counterpart is to be filed or recorded.

Section 7.14   Conspicuous. GRANTOR AND GRANTEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE OR ENFORCEABLE, THE PROVISIONS IN THIS CONVEYANCE IN ALL CAPS FONT ARE "CONSPICUOUS" FOR THE PURPOSE OF ANY APPLICABLE LAW.

Section 7.15   Binding Effect. All the covenants, restrictions and agreements of Grantor herein contained shall be deemed to be covenants running with the Subject Interests and the lands affected thereby. All of the provisions hereof shall inure to the benefit of Grantee and its successors and assigns and shall be binding upon Grantor and its successors and assigns and all other owners of the Subject Interests or any part thereof or any interest therein.

Section 7.16   Limitation on Damages. NOTWITHSTANDING ANYTHING TO THE CONTRARY, NONE OF GRANTOR, GRANTEE OR ANY OF THEIR RESPECTIVE AFFILIATES SHALL BE ENTITLED TO CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS CONVEYANCE, AND EACH PARTY, FOR ITSELF AND ON BEHALF OF ITS AFFILIATES, HEREBY EXPRESSLY WAIVES ANY RIGHT TO CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS CONVEYANCE AND THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 7.17   Term. The Developed Properties Net Profits Interest shall remain in full force and effect as long as (i) any portion of the Developed Properties Subject Interests not comprised of fee interests is in full force and effect, and (ii) any portion of the Developed Properties Subject Interests comprised of fee interests is producing Hydrocarbons in commercial

quantities.  At any time after the termination of the Developed Properties Net Profits Interest, Grantee shall, upon the request of Grantor, execute and deliver such instruments as may be necessary to evidence the termination of the Developed Properties Net Profits Interest.  The Remaining Properties Net Profits Interest shall remain in full force and effect as long as (i) any portion of the Remaining Properties Subject Interests not comprised of fee interests is in full force and effect, and (ii) any portion of the Remaining Properties Subject Interests comprised of fee interests is producing Hydrocarbons in commercial quantities.  At any time after the termination of the Remaining Properties Net Profits Interest, Grantee shall, upon the request of Grantor, execute and deliver such instruments as may be necessary to evidence the termination of the Remaining Properties Net Profits Interest.  The Overriding Royalty Interest shall remain in full force and effect as long as any portion of the ORI Properties Subject Interests is in full force and effect.  At any time after the termination of the Overriding Royalty Interest, Grantee shall, upon the request of Grantor, execute and deliver such instruments as may be necessary to evidence the termination of the Overriding Royalty Interest.

Section 7.18   Trust Agreement.  This Conveyance is delivered pursuant to, and hereby made subject to, the terms and conditions of the Trust Agreement.  In the event that any provision of this Conveyance is construed to conflict with any provision of the Trust Agreement, the provisions of the Trust Agreement shall be deemed controlling to the extent of such conflict.

Section 7.19   No Third Party Beneficiaries.  Nothing in this Conveyance shall entitle any Person other than the Parties to any claims, cause of action, remedy or right of any kind.

Section 7.20   Construction.  The Parties acknowledge that (a) Grantor and Grantee have had the opportunity to exercise business discretion in relation to the negotiation of the details of the transaction contemplated hereby, (b) this Conveyance is the result of arms-length negotiations from equal bargaining positions, and (c) Grantor and Grantee and their respective counsel participated in the preparation and negotiation of this Conveyance.  Any rule of construction that a document be construed against the drafter shall not apply to the interpretation or construction of this Conveyance.

Section 7.21   Merger Clause.  This Conveyance and the Trust Documents constitute the entire agreement between the Parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof.

Section 7.22   Reliance by Third Parties.  No third party (including operators, production purchasers and disbursing parties) is responsible for calculating or separately reporting and paying to Grantee any sums that are potentially attributable to the Net Profits Interests or the Overriding Royalty Interest; and such third parties may include the interest of Grantee within the interest credited to Grantor for all purposes.  Grantor shall attend to the actual distribution of the Developed Properties NPI Payment Amount, the Remaining Properties NPI Payment Amount and the Overriding Royalty Interest Proceeds to Grantee as provided in this Conveyance. To the extent that any provision of a state oil and gas proceeds payment statute requires an operator, production purchaser or disbursing party to account for and separately pay proceeds of production attributable to the Net Profits Interests or the Overriding Royalty Interest, Grantor and Grantee specifically (a) authorize such third parties to include the Net Profits Interests or the

44

Overriding Royalty Interest within the interest credited to Grantor, and (b) waive the application of such statute, to the extent possible, and such payment shall be made to Grantor directly. No third party shall be under any obligation to inquire as to, or to see to, the application by Grantor of the proceeds received by it from any sale of production attributable to the Net Profits Interests or the Overriding Royalty Interest.

      Section 7.23   <u>Replacement Conveyance</u>. This Conveyance replaces and supersedes that certain Conveyance of Net Profits Interests and Overriding Royalty Interest from Grantor to Grantee executed on May 8, 2012 and covering the same properties and interests covered by this Conveyance; and said Conveyance of Net Profits Interests and Overriding Royalty Interest shall be null and void, and of no force and effect.

*[Signature Page Follows]*

HN\932900.2

**IN WITNESS WHEREOF**, this Conveyance has been signed by each of the Parties on the Execution Date and duly acknowledged before the undersigned Notary Public.

GRANTOR:

**Pacific Coast Energy Company LP**

By its General Partner, PCEC (GP) LLC

By: _____
Name: _____
Title: _____


GRANTEE:

**Pacific Coast Oil Trust**

By its Trustee, The Bank of New York
Mellon Trust Company, N.A.

By: _____
Name: _____
Title: _____

[Signature Page – Conveyance]

HN\932900.2

STATE OF CALIFORNIA )
) ss.
COUNTY OF _____ )

On _____, 2012, before me, _____,
     Date

personally appeared _____,

who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State
of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Place Notary Seal Above               Signature of Notary Public

STATE OF CALIFORNIA )
) ss.
COUNTY OF _____ )

On _____, 2012, before me, _____,
     Date

personally appeared _____,

who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State
of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Place Notary Seal Above               Signature of Notary Public

[Acknowledgement Page – Conveyance]

HN\932900.2

**EXHIBIT A**

ATTACHED TO AND MADE A PART OF THAT
CERTAIN CONVEYANCE OF NET PROFITS INTERESTS
AND OVERRIDING ROYALTY INTEREST
DATED AS OF APRIL 1, 2012

LEASES

A.   **HUALDE DOME, EAST COYOTE FIELD, ORANGE COUNTY, CALIFORNIA**

1.   The "Property" as more particularly described in Exhibit "A" to that certain "Quitclaim Deed, Assignment and Bill of Sale" from Union Oil Company of California, as Seller, to BreitBurn Energy Company LLC, as Buyer, dated effective as of August 1, 1999, and recorded October 15, 1999, as Instrument No. 1999-0729882, Official Records, County of Orange, State of California;

2.   The "Property" as more particularly described in Exhibit "A" to that certain "Quitclaim Deed, Assignment and Bill of Sale" from Texaco Exploration and Production Inc., as Seller, to BreitBurn Energy Company LLC, as Buyer, dated effective as of October 1, 1999, and recorded April 30, 2000, as Instrument No. 2000-0169921, Official Records, County of Orange, State of California;

3.   The real property that is described by reference and incorporation in that certain "Quitclaim Deed" by Tosco Corporation to Union Oil Company of California, dated February 23, 2000, and recorded March 3, 2000, as Instrument No. 2000-0116228, Official Records, County of Orange, State of California;

4.   The real property that is described in Exhibit "A" to that certain "Quitclaim and Grant of Easements" from the City of Fullerton to Union Oil Company of California dated April 24, 2000, and recorded May 15, 2000, as Instrument No. 2000-0255748, Official Records, County of Orange, State of California; and

5.   Any additional lands subject to oil, gas and/or mineral leasehold or fee mineral interests of Grantor within the area known as the "East Coyote Field" and the Hualde Dome Unit, as described in that certain Unit Agreement-Hualde Dome Unit, Orange County, California, dated May 1, 1969, recorded on December 4, 1970 in Book 9478, Page 726 of the Official Records of said County and State, as modified pursuant to that certain Certificate and Declaration, recorded May 28, 1971 in Book 9657, Page 888 of the Official Records of said County and State.

SUBJECT TO the terms and conditions in those certain agreements recited in (1.) through (5.) above.

HN\932900.2

B.   **SAWTELLE FIELD, LOS ANGELES COUNTY, CALIFORNIA**

1.   The Federal Leases

    a.   Federal Oil and Gas Lease No. LA 0138800 (a/k/a CALA 00138800), made and issued effective as of November 1, 1963, in favor of Tom H. Dowlen, sometimes known and referred to as the "Sawtelle Area, V. A. Hospital Federal Oil and Gas Lease."

    SUBJECT TO: Those rights of Assignee in that certain Assignment of Interest in Oil, Gas and Mineral Lease by and between Assignor and Trio Petroleum LLC, Assignee, effective September 21, 2001, recorded January 20, 2012 as Document No. 20120107189, Official Records, County of Los Angeles, State of California.

    b.   Federal Oil and Gas "Protective" Lease No. R 1956 (a/k/a CARI 1956), made and issued effective as of January 1, 1969, in favor of Occidental Petroleum Corporation, sometimes know and referred to as the "Sawtelle Area, V. A. Hospital Federal Oil and Gas "Protective" Lease."

2.   Sawtelle Field – Unit 1 and Sawtelle Extension Area:

    a.   The oil and gas leases described in the schedule of leases entitled "Exhibit A Sawtelle," consisting of pages 1 through 57, attached to that certain "Assignment of Assets – Bill of Sale dated effective as of January 1, 1992, between Occidental Petroleum Corporation, et al., as Seller, and Westside Operating Partners Limited Partnership ("WOPLP"), as Assignee, recorded April 9, 1993 as Document No. 93-677456, Official Records, County of Los Angeles, State of California;

    b.   The following additional Sawtelle Extension Area Leases:

      i.   Oil, Gas and Mineral Lease dated March 1, 1994, by Klaus C. Brandt, et al., to BreitBurn Energy Corporation, recorded July 18, 1994, as Document No. 94-1331642, Official Records, County of Los Angeles, State of California;

      ii.   Oil, Gas and Mineral Lease dated March 1, 1994, by Ky Danny Nernberg, et al., to BreitBurn Energy Corporation, recorded December 16, 1994, as Document No. 94-2230561, Official Records, County of Los Angeles, State of California;

      iii.   Oil, Gas and Mineral Lease dated March 1, 1994, by Christopher Michael Olsen, et al., to BreitBurn Energy Corporation, recorded January 13, 1995, as Document No. 95-64942, Official Records, County of Los Angeles, State of California;

iv.  Oil, Gas and Mineral Lease dated April 10, 1995, by Metropolitan
Water District of Southern California, et al., to BreitBurn Energy
Corporation, recorded May 18, 1995, as Document No. 95-797738,
Official Records, County of Los Angeles, State of California;

v.  Oil, Gas and Mineral Lease dated March 1, 1994, by John Cinga, et
al., to BreitBurn Energy Corporation, recorded August 14, 1995, as
Document No. 95-1324701, Official Records, County of Los Angeles,
State of California;

vi.  Oil, Gas and Mineral Lease dated March 1, 1994, by Dardie Elsa Ann
Schaefer Dunlap, et al., to BreitBurn Energy Corporation, recorded
September 25, 1995, as Document No. 95-1573207, Official Records,
County of Los Angeles, State of California; and

vii.  Oil, Gas and Mineral Lease dated October 1, 2011, by Cornerstone Oil
Company, and BreitBurn Energy Company L.P., recorded January 6,
2012, as Document No. 20120021777, Official Records, County of
Los Angeles, State of California.

c.  Any additional lands subject to oil, gas and/or mineral leasehold or fee
mineral interests of Grantor herein located within the "Sawtelle Field" and
more particularly within (a) the area known as the "Sawtelle Field-Unit 1"
as described and outlined in the Communitization Agreement for the
Sawtelle Field Unit 1, Los Angeles County, California, dated as of March
21, 1969, and recorded May 1, 1969, as Document No. 3227 in Book M-
3222, Page 512 et seq, Official Records, County of Los Angeles, State of
California; and within (b) the "Sawtelle Extension Area" as described and
outlined in the Declaration of Pooling, Sawtelle Extension Area, dated
August 26, 1994, recorded August 30, 1994, as Document No. 94-
1602239, Official Records, County of Los Angeles, State of California.

All of the foregoing being subject to (1) the terms and conditions in those certain
agreements recited in (a.) through (c.) above; and (2) the terms and provisions of that
certain unrecorded Agreement of Sale and Purchase of Assets by and between Occidental
Petroleum Corporation and OXY USA, Inc., "Sellers," Occidental Petroleum Exploration
Company, "Nominee," and Eastern American Energy Corporation and BreitBurn Energy
Corporation, "Buyer," dated February 26, 1993 (except 2.b.vii. above).

## C.  WEST PICO AREA, BEVERLY HILLS (EAST) FIELD, LOS ANGELES COUNTY, CALIFORNIA

1. Those real properties more particularly described in the following conveyances:

a.  That certain Mineral Deed dated April 8, 1993, between Occidental
Petroleum Corporation, et al., and WOPLP, recorded April 9, 1993, as
Document No. 93-677460, Official Records, County of Los Angeles, State
of California;

Exhibit A

b.   That certain Assignment of Assets-Bill of Sale dated April 8, 1993,
between Occidental Petroleum Corporation, et al., and WOPLP, recorded
April 9, 1993, as Document No. 93-677456, Official Records, County of
Los Angeles, State of California, within which the included portion of the
West Pico properties are defined and described as part of the "Assets" at
pages 1 through 3, inclusive, and the included oil and gas leases
enumerated in Exhibit A thereto; and

2.   Any additional lands subject to oil, gas and/or mineral leasehold or fee mineral
interests of Grantor herein located within the area known as the "West Pico Area,"
and more particularly within that certain "Unit Agreement for the West Pico Area,
Los Angeles County, California," dated as of January 1, 1966, and recorded January
28, 1966 as Document No. 4829 at Book M2111, Page 9 et seq., Official Records,
County of Los Angeles, State of California, as amended by that certain "Revision of
Exhibit "A," Unit Agreement for the West Pico Area, Los Angeles County,
California," dated April 15, 1970, and recorded April 17, 1970 as Document No.
3092 at Book M3469, Page 199 et seq., Official Records, County of Los Angeles,
State of California.

SUBJECT TO:

a.   All right, title and interest of Grantee in that certain Grant Deed dated
March 25, 1997 to WAC, recorded April 1, 1997 as Document No. 97-
496668, Official Records, County of Los Angeles, State of California,
relating to the conveyance of one-half of Grantor's interest to a depth of
50 feet beneath the surface in certain parcels of real property in the West
Pico Area, including, but not limited to, the Buffer Lots, Production
Facility and Parking Lot ("Surface Real Estate Interests") and the limited
right of WAC to the use of the Drillsite, all capitalized terms defined in
the Co-Tenancy Agreement next described;

b.   All right, title and interest of WAC in and to that certain Co-Tenancy
Agreement by and between BreitBurn Energy Company LLC and WAC,
covering said Surface Real Estate Interests and, if applicable, the Drillsite,
effective March 25, 1997, a memorandum of which was recorded on April
1, 1997 as Document No. 97-496679, Official Records, County of Los
Angeles, State of California; and

c.   All right, title and interest of Stocker Resources, L.P., its successors and
assigns, under that certain unrecorded Agreement effective March 27,
1998, by and between Stocker Resources, L.P. and BreitBurn Energy
Company LLC.

All of the foregoing being also subject to (1) the terms and conditions in those certain
agreements recited in (a.) and (b.) above; and (2) the terms and provisions of that certain
unrecorded Agreement of Sale and Purchase of Assets by and between Occidental
Petroleum Corporation and OXY USA, Inc., "Sellers," Occidental Petroleum Exploration

Exhibit A

Company, "Nominee," and Eastern American Energy Corporation and BreitBurn Energy
Corporation, "Buyer," dated February 26, 1993.

D.   **ORCUTT FIELD, SANTA BARBARA COUNTY, CALIFORNIA**

1.   The properties more particularly described in that certain Deed, Assignment and Bill
of Sale from ERG Operating Company, Inc. to BreitBurn Energy Company L.P.,
dated as of October 4, 2004, recorded October 5, 2004 as Instrument No. 2004-
0106748, Official Records, County of Santa Barbara, State of California;

SAVE AND EXCEPT:

    a.   All of the right, title and interest conveyed in that certain Quitclaim Deed
effective May 1, 2005, by and between BreitBurn Energy Company L.P.,
as Grantor, and Orcutt Fee LLC, as Grantee, recorded June 29, 2005 as
Document No. 2005-0061316, Official Records, County of Santa Barbara,
State of California;

    b.   All of the right, title and interest of Grantor in and to the "Orcutt Hill
Fresh Water System" acquired by Grantor through and under the Deed,
Assignment and Bill of Sale from ERG Operating Company, Inc. to
BreitBurn Energy Company L.P., dated as of October 4, 2004, recorded
October 5, 2004 as Instrument No. 2004-0106748, Official Records,
County of Santa Barbara, State of California, as well as all right, title and
interest of Grantor in and to that certain "Water Rights Agreement" dated
as of October 4, 2004, and recorded October 5, 2004 as Instrument No.
2004-0106749, Official Records, County of Santa Barbara, State of
California;

    c.   All right, title and interest of Grantor in those certain properties described
as "Water Well 1" and "Water Well 2" in Exhibit "B" to that certain Deed,
Assignment and Bill of Sale from ERG Operating Company, Inc. to
BreitBurn Energy Company L.P., dated as of October 4, 2004, recorded
October 5, 2004 as Instrument No. 2004-0106748, Official Records,
County of Santa Barbara, State of California.

    d.   All right, title and interest of Grantor in, to and under that certain parcel of
land more particularly described as follows:

That portion of Parcel 1 in the County of Santa Barbara, State of
California, as shown on a Map filed in Book 119, Page 40 of Record of
Surveys, Records of said County, said portion containing 2,556 acres,
more or less, and particularly described as follows:

Beginning at the most westerly corner of Parcel 1; thence South 88
Degrees 06'12" East 8976.69 feet along the westerly line of said Parcel 1
to an angle point in said line of Parcel 1, also being the True Point of
Beginning; thence leaving said westerly line South 88 Degrees 20'06"

Exhibit A

East 6537.07 feet; thence North 23 Degrees 30'28" West 8926.66 feet, to the northerly line of said Parcel 1; thence North 57 Degrees 11'57" East 5016.47 feet along said northerly line to the southwesterly line of the 101 Highway as described in Grant Deed recorded December 22, 1955 in Book 1352, Page 468 of the Official Records, County of Santa Barbara, State of California; thence along said southwesterly line, the following five (5) courses:  South 34 Degrees 09'46" East 1154.27 feet; thence South 30 Degrees 47'17" East 251.26 feet; thence South 37 Degrees 06'47" East 418.80 feet; thence South 35 Degrees 39'17" East 6080.57 feet; thence South 36 Degrees 36'18" West 333.40 feet to the westerly line of said Parcel 1; thence South 03 Degrees 05'30" West 7617.90 feet to the southerly line of Parcel 1; thence along the southerly line of said Parcel 1 the following eight (8) courses: North 88 Degrees 21'00" West 3329.33 feet; thence South 61 Degrees 03'38" West 2570.44 feet; thence South 12 Degrees 03'10" West 893.10 feet; thence North 59 Degrees 00'20" West 2403.21 feet; thence South 55 Degrees 33'13" West 1464.29 feet; thence North 84 Degrees 50'42" West 1604.34 feet; thence South 58 Degrees 22'22" West 498.14 feet; thence North 43 Degrees 07'22" West 938.56 feet to the westerly line of said Parcel 1; thence North 01 Degrees 45'46" East 4653.34 feet along said westerly line to the True Point of Beginning [Portion of Newlove Fee Simple (mins)/Portion Careaga Mineral Fee]; and

e.  All right, title and interest of Grantor in all oil, gas and other hydrocarbon substances and minerals on, in, under and that may be extracted, produced and saved from that certain property described as "Careaga Mineral Fee" in Exhibit "B" to that certain Deed, Assignment and Bill of Sale from ERG Operating Company, Inc. to BreitBurn Energy Company L.P., dated as of October 4, 2004, recorded October 5, 2004 as Instrument No. 2004-0106748, Official Records, County of Santa Barbara, State of California; however, not including in this exclusion the interest of Grantor in (2.) below.

2.  The rights of Grantor herein as Lessor under the following:  (a) Indenture of Lease dated March 14, 1900, which was recorded April 19, 1900 in Book "E" of Leases, Page 460 by and between Juan B. Careaga as Lessor, and A.H. McKay et al., as Lessee, Official Records, County of Santa Barbara, and as extended and amended by Memorandum dated February 8, 1922 and recorded in Book "L" of Leases, Page 461, Official Records, County of Santa Barbara; and (b) that certain Oil and Gas Lease dated October 1, 1954, one copy of the Short Form of which was recorded May 24, 1955 in Book 1316, Page 190, by and between the "Owners" as Lessor, and Shell Oil Company as Lessee, Official Records, County of Santa Barbara (collectively deemed "Leases"), as said Leases are or have been amended or portions quitclaimed of record from time to time.

HN\932900.2

## WORKING INTERESTS AND NET REVENUE INTERESTS
### (Corresponds with Leases identified above)

| LEASE | WI POST 04/01/2012 | NRI POST 04/01/2012 |
|---|---|---|

### HUALDE DOME, EAST COYOTE FIELD

| | | |
|---|---|---|
| A.1. Union Oil Company Acquisition | Not less than 37.62% | Not less than an average of 30.00%# |
| A.2. Texaco (TEPI) Acquisition | Not less than 37.62% | Not less than an average of 30.00%*# |
| A.3. Union Oil Company Property | Not less than 37.62% | Not less than an average of 30.00% |
| A.4. Union Oil Company Property | Not less than 37.62% | Not less than an average of 30.00% |

*Texaco Stern Mineral Lease is subject to the rights of Transamerica Development Company with respect to ½ of 32% of net profits.
#All WI/NRIs given are for non-Unit production only; Unit production is shown below as A.5.

| | | |
|---|---|---|
| A.5 Hualde Dome Unit | Not less than an average of 37.62% | Not less than an average of 34.75%+ |

+Subject to tract participation of Leases in A.1 and A.2. and allocation to Unit.

### SAWTELLE FIELD

| | | |
|---|---|---|
| B.1.a Dowlen Federal (Primary) | Not less than 37.62% | Not less than an average of 27.47%+ |
| B.1.a. Dowlen Federal (DF-15 Boundary Area)* | Not less than 35.00% | Not less than an average of 26.00% |

*Area is located within the Dowlen Federal Lease and subject to the noted Assignment by and between Grantor and Trio Petroleum LLC.

| | | |
|---|---|---|
| B.1.a. DF-15 Well Assets (plus replacements) | Not less than 95.00% | Not less than an average of 70.00% |

| | | |
|---|---|---|
| B.1.b. CARI 1956 Protective Lease | Not less than 37.50% | Not less than an average of 29.31%+ |

[As to Parcel A in said Lease only; See "Sawtelle Field-Unit 1" below for Parcel B in said Lease.]

| | | |
|---|---|---|
| B.2.a.-c. Sawtelle Field-Unit 1 | Not less than an average of 37.62% | Not less than an average of 28.91%+ |

[Includes various Private Party Leases, the additional Sawtelle Extension Leases and Parcel B of the CARI 1956 Protective Lease.]

| | | |
|---|---|---|
| B.2.a.-c. Sawtelle Extension Area | Not less than an average of 37.50% | Not less than an average of 29.76% |

[Includes various Private Party Leases.]

+The represented NRIs do not include the effects of any existing net profits interests or advance royalty burdens against the NRI of the Leases, Subject Wells or Subject Interests.

Exhibit A

HN\932900.2

| **LEASE** | **WI POST 04/01/2012** | **NRI POST 04/01/2012** |
|---|---|---|
| **WEST PICO AREA** | | |
| C.1.- 2. <u>West Pico Area Unit</u> | Not less than an average of 98.00% | Not less than an average of 81.00% |
| C.2.c. "<u>Stocker JV</u>" | Not less than 49.00% | Not less than an average of 40.00% |
| **ORCUTT FIELD** | | |
| D.1.  <u>Former ERG Properties</u>: | Not less than 100% | Not less than an average of 80% |
| <u>EXCEPT:</u> | | |
| <u>California Coast Lease</u> (non-Unit)*<br>*Lease held jointly with Tandem Oil Company. | Not less than 50.00% | Not less than an average of 36.00% |
| <u>Orcutt Third Zone Unit</u>*<br>*PCEC, Operator; Tandem Oil Company, Non-Operator. | Not less than an average of 70.00% | Not less than an average of 50.00% |
| D.2.(a) and (b) | No WI owned. | Not less than an average of 0.5% |

Exhibit A

**EXHIBIT B-1**

ATTACHED TO AND MADE A PART OF THAT
CERTAIN CONVEYANCE OF NET PROFITS INTERESTS
AND OVERRIDING ROYALTY INTEREST
DATED AS OF APRIL 1, 2012

AFEs (DEVELOPED PROPERTIES)

| Field | Project Name | Description | Category | Date | AFE #'s |
|-------|-------------|-------------|----------|------|---------|
| East Coyote | EAST COYOTE MAN CAPEX | Upgrade PDP #1 and #3 Drives | Facilities | * | PC1124015 |
| East Coyote | EAST COYOTE MAN CAPEX | Purchase EZ-GO Work Horse | Non Rate Generating | * | PC1129004 |
| Orcutt | PINAL 20 PUMPING UNIT UPGRADE | Upgrade & Optimize | Rate Generating | * | C1124002 |
| Orcutt | PINAL 23 PUMPING UNIT UPGRADE | Upgrade & Optimize | Rate Generating | * | C1124003 |
| Orcutt | ELECTRIFICATION 2012 (3 Wells) | SQUIRES 28 OPTIMIZE (Convert to ESP) | Rate Generating | * | C1123027 |
| Orcutt | ELECTRIFICATION 2012 (3 Wells) | NEWLOVE 65 OPTIMIZE (Convert to ESP) | Rate Generating | * | C1123028 |
| Orcutt | ELECTRIFICATION 2012 (3 Wells) | NEWLOVE 73 OPTIMIZE (Convert to ESP) | Rate Generating | * | C1123029 |
| Orcutt | ORCUTT MAN CAPEX | Portable Light Stands and Generators | Discretionary | * | C1121022 |
| Orcutt | ORCUTT MAN CAPEX | Bobtail + Tractor for Weed Control (2) | Discretionary | * | C1129006 |
| Orcutt | ORCUTT MAN CAPEX | Replace Power Lines to Picnic Grounds | Discretionary | * | C1124012 |
| Orcutt | ORCUTT MAN CAPEX | Elec Upgrade Squires/Hartnell AWT+Alarm | Discretionary | * | C1124011 |
| Orcutt | ORCUTT MAN CAPEX | NL Transfer Pump VSDs (2) | Discretionary | * | C1123015 |
| Orcutt | ORCUTT MAN CAPEX | O/H k5/k6 Compressors | Discretionary | * | C1124014 |
| Orcutt | ORCUTT MAN CAPEX | 1 GOS + 1 HP Test Meter | Facilities | * | C1124018 |
| Orcutt | ORCUTT MAN CAPEX | 3 GOS + 3 HP Meters | Facilities | * | C1124018 |
| Orcutt | ORCUTT MAN CAPEX | REDA Variable Speed Drive for SLB ESPs | Facilities | * | C1123009 |

Exhibit B-1

| Field | Project Name | Description | Category | Date | AFE #'s |
|---|---|---|---|---|---|
| Orcutt | ORCUTT MAN CAPEX | Transformer Reconditioning (11) | Facilities | * | C1124016 |
| Orcutt | ORCUTT MAN CAPEX | Purchase A-frame Truck (2011) | Non Rate Generating | * | C1129005 |
| Orcutt | ORCUTT MAN CAPEX | Pump off controller SPOC (2011) | Non Rate Generating | * | C1123016 |
| Orcutt Diatomite | ORC DIA MAN CAP PDP | Increase Stock Holdings for Diatomite | Non Rate Generating | * | C1124008 |
| Orcutt Diatomite | ORC DIA MAN CAP PDP | Vac Truck | Non Rate Generating | * | C1129002 |
| Orcutt Diatomite | ORC DIA MAN CAP PDP | Seep Pumps (10 OH) | Non Rate Generating | * | C1124009 |
| West Pico | WEST PICO MAN CAPEX | Fork Lift | Facilities | * | C1129001 |
| West Pico | WEST PICO MAN CAPEX | Gas Odorant Vessel Upgrade | Facilities | * | C112482 |
| West Pico | WEST PICO MAN CAPEX | GC Room Storage System | Facilities | * | C1124007 |
| West Pico | WEST PICO MAN CAPEX | Rig Cellar Plates | Facilities | * | C1124004 |
| West Pico | WEST PICO MAN CAPEX | Rig Vaccuum System/Mud System Upgrade | Facilities | * | C1124001 |
| West Pico | WEST PICO MAN CAPEX | Spare HRP Unit | Non Rate Generating | * | C1124006 |

*To the extent scheduled to be spent prior to April 1, 2012 in the NSA Reserve Report for Year-End 2011

Exhibit B-1

## EXHIBIT B-2

ATTACHED TO AND MADE A PART OF THAT
CERTAIN CONVEYANCE OF NET PROFITS INTERESTS
AND OVERRIDING ROYALTY INTEREST
DATED AS OF APRIL 1, 2012

AFEs (REMAINING PROPERTIES)

| Field | Project Name | Description | Category | Date | AFE #'s |
|-------|-------------|-------------|----------|------|---------|
| Orcutt Diatomite | MOD 2 LOC 15 - 52 DRILL WELLS | Drill 14 wells in Q1 (38 drill wells total) | Development | * | C1122026T |
| Orcutt Diatomite | MOD 02 FACILITIES | Engineering / Design | Development | * | C111419 |
| Orcutt Diatomite | MOD 02 FACILITIES | Follow on Engineering | Development | * | C111462 |
| Orcutt Diatomite | MOD 02 FACILITIES | ICSS | Development | * | C111459 |
| Orcutt Diatomite | MOD 02 FACILITIES | Construction Contract | Development | * | C111456 |
| Orcutt Diatomite | MOD 02 FACILITIES | Site Prep & Civil Works | Development | * | C211449 |
| Orcutt Diatomite | MOD 02 FACILITIES | Long Lead P1 | Development | * | C111466 |
| Orcutt Diatomite | MOD 02 FACILITIES | Long Lead P2 | Development | * | C111461 |
| Orcutt Diatomite | MOD 02 FACILITIES | Long Lead P3 | Development | * | C111221 |
| Orcutt Diatomite | MOD 02 FACILITIES | IPMT/PreOps/EHS | Development | * | C111463 |
| Orcutt Diatomite | MOD 02 FACILITIES | Contingency | Development | * | C111457 |
| Orcutt Diatomite | MOD 02 FACILITIES | Spare Parts | Development | * | C111458 |

HN\932900.2

| Orcutt Diatomite | MOD 03 FACILITIES (FEL - Mod 3 and beyond prep Q1) | Module 03 Southern Expansion Environemental Studies | Facilities | * | C2124024 |
|---|---|---|---|---|---|
| Orcutt Diatomite | MOD 03 FACILITIES (FEL - Mod 3 and beyond prep Q1) | Module 03 Southern Expansion Engineering Design | Facilities | * | C2124025 |
| West Pico | PIPELINE AT WEST PICO | Pipeline Project | Rate Generating | * | C1124017 |

*To the extent scheduled to be spent prior to April 1, 2012 in the NSA Reserve Report for Year-End 2011

Exhibit B-2

HN\932900.2

# EXHIBIT C

ATTACHED TO AND MADE A PART OF THAT
CERTAIN CONVEYANCE OF NET PROFITS INTERESTS
AND OVERRIDING ROYALTY INTEREST
DATED AS OF APRIL 1, 2012

EXISTING HEDGES

| Commodity | Counterparty | Instrument | Quantity (bbls/d) | Pricing ($/bbl) | Effective Date | Termination Date |
|---|---|---|---|---|---|---|
| Oil - Brent IPE | Wells Fargo | Swap | 2000 bbls/d | $115.00 | 4/01/2012 | 3/31/2014 |

Exhibit C

**EXHIBIT D**

ATTACHED TO AND MADE A PART OF THAT
CERTAIN CONVEYANCE OF NET PROFITS INTERESTS
AND OVERRIDING ROYALTY INTEREST
DATED AS OF APRIL 1, 2012

DEVELOPED PROPERTIES SUBJECT WELLS

| LOCATION | NAME | API | DEEPEST PRODUCING FORMATION | WI POST-04/01/2012 | NRI POST-04/01/2012 |
|---|---|---|---|---|---|
| East Coyote | Anaheim 43 | 0405904947 | HUALDE | 0.37626263 | 0.31355219 |
| East Coyote | Coyote 2-17 RD1 | 0405904892 | STERN | 0.37626263 | 0.31355219 |
| East Coyote | Coyote 2-19 | 0405904894 | STERN | 0.37626263 | 0.31355219 |
| East Coyote | Coyote 2-24 | 0405904899 | ANAHEIM | 0.37626263 | 0.31355219 |
| East Coyote | Coyote 2-30 | 0405904905 | STERN | 0.37626263 | 0.31355219 |
| East Coyote | Coyote 2-34 | 0405904909 | STERN | 0.37626263 | 0.31355219 |
| East Coyote | Hole 03 | 0405905122 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 18 | 0405905336 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 23 | 0405905340 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 24 | 0405905341 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 25 | 0405905342 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 26 | 0405905343 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 29 | 0405905346 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 32 | 0405905349 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 33 RD1 | 0405905350 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 38 | 0405905355 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 39 | 0405905356 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 41 | 0405905358 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 43 | 0405905360 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 45 RD1 | 0405905362 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 48 | 0405905365 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 49 | 0405905366 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 51 | 0405905368 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 52 | 0405905369 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 54 | 0405905371 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 60 | 0405905376 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 63 RD1 | 0405905379 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 65 | 0405905381 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 66 | 0405905382 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 68 | 0405905383 | STERN | 0.37626263 | 0.37626263 |
| East Coyote | Hole 69 | 0405905384 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 75 | 0405920892 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 80 | 0405921188 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 81 | 0405921189 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 84 | 0405921249 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 86 | 0405921247 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hole 87 | 0405921306 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hualde 40 | 0405921246 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hualde Fee 06 | 0405904958 | ANAHEIM | 0.37626263 | 0.37626263 |

| LOCATION | NAME | API | DEEPEST PRODUCING FORMATION | WI POST- 04/01/2012 | NRI POST- 04/01/2012 |
|---|---|---|---|---|---|
| East Coyote | Hualde Fee 07 RD1 | 0405904959 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hualde Fee 15 | 0405904966 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hualde Fee 21 | 0405904972 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Hualde Fee 28 | 0405904979 | HUALDE | 0.37626263 | 0.37626263 |
| East Coyote | Hualde Fee 41-A | 0405904981 | ANAHEIM | 0.37626263 | 0.37626263 |
| East Coyote | Stern Realty 18 | 0405904999 | ANAHEIM | 0.37626263 | 0.31794192 |
| East Coyote | Stern Realty 24 | 0405905054 | STERN | 0.37626263 | 0.31794192 |
| Orcutt | Ca Coast 01 | 0408300578 | MONTEREY | 0.50000000 | 0.43750000 |
| Orcutt | Ca Coast 02 RD1 | 0408302131 | PT SAL | 0.71580170 | 0.60547470 |
| Orcutt | Ca Coast 03 RD1 | 0408302132 | MONTEREY | 0.71580170 | 0.60547470 |
| Orcutt | Ca Coast 04 RD2 | 0408302133 | PT SAL | 0.71580170 | 0.60547470 |
| Orcutt | Ca Coast 05 RD1 | 0408302134 | MONTEREY | 0.71580170 | 0.60547470 |
| Orcutt | Ca Coast 13 | 0408302141 | PT SAL | 0.71580170 | 0.60547470 |
| Orcutt | Ca Coast 21 | 0408300673 | PT SAL | 0.71580170 | 0.60547470 |
| Orcutt | Ca Coast 22 | 0408302143 | MONTEREY | 0.50000000 | 0.43750000 |
| Orcutt | Ca Coast 23 | 0408302144 | MONTEREY | 0.50000000 | 0.43750000 |
| Orcutt | Ca Coast 26 | 0408321055 | PT SAL | 0.71580170 | 0.60547470 |
| Orcutt | Dome 02 | 0408302146 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Dome 05 | 0408300241 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Dome 07 | 0408302149 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Dome 15 | 0408302154 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Folsom 06 | 0408302161 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Folsom 08 | 0408300243 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Folsom 09 | 0408302162 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Folsom 10 | 0408302163 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Folsom 14 | 0408320453 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Folsom 15 | 0408320502 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Graciosa 03 | 0408302172 | MONTEREY | 1.00000000 | 0.90000000 |
| Orcutt | Graciosa 10 | 0408302179 | MONTEREY | 1.00000000 | 0.90000000 |
| Orcutt | Hartnell 06 RD2 | 0408302193 | MONTEREY | 1.00000000 | 0.82833329 |
| Orcutt | Hartnell 08 | 0408302195 | MONTEREY | 1.00000000 | 0.82833329 |
| Orcutt | Hartnell 09 | 0408302196 | MONTEREY | 1.00000000 | 0.82833329 |
| Orcutt | Hartnell 10 | 0408302197 | MONTEREY | 1.00000000 | 0.82833329 |
| Orcutt | Hartnell 14 | 0408320623 | MONTEREY | 1.00000000 | 0.82833329 |
| Orcutt | Hartnell 17 | 0408320682 | MONTEREY | 1.00000000 | 0.82833329 |
| Orcutt | Hobbs 07 | 0408302205 | MONTEREY | 1.00000000 | 0.99500000 |
| Orcutt | Hobbs 13 | 0408302210 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Hobbs 15 | 0408302212 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Hobbs 18 | 0408320323 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Hobbs 19 | 0408320452 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Hobbs 22 | 0408321255 | PT SAL | 1.00000000 | 0.99500000 |
| Orcutt | Newlove 03 | 0408302267 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 100 | 0408300648 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 104 | 0408320320 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 105 | 0408322227 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 106 | 0408320386 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 108 | 0408321433 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 110 | 0408322212 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 112 | 0408322524 | MONTEREY | 1.00000000 | 1.00000000 |

Exhibit D

| LOCATION | NAME | API | DEEPEST PRODUCING FORMATION | WI POST- 04/01/2012 | NRI POST- 04/01/2012 |
|---|---|---|---|---|---|
| Orcutt | Newlove 17A | 0408321951 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 19 | 0408302278 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 27 | 0408302285 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 02 RD1 | 0408302266 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 300H | 0408322448 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 302 | 0408322425 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 303 | 0408322447 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 304 | 0408322449 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 305H RD 1 | 0408322502 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 306H | 0408322503 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 307H | 0408322506 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 308H | 0408322510 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 309H RD1 | 0408322518 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 310H | 0408322514 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 311H | 0408322519 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 312H | 0408322515 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 313H | 0408322529 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 314H | 0408322531 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 315H | 0408322533 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 316H | 0408322542 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 317H | 0408322543 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 321H | 0408322546 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 322H | 0408322547 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 325H | 0408322545 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 326H | 0408322548 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 328H | 0408322629 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 355I | 0408322520 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove TH-2 | 0408322588 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 36 | 0408302291 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 37 | 0408302292 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 42 | 0408302297 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 48 (RTP) | 0408302303 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 51 | 0408302306 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 52 | 0408302307 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 54 | 0408302308 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 55 | 0408302309 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 56 | 0408302310 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 57 | 0408302311 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 58 | 0408302312 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 62 | 0408302314 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 64 | 0408302316 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 65 | 0408302317 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 68 | 0408302318 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 69 | 0408302319 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 71 | 0408302320 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 72 | 0408302321 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 73 | 0408302322 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 82 | 0408302327 | PT SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 90 | 0408302332 | PT SAL | 1.00000000 | 1.00000000 |

Exhibit D

| LOCATION | NAME | API | DEEPEST PRODUCING FORMATION | WI POST-04/01/2012 | NRI POST-04/01/2012 |
|---|---|---|---|---|---|
| Orcutt | Newlove 92 | 0408302334 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 93 | 0408302335 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 94 | 0408302336 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 95 | 0408302337 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 96 | 0408302338 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Newlove 99 | 0408302340 | SX | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 02 | 0408302343 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 03 | 0408302344 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 07 | 0408301103 | MONTEREY | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 10 | 0408302347 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 20 | 0408302356 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 23 | 0408302358 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 24 | 0408300249 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 31 | 0408300105 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 33 | 0408302363 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Pinal 37 | 0408320385 | PT_SAL | 1.00000000 | 1.00000000 |
| Orcutt | Squires 11 RD1 | 0408302370 | MONTEREY | 1.00000000 | 0.83026659 |
| Orcutt | Squires 14 RD2 | 0408302372 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Monterey AP 6 (SQ14) | 0408302372 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 18 | 0408302375 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Squires 20 | 0408302259 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 21 | 0408302376 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Squires 22 | 0408302377 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Squires 23 | 0408302378 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Monterey AP 4 (SQ23) | 0408302378 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 28 | 0408302380 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 32 (RTP) | 0408302383 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 33 | 0408302384 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 34 (RTP) | 0408302385 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 35 RD1 | 0408302386 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Squires 38 | 0408302387 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Squires 39 | 0408302388 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 40 | 0408302389 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Squires 41 | 0408302390 | PT_SAL | 0.71580170 | 0.60547470 |
| Orcutt | Monterey AP 5 (SQ43) | 0408320079 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 45 (RTP) | 0408320661 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 47 | 0408320722 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt | Squires 48 | 0408322228 | PT_SAL | 1.00000000 | 0.83026659 |
| Orcutt Diatomite | Careaga Seep | 0408322567 | CAREAGA | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 76 RD1 | 0408300075 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 83 | 0408302328 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 206 | 0408322586 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 207 | 0408322585 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 208 | 0408322584 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 209 | 0408322581 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 210 | 0408322582 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 211 | 0408322593 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 212 | 0408322594 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 213 | 0408322595 | DIATOMITE | 1.00000000 | 1.00000000 |

Exhibit D

| LOCATION | NAME | API | DEEPEST PRODUCING FORMATION | WI POST- 04/01/2012 | NRI POST- 04/01/2012 |
|----------|------|-----|------------------------------|---------------------|----------------------|
| Orcutt Diatomite | Newlove 214 | 0408322596 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 216 | 0408322606 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 217 | 0408322607 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 218 | 0408322608 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 219 | 0408322609 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 220 | 0408322610 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 221 | 0408322611 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 222 | 0408322614 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 224 | 0408322616 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 225 | 0408322612 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 226 | 0408322598 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 227 | 0408322617 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 228 | 0408322618 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 229 | 0408322619 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 230 | 0408322620 | DIATOMITE - | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 231 | 0408322621 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 232 | 0408322622 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 235 | 0408322627 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 237 (M02-L03) | 0408322668 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 238 (M02-L05) | 0408322669 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 241 (M02-L01) | 0408322670 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 242 (M02-L09) | 0408322683 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 243 (M02-L02) | 0408322671 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 244 (M02-L04) | 0408322690 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83D | 0408322453 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83E | 0408322455 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83F | 0408322454 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83G | 0408322456 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83J (TBPR) | 0408322457 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83K | 0408322460 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83L | 0408322461 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83M | 0408322458 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83N | 0408322459 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83O | 0408322462 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83P | 0408322463 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83S | 0408322551 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83T | 0408322552 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83U | 0408322553 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 25-83W | 0408322583 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | Newlove 301 | 0408322434 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 06 (NL 252) | 0408322672 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 07 (NL 236) | 0408322643 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 08 (NL 260) | 0408322673 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 10 (NL 2110) | 0408322676 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 11 (NL 2116) | 0408322677 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 12 (NL 2119) | 0408322678 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 13 (NL 2123) | 0408322679 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 14 (NL 2103) | 0408322675 | DIATOMITE | 1.00000000 | 1.00000000 |
| Orcutt Diatomite | MOD 02 LOC 65 (NL 269) | 0408322674 | DIATOMITE | 1.00000000 | 1.00000000 |

Exhibit D

| LOCATION | NAME | API | DEEPEST PRODUCING FORMATION | WI POST-04/01/2012 | NRI POST-04/01/2012 |
|---|---|---|---|---|---|
| Sawtelle | DF02 RD1 | 0403716756 | RANCHO | 0.37626263 | 0.28394863 |
| Sawtelle | DF04 RD1 | 0403716758 | RANCHO | 0.37626263 | 0.28394863 |
| Sawtelle | DF05 | 0403700114 | RANCHO | 0.37626263 | 0.28394863 |
| Sawtelle | DF06 | 0403700126 | RANCHO | 0.37626263 | 0.28394863 |
| Sawtelle | DF07 RD2 | 0403720018 | RANCHO | 0.37626263 | 0.28394863 |
| Sawtelle | DF10 | 0403720358 | RANCHO | 0.37626263 | 0.28394863 |
| Sawtelle | DF12 | 0403720756 | RANCHO | 0.37626263 | 0.30407785 |
| Sawtelle | DF13 | 0403720887 | RANCHO | 0.37626263 | 0.30407785 |
| Sawtelle | DF14 RD3 | 0403723796 | RANCHO | 0.37503763 | ~~0.30726197~~ 0.30794690 |
| Sawtelle | DF15 RD1 | 0403725331 | RANCHO | 0.95000000 | 0.71740540 |
| Sawtelle | SAW 2 | 0403723797 | RANCHO | ~~0.37580171~~ 0.37503763 | ~~0.30332700~~ 0.30595746 |
| Stocker JV | P45A | 0403720729 | HAUSER | 0.49705132 | 0.40923891 |
| Stocker JV | P49A | 0403720769 | HAUSER | 0.49705132 | 0.40923891 |
| Stocker JV | P59D | 0403720946 | HAUSER | 0.49705132 | 0.40923891 |
| West Pico | HW10 RD1 | 0403721994 | HAUSER | 1.00000000 | 0.82333333 |
| West Pico | OW08 RD2 | 0403721211 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | PW9 RD1 | 0403721235 | HAUSER | 1.00000000 | 0.82333333 |
| West Pico | WP02 | 0403700996 | HAUSER | 0.98925682 | 0.81448811 |
| West Pico | WP03 RD1 | 0403700997 | HAUSER | 0.98925682 | 0.81448811 |
| West Pico | WP04 | 0403700998 | HAUSER | 0.98925682 | 0.81448811 |
| West Pico | WP05 | 0403700999 | HAUSER | 0.98925682 | 0.81448811 |
| West Pico | WP06 | 0403701051 | HAUSER | 0.98925682 | 0.81448811 |
| West Pico | WP07 RD5 | 0403700107 | REPETTO | 0.98925682 | 0.81448811 |
| West Pico | WP08 | 0403720013 | REPETTO | 0.98925682 | 0.81448811 |
| West Pico | WP09 (RTP) | 0403720040 | HAUSER | 0.98925682 | 0.81448811 |
| West Pico | WP10 RD1 | 0403720073 | OGDEN | 0.98925682 | 0.81448811 |
| West Pico | WP11 RD2 | 0403720105 | OGDEN | 0.99025681 | 0.81531144 |
| West Pico | WP12 RD1 | 0403720146 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP13 | 0403720189 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP14 | 0403720212 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP15 RD1 | 0403720252 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP17 | 0403720382 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP18 RD4 | 0403720434 | HAUSER | 1.00000000 | 0.82333333 |
| West Pico | WP19 | 0403720510 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP20 RD2 | 0403720552 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP21 RD3 | 0403720554 | HAUSER | 1.00000000 | 0.82333333 |
| West Pico | WP24 RD1 | 0403720886 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP25 | 0403720895 | REPETTO | 0.99025681 | 0.81531144 |
| West Pico | WP27 (RTP) | 0403720950 | REPETTO | 0.99025681 | 0.81531144 |
| West Pico | WP28 RD1 | 0403721006 | REPETTO | 0.99025681 | 0.81531144 |
| West Pico | WP31 | 0403721050 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP32 | 0403721061 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP34 RD1-LA (D4-5) | 0403721087 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP35 | 0403721121 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP36 | 0403721169 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP37 RD1 | 0403721188 | REPETTO | 0.99025681 | 0.81531144 |

Exhibit D

HN\932900.2

| LOCATION | NAME | API | DEEPEST PRODUCING FORMATION | WI POST-04/01/2012 | NRI POST-04/01/2012 |
|---|---|---|---|---|---|
| West Pico | WP39 RD2 | 0403721273 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP40 | 0403721284 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP41 RD4 | 0403721324 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP43 ESP | 0403721392 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP45 RD1 | 0403721996 | HAUSER | 0.99025681 | 0.81531144 |
| West Pico | WP58 | 0403726615 | HAUSER | 1.00000000 | 0.82333333 |
| West Pico | WP59-LA (B1-3) | 0403727133 | HAUSER | 0.98925682 | 0.81448811 |

## DEPTH MARKERS

| Field | Producing Zone | Depth Marker For Bottom of Deepest Producing Formation in Reference Well | Reference Well for Deepest Producing Formation Determination |
|---|---|---|---|
| East Coyote | Hualde | 2795 | Hualde Fee 41-A |
| East Coyote | Anaheim | 4410 | Hole 88 |
| East Coyote | Stern | 7310 | Hole 58 |
| West Pico | Repetto | 5360 MD (-5000 VSS) | WP 08 |
| West Pico | Hauser | 7600 MD (-6378 VSS) | WP 21 |
| West Pico | Ogden | 9250 MD (-7626 VSS) | WP 12 RD1 |
| Orcutt | Diatomite | 690 MD (+543 VSS) | Newlove 76 RD1 |
| Orcutt | Sx | 1270 MD (-88 VSS) | Newlove 301 (formerly 26-77Z) |
| Orcutt | Monterey | 3315 MD ( -2423 VSS) | Squires 43 |
| Orcutt | Pt Sal | 4315 MD (-3567 VSS) | Cal Coast 19 |
| Sawtelle | Rancho | 10432 MD (-9644 VSS) | Dowlen Federal 1 RD3 |

Exhibit D

HN\932900.2

**EXHIBIT E**

ATTACHED TO AND MADE A PART OF THAT
CERTAIN CONVEYANCE OF NET PROFITS INTERESTS
AND OVERRIDING ROYALTY INTEREST
DATED AS OF APRIL 1, 2012

ORI PROPERTIES SUBJECT INTERESTS

## ORCUTT FIELD, SANTA BARBARA COUNTY, CALIFORNIA

a. The properties more particularly described in that certain Deed, Assignment and Bill of Sale from ERG Operating Company, Inc. to BreitBurn Energy Company L.P., dated as of October 4, 2004, recorded October 5, 2004 as Instrument No. 2004-0106748, Official Records, County of Santa Barbara, State of California;

SAVE AND EXCEPT:

    i. All of the right, title and interest conveyed in that certain Quitclaim Deed effective May 1, 2005, by and between BreitBurn Energy Company L.P., as Grantor, and Orcutt Fee LLC, as Grantee, recorded June 29, 2005 as Document No. 2005-0061316, Official Records, County of Santa Barbara, State of California;

    ii. All of the right, title and interest of Grantor in and to the "Orcutt Hill Fresh Water System" acquired by Grantor through and under the Deed, Assignment and Bill of Sale from ERG Operating Company, Inc. to BreitBurn Energy Company L.P., dated as of October 4, 2004, recorded October 5, 2004 as Instrument No. 2004-0106748, Official Records, County of Santa Barbara, State of California, as well as all right, title and interest of Grantor in and to that certain "Water Rights Agreement" dated as of October 4, 2004, and recorded October 5, 2004 as Instrument No. 2004-0106749, Official Records, County of Santa Barbara, State of California;

    iii. All right, title and interest of Grantor in those certain properties described as "Water Well 1" and "Water Well 2" in Exhibit "B" to that certain Deed, Assignment and Bill of Sale from ERG Operating Company, Inc. to BreitBurn Energy Company L.P., dated as of October 4, 2004, recorded October 5, 2004 as Instrument No. 2004-0106748, Official Records, County of Santa Barbara, State of California.

    iv. All right, title and interest of Grantor in, to and under that certain parcel of land more particularly described as follows:

That portion of Parcel 1 in the County of Santa Barbara, State of California, as shown on a Map filed in Book 119, Page 40 of Record of

HN\932900.2

Surveys, Records of said County, said portion containing 2,556 acres, more or less, and particularly described as follows:

Beginning at the most westerly corner of Parcel 1; thence South 88 Degrees 06'12" East 8976.69 feet along the westerly line of said Parcel 1 to an angle point in said line of Parcel 1, also being the True Point of Beginning; thence leaving said westerly line South 88 Degrees 20'06" East 6537.07 feet; thence North 23 Degrees 30'28" West 8926.66 feet, to the northerly line of said Parcel 1; thence North 57 Degrees 11'57" East 5016.47 feet along said northerly line to the southwesterly line of the 101 Highway as described in Grant Deed recorded December 22, 1955 in Book 1352, Page 468 of the Official Records, County of Santa Barbara, State of California; thence along said southwesterly line, the following five (5) courses:   South 34 Degrees 09'46" East 1154.27 feet; thence South 30 Degrees 47'17" East 251.26 feet; thence South 37 Degrees 06'47" East 418.80 feet; thence South 35 Degrees 39'17" East 6080.57 feet; thence South 36 Degrees 36'18" West 333.40 feet to the westerly line of said Parcel 1; thence South 03 Degrees 05'30" West 7617.90 feet to the southerly line of Parcel 1; thence along the southerly line of said Parcel 1 the following eight (8) courses: North 88 Degrees 21'00" West 3329.33 feet; thence South 61 Degrees 03'38" West 2570.44 feet; thence South 12 Degrees 03'10" West 893.10 feet; thence North 59 Degrees 00'20" West 2403.21 feet; thence South 55 Degrees 33'13" West 1464.29 feet; thence North 84 Degrees 50'42" West 1604.34 feet; thence South 58 Degrees 22'22" West 498.14 feet; thence North 43 Degrees 07'22" West 938.56 feet to the westerly line of said Parcel 1; thence North 01 Degrees 45'46" East 4653.34 feet along said westerly line to the True Point of Beginning [Portion of Newlove Fee Simple (mins)/Portion Careaga Mineral Fee]; and

v.   All right, title and interest of Grantor in all oil, gas and other hydrocarbon substances and minerals on, in, under and that may be extracted, produced and saved from that certain property described as "Careaga Mineral Fee" in Exhibit "B" to that certain Deed, Assignment and Bill of Sale from ERG Operating Company, Inc. to BreitBurn Energy Company L.P., dated as of October 4, 2004, recorded October 5, 2004 as Instrument No. 2004-0106748, Official Records, County of Santa Barbara, State of California; however, not including in this exclusion the interest of Grantor in (b.) below.

b.   The rights of Grantor herein as Lessor under the following:  (a) Indenture of Lease dated March 14, 1900, which was recorded April 19, 1900 in Book "E" of Leases, Page 460 by and between Juan B. Careaga as Lessor, and A.H. McKay et al., as Lessee, Official Records, County of Santa Barbara, and as extended and amended by Memorandum dated February 8, 1922 and recorded in Book "L" of Leases, Page 461, Official Records, County of Santa Barbara; and (b) that certain Oil and Gas Lease dated October 1, 1954, one copy of the Short Form of which was recorded May 24, 1955 in Book 1316, Page

Exhibit E

HN\932900.2

190, by and between the "Owners" as Lessor, and Shell Oil Company as Lessee, Official Records, County of Santa Barbara (collectively deemed "Leases"), as said Leases are or have been amended or portions quitclaimed of record from time to time.

Exhibit E

1

2

## <u>PROOF OF SERVICE</u>

3    I am employed in Los Angeles County, California.  I am over the age of
4 eighteen years and not a party to the within-entitled action.  My business address is
5 11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA  90025-0509.  On August
27, 2020, I served a copy of the within document(s): **DECLARATION OF SASHE**
6 **D. DIMITROFF IN SUPPORT OF DEFENDANT PACIFIC COAST ENERGY**
**COMPANY LP'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT, OR**
7 **ALTERNATIVELY, COMPEL ARBITRATION**

8   ☐   by placing the document(s) listed above in a sealed envelope with postage
thereon fully prepaid, the United States mail at Los Angeles, California
9       addressed as set forth below.  I am readily familiar with the firm's practice of
collection and processing correspondence for mailing.  Under that practice it
10      would be deposited with the U.S. Postal Service on that same day with postage
thereon fully prepaid in the ordinary course of business.  I am aware that on
11      motion of the party served, service is presumed invalid if postal cancellation
date or postage meter date is more than one day after date of deposit for mailing
12      in affidavit.

13   ☐   by placing the document(s) listed above in a sealed envelope and affixing a
pre-paid air bill in the care and custody of **Golden State Overnight**, and
14      causing the envelope to be delivered to a **Golden State Overnight** agent for
delivery on the next business day.

15
☐   by transmitting via electronic mail the document(s) listed above to the e-mail
16      address(es) set forth below on this date and the transmission was reported as
complete and without error.

17
☒   by transmitting via e-mail or electronic transmission the document(s) listed
18      above to the person(s) at the e-mail address(es) set forth below.

19 | | |
|---|---|
| John T. Jasnoch<br>**SCOTT + SCOTT**<br>  **ATTORNEYS AT LAW**<br>600 W. Broadway, Suite 3300<br>San Diego, CA 92101<br>Telephone:  619.233.4565<br>Facsimile:   619.233.0508<br>Email:      jjasnoch@scott-scott.com<br><br>*Attorney for Plaintiff*<br>EVERGREEN CAPITAL<br>MANAGEMENT LLC | Thomas L. Laughlin, IV<br>Jing-Li Yu<br>**SCOTT + SCOTT**<br>  **ATTORNEYS AT LAW**<br>The Helmsley Building<br>230 Park Avenue, 17th Floor<br>New York, NY 10169<br>Tel:    (212) 233-6444<br>Fax:   (212) 233-6334<br>Email:  tlaughlin@scott-scott.com<br>        jyu@scott-scott.com<br><br>*Attorneys for Plaintiff*<br>EVERGREEN CAPITAL<br>MANAGEMENT LLC |

27

28

1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1        I declare under penalty of perjury under the laws of the United States of

2   America that the above is true and correct.  Executed on August 27, 2020, at

3   Los Angeles, California.

4                                                  */s/ Laura Hua*

                                             Laura Hua

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -